STATE OF NEBRASKA, APPELLEE, V. CHARLES JESS PALMER, ALSO
KNOWN AS CHARLES TINSLEY, ALSO KNOWN AS J.R. KIRKPATRICK,
APPELLANT.

399 N.W.2d 706

Filed December 29, 1986.   No. 84-733.

John A. Wolf and David A. Bush, for appellant.

Charles Jess Palmer, pro se.

Robert M. Spire, Attorney General, and J. Kirk Brown, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ., and BLUE, D.J.

PER CURIAM.

The defendant, Charles Jess Palmer, appeals from a jury verdict finding him guilty of felony murder under Neb. Rev. Stat. § 28-303(2) (Reissue 1985), and from a sentence imposed by a three-judge court ordering Palmer to be executed for the crime in accordance with the provisions of Neb. Rev. Stat. §§ 29-2521 et seq. (Reissue 1985). This case has twice before

been to this court. See, *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648 (1981) (*Palmer I*); *State v. Palmer*, 215 Neb. 273, 338 N.W.2d 281 (1983) (*Palmer II*). The relevant facts are as follows.

From August of 1977 to the time of the murder, the defendant and his wife lived and worked near Guide Rock, Nebraska. Their son, Jess, was born July 4, 1978. The victim, Eugene Zimmerman, operated a coin shop in his home in Grand Island, Nebraska.

The Palmers' first contact with the victim occurred in October of 1978. Mrs. Palmer telephoned Zimmerman and arranged a meeting. The Palmers intended to offer coins and silver objects for sale. The Palmers, with their baby, drove to the Zimmerman house, and the defendant waited in the truck while Mrs. Palmer negotiated the sale. In late December of 1978 Mrs. Palmer called Zimmerman and offered to sell additional coins and silver. On this occasion the defendant and the baby accompanied Mrs. Palmer into the Zimmerman residence. In late February of 1979 all three again went into the residence while Mrs. Palmer sold Zimmerman some silver baby spoons. When she asked him if he would be interested in buying two or three gold wedding bands, Zimmerman responded that he would. On March 5, 1979, Mrs. Palmer returned to sell Zimmerman the wedding rings. The defendant accompanied her into the house and walked around the office and the parlor adjacent to the business area while Mrs. Palmer conducted business. Mrs. Palmer asked Zimmerman if he would be interested in buying two antique rings. He replied that he would look at them, and arranged a meeting for the next afternoon.

On March 6, 1979, the day of the murder, the defendant, Mrs. Palmer, and their baby arrived at the Zimmerman house between 3 and 3:30 p.m. Zimmerman examined the rings and showed Mrs. Palmer how he could tell that her stones were imitation rather than real. He told her he would buy the settings from her if a test proved they were gold. Zimmerman rose from his desk, turned around, and picked a jar of solution from the cabinet. According to Mrs. Palmer, the defendant suddenly lunged at the victim while his back was turned and struck the victim's face. Zimmerman's glasses were dislodged. Defendant

and Zimmerman struggled, Zimmerman was thrown to the floor, and defendant demanded money from him. The evidence shows that, at the time, defendant was 40 years old, 6 feet 7 inches tall, and weighed approximately 245 pounds; the victim was 59 years old, 5 feet 11 inches tall, and weighed approximately 135 pounds. Zimmerman's face was bleeding. The defendant bound Zimmerman's hands, lifted him to his feet, and forced him up the stairs. Mrs. Palmer testified that the defendant remained upstairs alone with the victim for 15 minutes before she was to come upstairs. Upon entering the bedroom, she saw Zimmerman lying on a bed, his hands and feet tied. The defendant proceeded to search the upstairs. He told Mrs. Palmer to watch Zimmerman. The defendant then went downstairs and remained there for 20 minutes. During this time, the victim complained to Mrs. Palmer of stomach pain, and asked, "Why are you doing this to me?" Zimmerman then asked Mrs. Palmer to get him some medicine from his bathroom, which she did.

The defendant went back upstairs, wearing gloves, and sent Mrs. Palmer downstairs. She waited downstairs for him for 15 minutes, and testified that during this time she heard noises upstairs: "There was a — a lot of thumping noises. Thump, thump, thump, thump, and there was some kind of a — a guttural noise. I kept hearing a — a low, monotonous, almost a chant-like sound. A very deep and very throaty guttural type over and over, again." When the defendant returned downstairs around 4:30 p.m., the defendant, Mrs. Palmer, and the baby left, this being approximately 1 hour after they had arrived at the Zimmerman residence.

On March 7, 1979, the Palmers rented a storage unit in Hastings, Nebraska. After packing and making arrangements to have their employer's animals cared for, they left for Austin, Texas, approximately 2 weeks after the incident. Mrs. Palmer testified that the items stolen from the coin shop were placed in a diaper bag and accompanied them to Austin.

In Austin the defendant, using the name J.R. Kirkpatrick, contacted a coin dealer named Jesse Garza and sold him coins and jewelry. A few days later, Garza read a trade journal which covered the Zimmerman robbery and murder and cataloged the

stolen items. Garza recognized that several of the items he bought from the defendant were on the list, and called the police. When the defendant contacted Garza again, Garza arranged to meet him at an airport restaurant, where the police arrested defendant on March 27, 1979.

The victim's wife, Monica Zimmerman, returned home around 5 p.m. on March 6, 1979, and discovered that the coin shop had been looted. She called the police. The victim's body was found upstairs, with an electrical cord tied tightly around the neck, and coins, jewelry, money, and other valuables were discovered to be missing. A pathologist testified that the victim had a bruise below his left collarbone, a bruise over the right cheekbone, a bruised left eyebrow and eyelid, a scratch on the left side of his nose and under his left jaw, and a cut on his left temporal area. Those injuries preceded death. Mr. Zimmerman's windpipe and voice box were broken and evidenced bleeding. The time of death was fixed at 4:30; the cause of death was strangulation. In explaining the presence of the cuts, bruises, and abrasions, the pathologist testified that there were two possibilities: "One, if the head were thrown several times against an unyielding object or that the head received a blow in a number of different areas from one or more blunt objects."

The sentencing panel found that no mitigating circumstance existed to affect defendant's sentence, but found beyond a reasonable doubt that two statutory aggravating circumstances existed, namely, (1) that the murder was committed in an apparent effort to conceal defendant's identity as the perpetrator of the robbery, and (2) that while Zimmerman's murder was not "especially heinous, atrocious, cruel," it "manifested exceptional depravity by ordinary standards of morality and intelligence." § 29-2523(1)(b) and (d).

In each of the three trials, the State introduced circumstantial evidence tending to implicate defendant in the crime. In the first trial three witnesses who had undergone hypnosis were allowed to testify, leading this court to reverse and remand. See *Palmer I.* In the second and third trials the deceased's widow, Monica Zimmerman, was permitted to testify, although the trial judge limited the subject matter of her testimony. Additionally, in the

second and third trials Cherie Palmer was allowed to testify against her husband. It was her testimony in the second trial which we found to be contrary to the provisions of Neb. Rev. Stat. § 27-505 (Reissue 1979), and we accordingly set aside the conviction and remanded the cause for a third trial.

After our opinion in *Palmer II* was released, but before the third trial in this case was held, the Nebraska Legislature amended § 27-505, eliminating the provision which precluded one spouse from testifying against another in a criminal case except in limited circumstances not applicable to the instant case. See 1984 Neb. Laws, L.B. 696.

Defendant's counsel have filed a brief in this court alleging that some 27 errors were committed during the third trial, any one of which would entitle defendant to an order of this court reversing the decision and setting aside the sentence. Additionally, defendant has filed a pro se brief in which he has raised five specific assignments of error, all of which are essentially covered by his counsel's brief. These 32 assignments of error can be rephrased and reduced to 8, without in any way ignoring any issues raised by either defendant's counsel or defendant himself. These rephrased assignments are as follows: (1) That the evidence adduced at the trial during its various stages is insufficient to support the verdict. (2) That the action of the Legislature in amending § 27-505 with the passage of L.B. 696 is prohibited by the ex post facto clauses of both the U.S. and Nebraska Constitutions and that the trial court erred in permitting Cherie Palmer to testify against defendant. (3) That requiring defendant to stand trial a third time constituted placing him in double jeopardy, in violation of his federal constitutional rights. (4) That the district court erred in permitting Monica Zimmerman to testify regarding matters covered during her pretrial hypnotic interview. (5) That the district court erred in overruling defendant's motion to suppress the use of pretrial and in-court identifications of him. (6) That the district court erred in overruling defendant's motion to dismiss on the ground that he had been deprived of his right to a speedy trial under both Nebraska statute and the sixth amendment to the U.S. Constitution. (7) That the district court erred in overruling defendant's motion to suppress evidence

obtained from him at the time of his arrest in Austin, Texas. (8) That the district court erred in sentencing defendant to death. We shall discuss these issues in the order listed above.

(1) Sufficiency of the Evidence.

Defendant's first argument is that taking the evidence as a whole, it was insufficient to support the verdict finding him guilty of felony murder. When the evidence adduced at the trial is considered, the first assignment must be quickly overruled. To begin with, a person charged in a criminal case may be convicted on the basis of circumstantial evidence. See *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981). Furthermore, in determining the sufficiency of the evidence to sustain a conviction in a criminal prosecution, it is not the province of the Nebraska Supreme Court to resolve conflicts in the evidence, pass upon the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence, as such matters are for the jury. The verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. See, *State v. Wilkening*, 222 Neb. 107, 382 N.W.2d 340 (1986); *State v. Kakela*, 218 Neb. 843, 359 N.W.2d 786 (1984); *State v. Schroder*, 218 Neb. 860, 359 N.W.2d 799 (1984). The evidence, when viewed in light of these rules, is more than sufficient to justify the case's being submitted to the jury and more than sufficient for the jury to find the defendant guilty of felony murder. Therefore, unless some other error is found, the decision of the jury finding defendant guilty of felony murder must be affirmed.

(2) Amendment of § 27-505 and Cherie Palmer's testimony.

As we have already noted, in *Palmer II* this court held that § 27-505, as it was then constituted, prohibited Cherie Palmer from testifying against her husband. At that time § 27-505 provided as follows:

> (1) Neither husband nor wife can be examined in any case as to any confidential communication made by one to the other while married, nor shall they after the marriage relation ceases to [sic] be permitted to reveal in testimony any such communication while the marriage subsisted except as otherwise provided by law. This privilege may be waived only with the consent of both spouses. After the

death of one, it may be waived by the survivor.

(2) During the existence of the marriage, a husband and wife can in no criminal case be a witness against the other. This privilege may be waived only with the consent of both spouses.

(3) These privileges may not be claimed:

(a) In any criminal case where the crime charged is rape, adultery, bigamy, incest . . . .

Following our decision in *Palmer II* and before the subject trial, the Nebraska Legislature amended § 27-505, and in particular amended subsection (3) to provide as follows: "These privileges may not be claimed: (a) In any criminal case where the crime charged is a crime of violence, bigamy, incest . . . ." See § 27-505 (Reissue 1985). While defendant raises some issue as to the meaning of the amendment (a matter which we will later discuss), it nevertheless appears fairly clear that unless by adopting L.B. 696 and amending § 27-505, the Nebraska Legislature has adopted an ex post facto law and thereby violated defendant's constitutional rights, Mrs. Palmer was properly permitted to testify.

Both U.S. Const. art. I, § 10, and Neb. Const. art. I, § 16, clearly provide that no ex post facto law may be passed. What is not so clear, however, is what constitutes an ex post facto law.

The Latin phrase "ex post facto" means literally "a thing done afterward." Webster's Third New International Dictionary, Unabridged 802 (1981). In a general sense an ex post facto law is one which "renders an act punishable in the manner in which it was not punishable when it was committed." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 138, 3 L. Ed. 162 (1810). The traditional justification for prohibiting retroactive laws is that such laws "are contrary to the first principles of the social compact, and to every principle of sound legislation." The Federalist No. 44, at 349 (J. Madison) (J. Hamilton ed. 1882). At first blush this would seem to prohibit anything from being done after an act is committed.

However, an examination of the history as it relates to the doctrine of ex post facto and the cases which have been decided from the earliest of times leads to the conclusion that not all retroactive legislation is in violation of the prohibition against

ex post facto laws. The clause, as it has been interpreted, applies principally, if not exclusively, to criminal laws or laws impacting criminal prosecutions. See *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798). The most frequently stated rendition of the ex post facto prohibition is that a legislature may not enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed . . . ." *Cummings v. The State of Missouri*, 71 U.S. (4 Wall.) 277, 325-26, 18 L. Ed. 356 (1867). Approximately a decade after the ratification of the Constitution, the U.S. Supreme Court was called upon to construe the ex post facto clause. See *Calder v. Bull, supra.* In doing so the U.S. Supreme Court held that a Connecticut resolution setting aside the decree of the probate court and granting a right of appeal where one had not previously existed did not offend the ex post facto clause. This ruling was somewhat modified by a later decision in *Kring v. Missouri*, 107 U.S. 221, 2 S. Ct. 443, 27 L. Ed. 506 (1883). The case most relevant, however, to the instant case is the case of *Hopt v. Utah*, 110 U.S. 574, 4 S. Ct. 202, 28 L. Ed. 262 (1884). Hopt was charged with first degree murder. At the time the crime was committed, the Utah criminal procedure act prohibited the admission of testimony of convicted felons. Prior to trial, the Utah Legislature repealed that provision, thereby removing any obstacle to the competency of convicted felons. At trial Emerson, a previously convicted accomplice, was allowed to testify. Following conviction, an appeal was ultimately taken to the U.S. Supreme Court. The Court held that the repeal of the felon competency rule after the commission of the offense but before trial was not an ex post facto law.

After discussing *Kring, supra*, the Court noted that Kring had been deprived of a substantial right possessed by him at the time the offense was committed. The Court went on to distinguish Hopt's situation, noting:

> But there are no such features in the case before us. Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach

criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.

The crime for which the present defendant was indicted, the punishment prescribed therefor, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would authorize conviction upon less proof, in amount or degree, than was required when the offence was committed, might, in respect of that offence, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offence charged.

*Hopt v. Utah, supra* at 589-90.

Similarly, in the instant case nothing done by the Legislature in amending § 27-505 created any criminal act, nor altered the standard of proof necessary for conviction, nor altered the punishment prescribed for committing the crime. The decision in *Hopt, supra,* is wholly consistent with our holdings in this jurisdiction to the effect that no one has a vested right in a procedure and that procedural matters can be changed at any time before trial and are binding on the defendant. See, *State v.*

*Shiffbauer*, 197 Neb. 805, 251 N.W.2d 359 (1977); *Durousseau v. Nebraska State Racing Commission*, 194 Neb. 288, 231 N.W.2d 566 (1975).

The holding in *Hopt, supra*, was further affirmed by the U.S. Supreme Court decision in *Thompson v. Missouri*, 171 U.S. 380, 18 S. Ct. 922, 43 L. Ed. 204 (1898). *Thompson* was a case very similar to the case at bar. Thompson was charged with first degree murder. After conviction the Missouri Supreme Court reversed, holding the admission of certain writing samples for comparative purposes to be prejudicial error. Prior to his retrial, the Missouri Legislature enacted a statute allowing admission of such evidence. The same samples were then admitted in the second trial. Thompson was convicted, and the Missouri Supreme Court upheld the conviction.

On appeal the U.S. Supreme Court held that the subsequent legislative change of the rules of evidence regarding writing samples for comparative purposes did not violate the ex post facto prohibition of the federal Constitution. The Court admitted that a number of cases containing language supporting Thompson's "ex post facto" argument could be found, but, "[a]pplying the principles announced in former cases—without attaching undue weight to general expressions in them that go beyond the questions necessary to be determined," 171 U.S. at 386, the U.S. Supreme Court held that the rights abrogated were not substantial enough to render retroactive application of the statute unconstitutional. In doing so the Court said at 387:

> If persons excluded, upon grounds of public policy, at the time of the commission of an offence, from testifying as witnesses for or against the accused, may, in virtue of a statute, become competent to testify, we cannot perceive any ground upon which to hold a statute to be *ex post facto* which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offence was committed.

Four states have previously considered whether a change in the marital privilege statutes constitutes an ex post facto law,

and in each instance determined that it does not. See, *Huckaby v. State*, 262 Ark. 413, 557 S.W.2d 875 (1977); *State v. Clevenger*, 69 Wash. 2d 136, 417 P.2d 626 (1966); *Ritchey v. State*, 407 S.W.2d 506 (Tex. Crim. 1966); *Wester v. The State*, 142 Ala. 56, 38 So. 1010 (1905).

As part of his "ex post facto" argument, defendant raises two other related issues. He maintains that, in any event, L.B. 696 is unconstitutionally vague because there is no definition of "crime of violence." Furthermore, he argues that the exceptions adopted by L.B. 696 apply only in cases where the spouse or child is the other party.

The vagueness argument is controlled by the rule that in the absence of anything indicating the contrary, statutory language is to be given its plain and ordinary meaning. *State v. Carlson*, 223 Neb. 874, 394 N.W.2d 669 (1986). By that standard a "crime" is an act or omission for which one is subject to punishment by public authority. See Webster's Third New International Dictionary, Unabridged 536 (1981). By that same standard "violence" is the exertion of physical force so as to injure or abuse. *Id.* at 2554. Thus, "crime of violence" is an act which injures or abuses through the use of physical force and which subjects the actor to punishment by public authority. This court has said that robbery is a crime of violence. *Draper v. Sigler*, 177 Neb. 726, 131 N.W.2d 131 (1964). Certainly, then, murder is a crime of violence. *Com. v. Ferrer*, 283 Pa. Super. 21, 423 A.2d 423 (1980); *People v. Manns*, 12 Mich. App. 543, 163 N.W.2d 232 (1968). Accordingly, L.B. 696 is not vague.

Defendant's argument regarding the application of L.B. 696 is that the crimes described in § 27-505 apply only to cases where one spouse commits a crime against the other spouse. Therefore, according to him, L.B. 696 applies only where one spouse commits a crime of violence against the other spouse. We do not read either the history of the amendment nor the language itself to so limit § 27-505 as amended by L.B. 696. The clear meaning of the statute is that the privilege may not be claimed where the crime charged is "a crime of violence, bigamy, incest, *or* any crime committed by one against the person or property of the other." (Emphasis supplied.) Defendant's argument flies in the face of the clear meaning of

the statute. If defendant's argument were correct, there would have been no need for the enumeration of not only crimes of violence but those of bigamy and incest as well, crimes which cannot be committed except by one spouse against the other or upon some other member of the family. Nothing within L.B. 696, as it amended § 27-505, limits crimes of violence to acts committed by one spouse against the other spouse. The words are clear and require no interpretation. We have consistently held that where the language of a statute is plain and unambiguous, no interpretation is needed, and a court is without authority to change such language. See *Palmer II*. See, also, *Kellogg Company v. Herrington*, 216 Neb. 138, 343 N.W.2d 326 (1984); *State v. Schneckloth, Koger, and Heathman*, 210 Neb. 144, 313 N.W.2d 438 (1981). L.B. 696, as it amended § 27-505, is clear and unambiguous and applies to all crimes of violence, regardless of who the victim may be. This assignment of error is therefore without merit and must be overruled.

(3) Double Jeopardy.

Defendant next argues, both through his attorney and in his pro se brief, that the State's decision to try him a third time violated the double jeopardy clauses of both the federal and Nebraska Constitutions. Although the thrust of the arguments is not readily apparent, it appears to follow two separate tracks. One argument is based upon the notion that the evidence adduced at the earlier trial was insufficient to submit the case to the jury, and, therefore, a bar to further prosecution. The second argument, raised by defendant himself, appears to be to the effect that there was both prosecutorial and judicial misconduct which compelled defendant to seek a new trial, and, therefore, this bars the State from retrying him. Neither contention is valid.

In his first argument regarding insufficiency of the evidence, defendant relies upon the U.S. Supreme Court opinion in *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978). In *Burks* the U.S. Supreme Court held that an appellate finding of insufficient evidence to convict is tantamount to an acquittal and, therefore, that the double jeopardy clause precludes a second trial once the reviewing

court has found the evidence legally insufficient. In reaching that conclusion, the Court set out its rationale precisely, saying at 16:

> Since we necessarily afford absolute finality to a jury's *verdict* of acquittal—no matter how erroneous its decision—it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty.

It is clear beyond question, however, that the decision in *Burks* does not give any support to the argument raised by defendant in the instant case. The Court specifically addressed that issue and distinguished a reversal based upon trial error from a verdict of acquittal based upon an erroneous decision.

In doing so the U.S. Supreme Court in *Burks, supra*, said at 15:

> Various rationales have been advanced to support the policy of allowing retrial to correct trial error, but in our view the most reasonable justification is that advanced by *Tateo*, supra, at 466: "It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." See *Wilson, supra*, at 343-344, n. 11; *Wade v Hunter*, 336 U.S. 684, 688-689 (1949). In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e. g.*, incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.

See, also, *State v. Bostwick*, 222 Neb. 631, 385 N.W.2d 906 (1986).

In view of the fact that we have already held that there was sufficient circumstantial evidence to submit the case to the jury and sufficient circumstantial evidence from which the jury could find defendant guilty of felony murder, our reversal of *Palmer II* because of the trial court's error in permitting Mrs. Palmer to testify does not constitute double jeopardy so as to preclude the State from prosecuting defendant in the instant case.

Nor does defendant's contention that there was prosecutorial or judicial misconduct of such a nature as to bar a retrial have merit. The record in all three cases is devoid of any evidence to establish either prosecutorial or judicial misconduct. That a county attorney vigorously prosecutes one accused of a crime does not constitute prosecutorial misconduct. Nor does the fact that a trial court permits the introduction of evidence which may later be excluded because of a difficult or complicated rule of law constitute judicial misconduct. The argument raised by defendant is wholly unsupported by any evidence. Defendant was convicted in *Palmer II*. That conviction was reversed because of a procedural error considered to be prejudicial. Absent that procedural error, there was sufficient circumstantial evidence to submit the case to the jury and to convict him. Therefore, defendant was never placed in double jeopardy, and his assignment of error in that regard must be overruled.

(4) <u>Matters Covered During Monica Zimmerman's Pretrial Hypnotic Interview</u>.

The basis of defendant's assignment of error regarding the testimony of Monica Zimmerman is based almost totally upon our holding in *Palmer I*. However, *Palmer I* must be read in light of our subsequent decision in *State v. Patterson*, 213 Neb. 686, 331 N.W.2d 500 (1983), wherein we explained our holding in *Palmer I* and set out the rule as it was thereafter to be applied in Nebraska. Were we to subscribe to the argument made by defendant herein as to what he believes we said in *Palmer I*, a rule of ridiculous proportion would be reached. What we were seeking in *Palmer I*, as more clearly set out in *State v. Patterson, supra*, was to prohibit the introduction of testimony which came about for the first time after hypnosis. As we indicated in

*Palmer I*, our concern was preventing evidence which was hypnotically induced rather than hypnotically recalled. Where, however, the evidence is clear that the witness knew about the matters before being subjected to hypnosis, we can perceive of no rule which should preclude the witness from thereafter being permitted to testify. The district court was extremely careful in limiting Monica Zimmerman's testimony in the subject trial to those matters for which there was sufficient evidence to establish that she knew of the matters and had related them to another before being subjected to hypnosis. The rule in Nebraska as set out in *State v. Patterson, supra*, is that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case; rather, the witness will be permitted to testify with regard to those matters which he or she was able to recall and relate prior to hypnosis, provided that there is sufficient evidence to satisfy the court that the evidence was known and related prior to hypnosis.

Nowhere in *Palmer I* can it be found that we precluded Monica Zimmerman from testifying. In fact, we ordered reversal with instructions to the district court to determine what of her testimony was properly admissible. In making that determination the district court was required to consider our refinement of the rule as set out in *State v. Patterson, supra*. See, also, *State v. Shiffbauer*, 197 Neb. 805, 251 N.W.2d 359 (1977). There was no error committed by the district court in permitting Monica Zimmerman to testify.

(5) <u>Pretrial and In-court Identifications of Defendant</u>.

Defendant argues that the in-court identification of him was tainted by a photographic lineup which took place at the Austin, Texas, police department following his arrest and prior to his trial in *Palmer I*.

The record discloses that following a call from the Austin Police Department informing the Grand Island Police Department that articles stolen from the Zimmerman residence had been confiscated and a suspect arrested, a number of Nebraska investigators and Monica Zimmerman flew to Austin, Texas. Upon arriving in Austin the officer in charge of the Nebraska contingent determined that because of

defendant's unusual height it would be inappropriate to have Monica Zimmerman view him in a traditional lineup. In a purported effort to alleviate the height discrepancy between defendant and the officers chosen to fill the lineup group, the officers decided to individually photograph defendant and the four officers. All five were photographed standing in front of a white wall and positioned next to a doorframe. When shown the five photographs, Monica Zimmerman immediately identified defendant as being the customer whom she had reported to the police as looking suspicious.

Defendant now argues that the identification procedure used was unduly suggestive in that the relative heights of the subjects were readily determinable by reference to the strategically placed doorframe visible in each photograph. Defendant then argues that under the U.S. Supreme Court decision in *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and our decision in *State v. Sanchell*, 191 Neb. 505, 216 N.W.2d 504 (1974), this allegedly unduly suggestive procedure, coupled with the subsequent in-court identification made by Monica Zimmerman, abridged defendant's right to due process under both the U.S. and Nebraska Constitutions. We believe that the contention is without merit.

In *Simmons v. United States*, 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), the U.S. Supreme Court addressed the issue of a photographic lineup. Approving the use of photographs, the Court said at 384:

> [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

Following its decision in *Simmons v. United States, supra*, the U.S. Supreme Court decided *Neil v. Biggers, supra. Neil* involved an eyewitness identification at trial following a police station showup of the defendant. After discussing its past due process cases, the U.S. Supreme Court determined that unnecessary suggestiveness alone does not require an exclusion

of identification evidence. The Court noted that the showup could have been better conducted but found that the "central question" was "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil, supra* at 199. The Court then stated at 199-200:

> As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

An examination of the photographs in this case fails to support defendant's contention that the presence of the doorframe was unduly suggestive and caused Monica Zimmerman to select defendant. In the first instance many courts have held that a suspect's distinctive appearance in a photographic display does not necessarily render the procedure suggestive. See, *United States v. Mefford*, 658 F.2d 588 (8th Cir. 1981) (suspect was the only man in the lineup who was within age range previously described by witnesses); *United States v. Smith*, 602 F.2d 834 (8th Cir. 1979) (suspect wearing blue overalls was only person matching description of robber); *United States v. Bostic*, 360 F. Supp. 1300 (E.D. Pa. 1973), *aff'd mem.* 491 F.2d 751 (3d Cir. 1973) (only suspect's photograph showed scar on forehead). It is impossible from viewing the photographs to determine how far from the wall and doorjamb each subject is standing, and, therefore, one viewing the photographs could not necessarily determine the height of the subject. Furthermore, there was testimony from one of the officers present during the photographic lineup that when Monica Zimmerman viewed the photographs, it took her only "one to two" seconds to eliminate from the array all of the photographs but that of the defendant. The officer's testimony was corroborated by a member of the Nebraska State Patrol who was also present. An examination of the totality of the circumstances makes it abundantly clear that the photographic

array was not unduly suggestive. This assignment of error is therefore overruled.

(6) Right to a Speedy Trial.

Defendant's argument that he was denied a speedy trial under either Nebraska statute or the sixth amendment to the federal Constitution is likewise without merit. The mandate in *Palmer II* was received by the district court on October 28, 1983. Voir dire for the subject trial began on March 5, 1984. In the time between the filing of the mandate and the beginning of the trial, more than 20 motions, the bulk of which went to evidentiary matters, were filed by defendant's attorneys or by defendant himself. Some of these motions were submitted on arguments alone, some were supported by affidavits, and some required full-blown evidentiary hearings. Even without tolling the period on account of defendant's pretrial motions, it is clear that the time required by Neb. Rev. Stat. § 29-1207 (Reissue 1985) had not expired. Section 29-1207(3) provides: "If such defendant is to be tried again following a mistrial, an order for a new trial, or an appeal or collateral attack, such period shall commence to run from the date of the mistrial, order granting a new trial, or the mandate on remand." Trial must then be had within 6 months from that date.

Section 29-1207(4)(a) excludes from the computation of the 6-month period "the time from filing until final disposition of pretrial motions of the defendant . . . ." The subject trial began 17 weeks after the return of the mandate. If one disregards the time during which the pretrial motions were pending, there was only a period of approximately 3 days between the time that the pretrial motions were disposed of and the voir dire of the jury began. To therefore suggest that there was any violation of Nebraska's speedy trial act is wholly frivolous.

Defendant, however, maintains that under the sixth amendment to the U.S. Constitution he was not granted a speedy trial. In so arguing he relies primarily on the U.S. Supreme Court decision in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). In that case the U.S. Supreme Court set out the balancing test it thought was appropriate for the resolution of speedy trial issues under the U.S. Constitution. After noting that the speedy trial right "is

generically different from any of the other rights enshrined in the Constitution for the protection of the accused," *id.* at 519, the Court refused to define the nature of the right by reference to an arbitrary time period as, for instance, the 6-month period set out in § 29-1207. Instead, the Court stated that "[t]he approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530. The Court then set out four factors to be considered in this balancing process: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* Explaining this mechanism, the U.S. Supreme Court expounded on the first factor, saying:

> The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. To take but one example, the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge.

*Id.* at 530-31. In our view a delay of 17 weeks from the return of the mandate to a trial does not constitute an unreasonable delay sufficient to cause the other factors to be triggered. We are not, therefore, required to examine any of the factors, finding that a delay of 17 weeks from return of mandate to trial is not unconstitutionally unreasonable. Defendant's assignment regarding lack of a speedy trial is without merit and is overruled.

(7) <u>Motion to Suppress Evidence Obtained From Defendant at the Time of His Arrest in Austin, Texas.</u>

Defendant next challenges the propriety of his arrest in Texas and the seizure of property allegedly stolen from Zimmerman at the time of his death. The evidence presented in the subject trial is identical to that presented in *Palmer I*. That issue was raised in *Palmer I*, and in that regard we said at 212, 313 N.W.2d at 652:

In the case at bar the evidence establishes, and the defendant does not contest, that the officers had probable cause to arrest the defendant. A valid warrantless arrest was made under the laws of Texas, and the District Court properly overruled the motion to suppress the evidence seized from the person of the defendant at the time of the arrest.

The issue was properly resolved in *Palmer I,* and our holding therein is reapplied in this appeal.

(8) Imposition of the Death Penalty.

Defendant has raised a number of specific subissues with regard to the imposition of the death penalty. They will be considered in the same order in which they are raised.

A. *The overruling of defendant's motion to allow him to secure expert testimony regarding proportionality.*

Defendant maintains that he was entitled to be given sufficient public funds so that he might secure an expert, either at trial or in preparation for an appeal before this court, to produce testimony with respect to the imposition of the death penalty in the State of Nebraska. However, while either a defendant or the State may wish to adduce evidence before the sentencing judge or panel of any case in which the death penalty has been imposed but which has not yet been reviewed by this court, the question of proportionality is not for expert testimony; it is for court determination. See *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982). Thus, defendant's motion was properly overruled.

B. *The overruling of defendant's motion to quash the presentence investigation.*

Defendant maintains that a sentence of death may not be imposed, even in part, on the basis of information contained in a presentence investigation. Like many of the assignments of error raised by defendant, we have previously considered this issue and have rejected it. In *State v. Reeves,* 216 Neb. 206, 221, 344 N.W.2d 433, 444 (1984), we specifically addressed this issue and said: " '[T]he traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence.' " Further, in *Reeves, supra* at 223, 344 N.W.2d at

445, we quoted from *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981), saying:

> "We are unable to find any requirement in the law that a sentencing court may consider only information adduced at trial when exercising discretion in imposing sentence. Likewise, we find no constitutional requirement to permit one convicted the right to confront all who might give information to be used by the sentencing court. Such a requirement goes far beyond any constitutional mandate."

See, also, *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984). For these reasons this assignment is overruled.

C. *The overruling of defendant's several objections to the imposition of the death penalty.*

While this assignment of error, as presented, is somewhat vague and does little to assist the court in determining any specific claim of error, defendant, in his brief, makes arguments about several specific factors which will be considered by us to have been included under this assignment of error. While, normally, such an assignment might not be considered by the court because of its vagueness, in view of the severity of the punishment imposed in this case, we address each of the items raised.

(i) *Whether the district court erred in not considering nonstatutory mitigating factors.*

Defendant argues that it has now been firmly established that in a capital case the sentencing authority must not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record, or any of the circumstances of the offense, citing *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), and *Bell v. Ohio*, 438 U.S. 637, 98 S. Ct. 2977, 57 L. Ed. 2d 1010 (1978). In *State v. Moore, supra*, this court specifically declared that the defendant could offer, on the issue of mitigation, any evidence, even though the mitigating factor was not specifically listed in the statute.

Defendant argues that the sentencing court did not consider nonstatutory mitigating circumstances concerning his

childhood when imposing the death penalty in this case. A closer examination of both the argument advanced by him and the record makes it clear that defendant's complaint is not that he was not permitted to present the evidence but, rather, that the trial court must have refused to consider the factors, otherwise the court would not have imposed the death penalty in this case. In essence, defendant merely asserts that he is disappointed that the sentencing panel was not persuaded by his evidence. The sentencing panel made specific reference to the evidence regarding his childhood and found that "such evidence does not give rise to a mitigating circumstance." There is nothing in the record to indicate that the court did not consider all of the mitigating evidence offered by defendant, but merely rejected it. The record in this case indicates that defendant's evidence was unconvincing.

(ii) *Whether the statutory aggravating circumstances set out in § 29-2523(1)(d) are unconstitutionally vague.*

This argument has previously been considered by this court and rejected. See, *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984); *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982); *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977); *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977). It is again rejected in accordance with the later analysis of subissue G of this assignment of error.

(iii) *Whether placing the burden of proof upon defendant to establish mitigating circumstances is in violation of his constitutional rights.*

In effect, defendant argues that, absent proof that one or all mitigating circumstances are not present, the sentencing court must presume that *all* mitigating circumstances exist. Not only does that argument not make any sense on its face, but it has previously been specifically rejected by this court. In *State v. Moore, supra* at 480, 316 N.W.2d at 46, we said:

> The defendant's eighth assignment asserts that the State has the burden of proving beyond a reasonable doubt that no mitigating factor exists. He cites no authority for this proposition. None seems to exist. There is no evidence or claim that the State suppressed any favorable evidence. If there were any mitigating factors other than those shown,

the defendant is in the best position to know and reveal those factors.

The record does not sustain this alleged error.

(iv) *Whether a criminal defendant in a capital case must receive notice of the nature and extent of the aggravating charges to be offered in support of the death penalty.*

Defendant next argues that the district court erred in overruling his motion to require the State to specify upon which aggravating circumstances it intended to rely. In support of that position defendant argues that the sixth amendment to the U.S. Constitution, as well as Neb. Const. art. I, § 11, requires that the accused be informed or have the right to demand "the nature and cause of accusation," citing, further, *May v. State,* 153 Neb. 369, 44 N.W.2d 636 (1950), and *Kissinger v. State,* 123 Neb. 856, 244 N.W. 794 (1932). Defendant is in error in that regard. As we previously noted in both *State v. Anderson and Hochstein,* 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981), as well as *State v. Williams,* 217 Neb. 539, 352 N.W.2d 538 (1984), and *State v. Reeves, supra,* in the sentencing stage, since it occurs after the question of guilt has been established, the then-convicted defendant is not entitled to all of the same rights accorded one merely accused of a crime but not yet convicted. Furthermore, we note in the instant case that the record clearly establishes that both defendant and his counsel were informed on the record of the aggravating circumstances the State intended to rely upon. There is no merit in this alleged error.

D. *Whether the refusal to permit the jury to consider a lesser-included offense violated defendant's constitutional rights.*

Defendant first acknowledges that neither second degree murder nor manslaughter is a lesser-included offense of the charge of felony murder, citing *Morgan v. State,* 51 Neb. 672, 71 N.W. 788 (1897), *Rhea v. State,* 63 Neb. 461, 88 N.W. 789 (1901), and *Wilson v. State,* 170 Neb. 494, 103 N.W.2d 258 (1960). He then argues, citing, however, no authority for the proposition, that because there is no lesser-included offense for the charge of felony murder, one who commits felony murder may not be sentenced to death. If, as in the present case, there is

no lesser-included offense to the crime charged, a defendant is not entitled to an instruction on a lesser-included offense. The fact, however, that a defendant is not entitled to such an instruction does not eliminate the penalty otherwise provided by statute. For these reasons all of these various miscellaneous objections raised by defendant in this regard are overruled.

E. *Whether the sentence of death must be set aside because it was not imposed, at least in part, by a jury.*

This issue, likewise, has been firmly established to the contrary by this court. In *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), we specifically addressed this issue and rejected the contention that a death penalty could not be imposed absent a jury. In doing so we specifically called attention to the U.S. Supreme Court decision in *Proffitt v. Florida*, 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), *reh'g denied* 429 U.S. 875, 97 S. Ct. 198, 50 L. Ed. 2d 158:

> "This [the U.S. Supreme] Court has pointed out that jury sentencing in a capital case can perform an important societal function, Witherspoon v. Illinois, 391 U.S. 510, 519, n.15, but it has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."

*State v. Simants, supra* at 558, 250 N.W.2d at 887. We then went on to say at 559, 250 N.W.2d at 888:

> As we understand the federal and state constitutional provisions, they do not require or even suggest that jury sentencing is constitutionally required. Whatever the relative merits of sentencing by a judge or jury may be, we need not consider them. Our concern is the constitutionality of the Nebraska system, under the federal and state Constitutions. The relative merits of the one or the other is for legislative and not judicial determination. We find the sentencing procedure provided by the Nebraska statute does not violate either

the Nebraska or the federal Constitution.

See, also, *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981). This alleged error is overruled.

F. *The overruling of defendant's motion to recuse the members of the sentencing panel.*

While the assignment is raised, there appears to be no argument addressing that specific issue, and we are unable to determine what it is that defendant contends was error. For that reason the alleged error must be overruled.

G. *Whether the sentencing panel properly applied § 29-2523(1)(b) and (d) in sentencing defendant to death.*

After *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), wherein the U.S. Supreme Court held to be violative of U.S. Const. amends. VIII and XIV death sentences imposed under statutes that left juries with untrammeled discretion to impose or withhold the death penalty, the Legislature of Nebraska revised certain statutes pertaining to capital punishment. In 1973 the Legislature enacted the following:

> In the proceeding for determination of sentence, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances set forth in section 29-2523. . . .

§ 29-2521. In 1973 and 1978 the Legislature also enacted:

> After hearing all of the evidence and arguments in the sentencing proceeding, the judge or judges shall fix the sentence at either death or life imprisonment, but such determination shall be based upon the following considerations:
>
> (1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death;
>
> (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In each case in which the court imposes the death sentence, the determination of the court shall be in writing and shall be supported by written findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination. § 29-2522.

As the aggravating circumstances referred to in §§ 29-2521 and 29-2522, in 1973 the Legislature, in § 29-2523, specified:

(1) Aggravating Circumstances:

(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

(e) At the time the murder was committed, the offender also committed another murder;

(f) The offender knowingly created a great risk of death to at least several persons;

(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or

(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.

As noted earlier, the sentencing panel found the existence of aggravating circumstances (1)(b) and (d). The evidence establishes that defendant was known to the Zimmermans due to their prior course of dealings. The defendant and his wife had been to the victim's home at least four times prior to the date of the murder. The victim clearly knew and could identify the defendant. The record therefore establishes that

Zimmerman was murdered in an effort to conceal defendant's identity. Thus, the existence of aggravating circumstance (1)(b) has been established beyond a reasonable doubt.

At approximately the time when the Nebraska Legislature was enacting §§ 29-2521 to 29-2523, the Supreme Court of Florida decided *State v. Dixon*, 283 So. 2d 1 (Fla. 1973), *cert. denied* 416 U.S. 943, 94 S. Ct. 1951, 40 L. Ed. 2d 295 (1974). *Dixon* dealt with the aggravating circumstance "especially heinous, atrocious or cruel" found in the Florida statutes. In *Dixon* the court stated at 283 So. 2d at 9:

> The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony. Fla.Stat. § 921.141(6)(h), F.S.A. Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.

The U.S. Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), expressed the following:

> Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. . . .

> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious

action.

428 U.S. at 188-89.

> While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate, the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded "that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed *and weighed against each other* when they are presented in a concrete case." ALI, Model Penal Code § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959) (emphasis in original). While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.

428 U.S. at 193-95.

After noting existence of the Model Penal Code, which refers to aggravating circumstances to warrant imposition of the death penalty and uses the phrase "manifesting exceptional depravity" (now found in Model Penal Code § 210.6(3)(h) (1980)), the Court continued:

> In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

428 U.S. at 195.

*Gregg v. Georgia, supra,* was followed by *Godfrey v.*

*Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). Godfrey's wife and daughter lived with Godfrey's mother-in-law in her trailer. When reconciliation efforts were rebuffed by Godfrey's wife, Godfrey went to the trailer; fired a shotgun through the trailer's window, killing the wife instantly; proceeded into the trailer; and, inside, shot and instantly killed his mother-in-law. On conviction for the murders, Godfrey was sentenced to death by virtue of a statute authorizing capital punishment if evidence beyond a reasonable doubt showed that the murder "was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code Ann. § 27-10-30(b)(7) (1982). The U.S. Supreme Court stated:

In *Furman v. Georgia*, 408.U.S. 238, the Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. *Gregg v. Georgia, supra*, reaffirmed this holding:

"[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S., at 189 (opinion of Stewart, Powell, and Stevens, JJ.).

A capital sentencing scheme must, in short, provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Id.*, at 188, quoting *Furman v. Georgia, supra*, at 313 (White, J., concurring).

This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." [Citations omitted.] It must channel the sentencer's discretion by

"clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." As was made clear in *Gregg*, a death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." 428 U.S., at 195, n. 46.

In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman." There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman."

446 U.S. at 427-29.

The petitioner's crimes cannot be said to have reflected a consciousness materially more "depraved" than that of any person guilty of murder. His victims were killed instantaneously. They were members of his family who were causing him extreme emotional trauma. . . . [I]t "is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."

That cannot be said here. There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not. Accordingly, the judgment of the Georgia Supreme Court insofar as it leaves standing the petitioner's death sentences is reversed . . . .

446 U.S. at 433.

With the foregoing background regarding the appearance of *State v. Dixon*, 283 So. 2d 1 (Fla. 1973), *cert. denied* 416 U.S. 943, 94 S. Ct. 1951, 40 L. Ed. 2d 295 (1974), *Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), and

*Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980), this court has decided death penalty cases in reference to § 29-2523(1)(d) as an aggravating circumstance, that is, "[t]he murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." We note that the word *or* separates "especially heinous, atrocious, cruel" from "manifested exceptional depravity by ordinary standards of morality and intelligence." Thus, aggravating circumstance (1)(d) of § 29-2523 describes in the disjunctive at least two distinct components of an aggravating circumstance which may relate to a murder and which "may operate in conjunction with or independent of one another." *State v. Moore*, 210 Neb. 457, 470, 316 N.W.2d 33, 41 (1982). See, also, *Jones v. Commonwealth*, 228 Va. 427, 323 S.E.2d 554 (1984). The presence of any of the components will sustain a finding that aggravating circumstance (1)(d) exists. See *State v. Correll*, 148 Ariz. 468, 715 P.2d 721 (1986). See, also, *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983), *cert. denied* 461 U.S. 971, 103 S. Ct. 2444, 77 L. Ed. 2d 1327 (regarding "heinous, cruel, or depraved," such statutory expression is in the disjunctive, " 'so either all or one could constitute an aggravating circumstance' "). To the extent any of our previous cases such as *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985), *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977), and *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), contain language which may be read to suggest that the components of aggravating circumstance (1)(d) are in the conjunctive rather than the disjunctive, such language is disapproved.

Among the crimes in which circumstance (1)(d) is frequently found are murders involving " 'torture, sadism, sexual abuse, or the imposition of extreme suffering. . . .' " *State v. Rust*, 197 Neb. 528, 538-39, 250 N.W.2d 867, 874 (1977). See, also, *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984).

There is no arithmetical computation or formula required in a court's consideration of aggravating and mitigating circumstances under § 29-2523. Regarding an aggravating circumstance or a mitigating circumstance, there is no prescribed statutory method by which more or less weight is

assigned to each circumstance indicated in § 29-2523. Where one or more of the aggravating circumstances are established beyond a reasonable doubt concerning a murder, the death penalty may be imposed as a proper sentence unless mitigating circumstances approach or outweigh any aggravating circumstance or circumstances, thereby overriding the effect of such aggravation. See *State v. Dixon, supra.* Existence of an aggravating circumstance under § 29-2523(1) must be proved beyond a reasonable doubt. *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881 (1977); *State v. Rust, supra.*

As a meaning for the words "especially heinous, atrocious, cruel" found in circumstance (1)(d) of § 29-2523, this court, in *State v. Simants, supra* at 566, 250 N.W.2d at 891, has adopted the definition utilized by the Florida court in *State v. Dixon, supra,* that is, especially heinous, atrocious, cruel is "directed to the conscienceless or pitiless crime which is unnecessarily torturous to the victim." See, *State v. Stewart, supra; State v. Moore, supra; State v. Reeves, supra.* See, also, *State v. Hunt, supra.*

"Torture may be found where the victim is subjected to serious physical, sexual, or psychological abuse before death." *Phillips v. State,* 250 Ga. 336, 340, 297 S.E.2d 217, 221 (1982). "A victim's uncertainty as to the ultimate fate can be significant in indicating mental suffering." *State v. Correll, supra* at 480, 715 P.2d at 733.

As did the U.S. Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), we note the existence of Model Penal Code § 210.6(3)(h) (1980), which is an aggravating circumstance for imposition of the death penalty and contains the phrase "manifesting exceptional depravity." In applying the "exceptional depravity" component of § 29-2523(1)(d), we have interpreted and construed that phrase to mean "totally and senselessly bereft of any regard for human life." *State v. Stewart, supra* at 523, 250 N.W.2d at 864; *State v. Rust, supra; State v. Holtan, supra; State v. Harper,* 208 Neb. 568, 304 N.W.2d 663 (1981); *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982).

In reviewing death penalty cases this court has determined

that "exceptional depravity," or an act "totally and senselessly bereft of any regard for human life," existed in several cases. Some of those cases are now set forth for illustrative purposes.

*State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977): While robbing a bar, Holtan "herded" the bartender (Loder), the bartender's friend (Ulshafer), and bar patron (Christensen) into a restroom, where Holtan ordered Loder to tie the other two and, while the three victims were lying on the floor, then fired four shots, two striking and killing Loder, one wounding Ulshafer, and the fourth missing any victim. This court stated: "The defendant killed, and attempted to kill, unresisting victims of the robbery. The act was totally and senselessly bereft of any regard for human life." *Id*. at 547, 250 N.W.2d at 880.

*State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977): Simants sexually abused three female victims, including first degree sexual assault on a 10-year-old female and sexual penetration of the child's corpse after Simants had shot and killed the child; sexual molestation of a 7-year-old female; and sexual molestation of the grandmother of the 10-year-old victim and a sexual "attack on her body after her death." *Id*. at 566, 250 N.W.2d at 891. The victims' deaths were caused by gunshot wounds inflicted by Simants. This court stated: "The use of the word 'exceptional,' however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence." *Id*. This court then determined that depravity was present in the murder of the three females, because (1) "[t]he sexual assault [on the 10-year-old] caused pain, and when the young girl cried out she was killed and there was a further sexual assault upon her after death"; (2) there were "bruises displayed on the inside of [the 7-year-old child's] thighs"; and (3) concerning the victim-grandmother, there was "the difference in the ages of the defendant and the victim, coupled with the attack on her body after her death." *Id*. at 565-66, 250 N.W.2d at 891.

*State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977): With a rope Peery tied his victim's feet and hands at the wrist behind the victim's back. The victim was gagged and offered no resistance ("totally helpless"). *Id*. at 675, 261 N.W.2d at 105. Peery inflicted three gunshot wounds on the victim, one

between the victim's eyes, one at the right temple of the victim, and the third inflicted while the firearm was thrust into the victim's mouth so that the bullet pierced the roof of the mouth and entered the victim's brain.

*State v. Otey,* 205 Neb. 90, 287 N.W.2d 36 (1979): Otey told the victim he was going to rob and rape her. When the victim tried to resist, Otey slashed the victim's forehead with a knife and then sexually assaulted the victim. After the sexual assault Otey took the victim to another part of a building where Otey sought the victim's money and inflicted several deep knife wounds on the victim, hit her in the head with a hammer, and, finally, strangled the victim.

*State v. Harper,* 208 Neb. 568, 304 N.W.2d 663 (1981): When his girlfriend declined to marry him and married another, Harper tested a carcinogen, dimethylnitrosamine, on his parents' pets. Dimethylnitrosamine induces cancer and disrupts blood clotting. After the pets had died as a result of the dimethylnitrosamine, Harper entered his ex-girlfriend's residence and put the dimethylnitrosamine in beverages later ingested by his girlfriend's husband and an 11-month-old child, causing the deaths of the two victims. This court, after noting that each victim had "died a slow and agonizing death" and experienced "extreme suffering" as a result of the dimethylnitrosamine, stated: "[T]he murders of [the two victims] were so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life." *Id.* at 576, 304 N.W.2d at 668.

*State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982): Moore devised a plan to rob Omaha cabdrivers. From a telephone booth in downtown Omaha, Moore called a cab and waited to see how quickly the cabdriver responded to that call. If the responding cabdriver was suitable for Moore's plan, that is, "an older man" rather than a young man, Moore planned to shoot the cabdriver and take the driver's money. Pursuant to his plan, Moore shot and killed one cabdriver on August 22, 1979, and another on August 26, 1979. This court held at 471, 316 N.W.2d at 41:

> We agree that the following circumstances exhibit a state of mind exceptionally depraved and totally and senselessly

> bereft of regard for human life: (1) The murders here were coldly planned as a part of the robberies. (2) The evidence clearly supports the conclusion that the murders were to be repetitive, i.e., the defendant intended to continue on his selected course of conduct so long as his needs required. (3) The victims were selected on the basis of certain characteristics which made it easier for the defendant to shoot them, namely, their ages. His unstated conclusion was that a human life in the middle years is less valuable than a younger life.

*State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984): After a struggle with the victim and during the course of a first degree sexual assault, Reeves stabbed his victim seven times in her chest. The cuts on the victim's hands "showed that she tried to defend herself from the defendant's brutal attack." Before dying, the victim experienced "extreme suffering." *Id*. at 227, 344 N.W.2d at 447.

The foregoing Nebraska death penalty cases involving the "exceptional depravity" component of aggravating circumstance (1)(d) are clear-cut, specific examples which demonstrate the meaning of the phrase "exceptional depravity." Other courts have held that "depraved" means "marked by debasement, corruption, perversion or deterioration." *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983), *cert. denied* 461 U.S. 971, 103 S. Ct. 2444, 77 L. Ed. 2d 1327. See, also, *State v. Morehouse*, 120 N.H. 738, 424 A.2d 798 (1980). Therefore, the finding concerning this component of aggravating circumstance (1)(d) must be not only that the murderer manifested depravity but that the murderer manifested "exceptional depravity." The word "exceptional" sets the defendant's act apart from the usual or norm of first degree murder cases and requires "a consciousness materially more 'depraved' than that of any person guilty of murder." *Godfrey v. Georgia*, 446 U.S. 420, 433, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). In this manner "exceptional depravity" is not a catchall phrase or provision for imposition of the death penalty in first degree murder cases where none of the aggravating circumstances otherwise apply to the murder under examination.

The phrase "exceptional depravity" in § 29-2523(1)(d) refers and pertains to "the state of mind of the actor." *State v. Moore, supra* at 470, 316 N.W.2d at 41. See, also, *State v. Martinez-Villareal*, 145 Ariz. 441, 702 P.2d 670 (1985). Depravity, as a murderer's state of mind, may be proved by or inferred from the defendant's conduct at or near the time of the offense. See, *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977); *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977); *State v. Martinez-Villareal, supra*.

The Supreme Court of Missouri made the following observation in *State v. Preston*, 673 S.W.2d 1, 11 (Mo. 1984), *cert. denied* 469 U.S. 893, 105 S. Ct. 269, 83 L. Ed. 2d 205:

> In following the mandate of *Godfrey* to establish "clear and objective standards" as to what types of murders constitute "depravity of mind," this Court, while not expressly adopting a precise definition, has noted the following factors to be considered in finding "depravity of mind": mental state of defendant, infliction of physical or psychological torture upon the victim as when victim has a substantial period of time before death to anticipate and reflect upon it; brutality of defendant's conduct; mutilation of the body after death; absence of any substantive motive; absence of defendant's remorse and the nature of the crime. [Citations omitted.]

In *State v. Gretzler, supra*, the Supreme Court of Arizona provided a list of specific factors which may lead to a finding of depravity, namely, (1) the apparent relishing of the murder by the killer, (2) the infliction of gratuitous violence on the victim, (3) the needless mutilation of the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim. See, also, *State v. Wallace,* 151 Ariz. 362, 728 P.2d 232 (1986).

By use of objective factors, such as those suggested by the Supreme Court of Arizona in *State v. Gretzler, supra*, there is a "principled way to distinguish" a death penalty case from those cases where the death penalty is not imposed, see *Godfrey v. Georgia*, 446 U.S. at 433, and, in the imposition of the death penalty, to control discretion " 'by clear and objective standards so as to produce non-discriminatory application,' "

*Gregg v. Georgia*, 428 U.S. 153, 198, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

Therefore, for the purpose of § 29-2523(1)(d) as an aggravating circumstance in determining whether the death penalty may be imposed, we hold that "exceptional depravity" in a murder exists when it is shown, beyond a reasonable doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim. As we have previously mentioned in reference to "heinous, atrocious, cruel" and "exceptional depravity" as disjunctive components of the aggravating circumstance at § 29-2523(1)(d), the five factors which will support a finding of "exceptional depravity" are also stated in the disjunctive. Consequently, where one or more of those five factors are present, there may be a finding of "exceptional depravity" concerning a first degree murder. Further, we observe that one or more of those five factors or circumstances, listed above, were present in those cases where "exceptional depravity" was found to exist as an aggravating circumstance in the illustrative Nebraska cases involving "exceptional depravity," which we have previously mentioned in this opinion, namely, *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977), *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979), *State v. Harper*, 208 Neb. 568, 304 N.W.2d 663 (1981), *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), and *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984).

Thus, both the phrase "especially heinous, atrocious, cruel" and the phrase "manifested exceptional depravity by ordinary standards of morality and intelligence" provide objective standards in imposing the death penalty, and neither phrase is unconstitutionally vague. Cf. *State v. Simants, supra*.

We emphasize that we do not state, nor do we imply, that "exceptional depravity" may not exist independent of "especially heinous, atrocious, cruel," although existence of a

murder which is "especially heinous, atrocious, cruel" may well establish "exceptional depravity," such as a murderer's relishing the victim's murder or infliction of gratuitous violence. See, *State v. Cooper*, 718 S.W.2d 256 (Tenn. 1986); *Bunch v. Commonwealth*, 225 Va. 423, 304 S.E.2d 271 (1983); *Hance v. State*, 245 Ga. 856, 268 S.E.2d 339 (1980).

The sentencing panel did not find Zimmerman's murder to be "especially heinous, atrocious, cruel," although the evidence would have supported such a finding beyond a reasonable doubt. The facts of this case show that the murder of Zimmerman was a "conscienceless or pitiless crime" which was unnecessarily torturous to the victim. Defendant physically abused Zimmerman by beating him, causing bruises, cuts, and scratches. Zimmerman's physical and mental pain are shown by the testimony of Cherie Palmer and found in the appreciable period of time endured by Zimmerman while he awaited his death at defendant's hands. Zimmerman's stress and fear very likely grew to immense proportions as he lay bound and helpless before the murder.

The murder of Zimmerman also "manifested exceptional depravity" on the part of defendant. With Zimmerman bound and helpless on the bed, there was no obstacle to defendant's absconding with Zimmerman's property. Defendant's physical abuse of Zimmerman, who was bound on the bed, was unnecessary to complete the robbery. In murdering Zimmerman defendant inflicted gratuitous violence upon a helpless victim.

The record establishes beyond a reasonable doubt that Zimmerman's murder "manifested exceptional depravity" and that aggravating circumstance (1)(d) exists beyond a reasonable doubt.

Section 29-2523 also specifies seven mitigating circumstances as required by § 29-2522.

Section 29-2523(2)(a) states: "The offender has no significant history of prior criminal activity." The defendant's prior convictions include a 1959 conviction for breaking and entering, a 1970 conviction for two violations of the Mann Act, a 1974 conviction for buying, receiving, or aiding the concealment of stolen property, and a 1975 conviction for

interstate transportation of forged and altered securities. In view of the defendant's significant history of criminal activity, this mitigating circumstance does not exist.

The defendant was not under unusual pressure, influence, or under the domination of another person. Therefore, the record does not establish the existence of the mitigating circumstance set out under § 29-2523(2)(b).

Section 29-2523(2)(c) provides: "The crime was committed while the offender was under the influence of extreme mental or emotional disturbance." The record does not support the existence of this mitigating circumstance.

At the time of the crime the defendant was 40 years old. The mitigating circumstance set out under § 29-2523(2)(d), which provides for the mitigating factor of youth or extreme age, does not exist.

Mitigating circumstance (2)(e) exists when the offender was an accomplice in the crime committed by another and the offender's participation was relatively minor. Mitigating circumstance (2)(f) exists when the victim was a participant in the defendant's conduct or consented to the act. The record establishes that defendant alone did the killing and did not act as an accomplice whose participation was relatively minor. Neither does the record establish that Zimmerman either participated in or in any way consented to any act. Therefore, there is nothing in the record which would support a finding that either mitigating circumstance (2)(e) or (2)(f) exists.

Finally, the issue of the defendant's capacity to appreciate the wrongfulness of his actions or his ability to conform his conduct to the law has not been questioned. Therefore, the mitigating circumstance of mental illness, mental defect, or intoxication at the time of the murder does not exist as provided for under § 29-2523(2)(g).

The record reveals no other mitigating circumstances.

H. *Proportionality of the death penalty.*

Finally, the defendant argues that the sentence of death in this case is erroneous because it is "greater than those imposed in other cases with the same or similar circumstances," and therefore is disproportionate in violation of § 29-2521.03.

Sections 29-2521.01, 29-2521.02, and 29-2521.03 provide

that this court shall review and analyze all cases involving *criminal homicide* committed on or after April 20, 1973, and determine the propriety of the sentence in each case involving a criminal homicide "by comparing such case with previous cases involving the same or similar circumstances." The expressed purpose is to ensure that the death penalty should be applied uniformly and not arbitrarily.

It is apparent that the statutes cannot be enforced as they were written. The term *homicide* includes all crimes involving "the killing of a person by another." Neb. Rev. Stat. § 28-302(1) (Reissue 1985). A death sentence may be imposed only in cases involving a Class I felony. Neb. Rev. Stat. § 28-105(1) (Reissue 1985).

In *State v. Williams*, 205 Neb. 56, 76, 287 N.W.2d 18, 29 (1979), we noted that to interpret the language of the statute literally "would create insurmountable constitutional problems." We further noted that cases construing a similar Georgia statute reflected the obvious fact that it was a practical impossibility to make a meaningful comparison of a death sentence in a first degree murder case with a sentence imposed for another crime for which the death sentence was not authorized.

In the *Williams* case we construed the word "sentence" in § 29-2521.03 to mean a sentence of death and that the provisions requiring a comparison with previous cases were applicable only to cases in which a sentence of death had been imposed. Finally, we concluded in the *Williams* case that the sentence imposed was not excessive or "disproportionate to the death penalties imposed in the other death penalty cases." 205 Neb. at 77, 287 N.W.2d at 29-30.

In *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), we delineated some of the reasons why a literal application of the statute would unconstitutionally encroach upon the judicial function. In the *Moore* case we stated at 473-76, 316 N.W.2d at 42-44:

> Neb. Const. art II, § 1, provides: "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial, and no person or collection of persons being one of these

departments, shall exercise any power properly belonging to either of the others, except as hereinafter expressly directed or permitted." A similar division of powers, under the U.S. Constitution, is held to exist by implication. Corwin's The Constitution and What It Means Today at 6-7, 204 (14th ed. H. Chase & C. Ducat 1978); *Hampton & Co. v. United States*, 276 U.S. 394, 48 S. Ct. 348, 72 L. Ed. 624 (1928); *Hayburn's Case*, 2 Dall. 409, 2 U.S. 409, 1 L. Ed. 436 (1792).

The separation of powers doctrine imposes restrictions upon the legislative branch to limit the judicial functions of the courts. The Legislature cannot, by subsequent legislation, divest rights which have vested by virtue of a judgment. *City of Wayne v. Adams*, 156 Neb. 297, 56 N.W.2d 117 (1952). It cannot enact legislation to retroactively open or vacate a judgment. *Mooney v. Drainage District, on rehearing* 134 Neb. 192, 278 N.W. 368 (1938), *cert. denied* 305 U.S. 622, 59 S. Ct. 84, 83 L. Ed. 398 (1938). The limits of the jurisdiction conferred upon the Supreme Court by the Constitution may not be increased or extended by legislative enactment. *State ex rel. Wright v. Barney*, 133 Neb. 676, 276 N.W. 676 (1937); *Miller v. Wheeler*, 33 Neb. 765, 51 N.W. 137 (1892); *State v. Hall*, 47 Neb. 579, 66 N.W. 642 (1896). It cannot change procedures established by the Constitution. *State ex rel. v. Ellis*, 156 Or. 83, 66 P.2d 995 (1937). It cannot interfere with the judicial function of adjudicating the fact of an acquittal. *In re Johnston*, 3 Cal. 2d 32, 43 P.2d 541 (1935). It may not reverse a judgment. *Roberts v. The State*, 160 N.Y. 217, 54 N.E. 678 (1899). It may not direct the disposition of a case in which jurisdiction has attached. *State v. Costen*, 141 Tenn. 539, 213 S.W. 910 (1919). *It is to be clearly implied from the foregoing principles that the Legislature cannot direct the disposition of one case by the factual determinations in another.*

It is apparent from the language of § 29-2521.01(5) and § 29-2521.02 that the Legislature attempts to impose a mandate upon this court to look behind prosecutorial judgments concerning the charges to be filed, jury verdicts

determining the particular degree of homicide, and then, based upon our independent findings of the facts in those adjudicated cases, to determine the penalty in the case before us.

We must examine the constitutional import of the foregoing legislative purpose. In examining prosecutorial discretion we would of necessity have to independently gather evidence. The gathering of evidence is not a judicial function but one of the executive. We would then determine what charges we think should have been filed. Again, this is an executive function of the prosecutor. We would make a judgment about the chances of a conviction as against an acquittal, again an executive function. We would need to weigh the advisability of a plea bargain to secure a conviction on a lesser charge in order to avoid a likely acquittal of all charges. These are all clearly executive and not judicial functions.

It must be borne in mind that not all homicide convictions result in appeals to this court. The following illustrates the Legislature's intrusion into the judicial function under L.B. 711. If a person is charged with murder in the first degree but convicted of a lesser degree of homicide, and if L.B. 711 is to be applied literally, we would then, for purposes of reviewing the case before us, disregard the factfindings of the jury in the so-called "analogous" case. Such a procedure would be constitutionally objectionable for a number of reasons. First, it would require this court to find facts in a case not before it. Secondly, it would constitute an attempt by the Legislature to make the factfindings of one case determinative of the sentence in another case on review. It is plain that under the principles we have earlier cited, that legislation which attempts to achieve such results is an intrusion on the judicial function, contrary to the separation of powers doctrine, and thus violates article II, § 1.

Another effect of L.B. 711 would be to unconstitutionally restrict the appellate review powers of this court under Neb. Const. art. I, § 23, as that

> legislation attempts to bind this court by requiring it to apply sentences imposed in some "analogous" case in a district court. It is clear that applying such a standard would restrict a defendant's right to an independent review by this court under article I, § 23, of the Bill of Rights of our Nebraska Constitution. This section provides: "In all cases of felony the defendant shall have the right of appeal to the Supreme Court; and in capital cases such appeal shall operate as a supersedeas to stay the execution of the sentence of death, until further order of the Supreme Court."
>
> Upon this closer review of L.B. 711, it is clear the Legislature in that act attempts to exercise the judicial function in violation of the Constitution. Sections 2 and 3 of L.B. 711 must be restricted in their application to a comparison in this court of only those cases in which the defendant in the District Court has been convicted of murder in the first degree.

(Emphasis supplied.)

In his brief the defendant cites a number of cases in which a sentence to life imprisonment was imposed. He then argues that the cited cases involved the same or similar circumstances as this case and that the sentence imposed in this case is, therefore, excessive and disproportionate.

One of the cases cited by the defendant is *State v. Floyd*, a Hamilton County, Nebraska, case in which no appeal was taken to this court. In *State v. Moore*, 210 Neb. 457, 477, 316 N.W.2d 33, 44 (1982), in reference to an exhibit relating to the *Floyd* case, we said: "Although not specifically argued, it clearly appears the apparent purpose of introducing the exhibit was to raise the issue of whether an isolated case in which the death penalty perhaps should have been imposed, but was not, becomes the standard which governs all capital cases before this court." We rejected the argument, largely upon the basis that it was impossible to tell from the limited record before us whether Floyd should have been sentenced to death. However, we concluded also that an isolated case should not be the standard by which all other sentences must be judged.

Evenhandedness in sentencing is a goal for which all courts

strive. We do not perceive, however, that it was the purpose of the Legislature to eliminate all discretion in sentencing and ensure that the death penalty be imposed in every case in which it is a possible sentence or that the penalty not be imposed in cases in which it is appropriate because in certain other cases it was not imposed, although it might have been an appropriate sentence. We think the dominant purpose of the statute is best expressed by the provision in § 29-2521.03 that "[n]o sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances."

It would be possible to construe the statute so that cases in which the death penalty was not imposed, although upon reflection it could be said that the death penalty might have been imposed, would be the standard against which all future death penalty cases would be compared. By a process of "attrition" this would result in a substantial narrowing of the group of cases in which the death penalty would be a possible sentence and, eventually, for all practical purposes, could amount to a repeal of the death penalty. We do not understand that the Legislature intended the statute to effect a repeal of the death penalty. We take judicial notice of the fact that the Legislature has considered bills to repeal the death penalty many times in recent years, but a repeal has never become law. Most recently, a legislative bill for that purpose (L.B. 70, 89th Leg., 1st Sess.) was indefinitely postponed by the Legislature's adjournment on April 16, 1986.

Whatever cases are examined, the final act of review which this court must perform is to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." § 29-2522(3). In order for this court to perform that function, that section also requires that when the trial court imposes the death sentence, the determination must be in writing with reference to the aggravating and mitigating circumstances involved. There is no similar requirement when the sentence is life imprisonment.

Accordingly, there is no way of this court's knowing whether any aggravating or mitigating circumstances were present in a given case unless the sentence was death. Therefore, no other

case but a death sentence case can be said to be a case similar to that under review.

In *Pulley v. Harris*, 465 U.S. 37, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984), the U.S. Supreme Court held that the U.S. Constitution does not require a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases, although requested to do so by the prisoner. In death cases the proportionality requirements of the U.S. Constitution are satisfied by the procedure for identifying aggravating and mitigating circumstances and meaningful appellate review.

In *Pulley* the Court stated at 54:

> *Any capital sentencing scheme may occasionally produce aberrational outcomes. Such inconsistencies are a far cry from the major systemic defects identified in Furman. As we have acknowledged in the past, "there can be 'no perfect procedure for deciding in which cases governmental authority should be used to impose death.'" Zant v. Stephens*, 462 U.S., at 884, quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (plurality opinion).

(Emphasis supplied.)

In *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), the Court stated: "Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution."

In some of our prior decisions we have indicated that the proportionality review in all death penalty cases is a comparison of the facts and circumstances in all first degree murder cases, whether the penalty imposed was death or life imprisonment. Upon further consideration of this question we have concluded that the review should include only those cases in which the death penalty was imposed. Since there is an automatic appellate review in all such cases, we have before us records upon which we can rely in making the analysis and comparison.

An important distinguishing factor that is present in all death penalty cases is an adjudication that there are one or more aggravating circumstances which are not outweighed by any

mitigating circumstances. Although the existence of an aggravating circumstance does not ensure that the death penalty will be imposed, the absence of an adjudication that at least one aggravating circumstance exists prevents the death penalty from being imposed.

The Supreme Court of South Carolina has determined that the proportionality review which it makes in death cases under a similar statute should be limited to other cases in which the death penalty was imposed. In *State v. Copeland*, 278 S.C. 572, 586-87, 300 S.E.2d 63, 71-72 (1982), *cert. denied* 460 U.S. 1103, 103 S. Ct. 1802, 76 L. Ed. 2d 367 (1983), that court stated:

> Appellant Copeland attacks the constitutionality of the South Carolina death penalty regime on the basis of this Court's interpretation of § 16-3-25(C) of the Code. . . .
>
> The General Assembly of South Carolina has clearly made the policy determination that proportionality review by this Court shall be accorded capital defendants who actually receive a sentence of death. The language of § 16-3-25(C) puts three questions before this Court for review in a given case:
>
> 1. Whether sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
>
> 2. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 16-3-20, and
>
> 3. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
>
> It is the third inquiry which constitutes proportionality review in South Carolina. Under the statute, the task of defining "similar cases" and with it the scope of any comparative analysis is plainly and properly left to this Court. As indicated below, both the statutory language and the nature of the task give rise to perplexity. There is, after all, some logic to the view that the heinous crime is *sui generis*, simply beyond comparison.

Then, after discussing the absence of any federal constitutional requirement of a proportionality review, the

court stated at 590-91, 300 S.E.2d at 74:

> We conclude from the foregoing that the contours of proportionality review, where it exists, have been left to state determination since the U.S. Supreme Court has declined to impose any specific model of review upon the states. § 16-3-25(C) of the Code represents an act of legislative grace by the General Assembly which we are required to interpret in accordance with sound rules of statutory construction.
>
> In our view, the search for "similar cases" can only begin with an actual conviction and sentence of death rendered by a trier of fact in accordance with § 16-3-20 of the Code. We consider such findings by the trial court to be a threshold requirement for comparative study and indeed the only foundation of "similarity" consonant with our role as an appellate court.
>
> We recognize that in some jurisdictions and commentaries it is felt that the reviewing court should compare a given death sentence with a "universe" of cases which includes sentences of life imprisonment, acquittals, reversals and even mere indictments and arrests. Under such a regime, the reviewing court could only determine the size of its sample or "universe" by some arbitrary device. Fact findings of the trial court, by contrast, provide a fundamental line of demarcation well recognized in and even exalted by our legal tradition. The decisive importance of such findings is evidenced by the language of Article V, section 5, South Carolina Constitution, which limits our review to "correction of errors at law" in all but equity cases.
>
> To expand the notion of a "universe" would also entail intolerable speculation by this Court. Under the South Carolina statute, a jury is not required to state its reasons for failing to recommend a sentence of death. In a given case, the alleged aggravating circumstance may not have been proven to the satisfaction of the jury, while in another "similar case" (expansively defined) the statutory mitigating circumstances or some mitigating factor "otherwise authorized or allowed by law" may have

deterred imposition of the death sentence.

This Court would enter a realm of pure conjecture if it attempted to compare and contrast such verdicts with an actual sentence of death. They represent acts of mercy which have not yet been held to offend the United States Constitution. Moreover, they reflect the emphasis upon individualized sentencing mandated by the United States Supreme Court. We will not subject these verdicts to scrutiny in pursuit of phantom "similar cases," when a meaningful sample lies ready at hand in those cases where the jury has spoken unequivocally.

Similarly, in *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985), the Arizona Supreme Court limited its proportionality review to cases in which the death penalty had been imposed and the sentence affirmed or reduced.

It must be recognized that no two death cases are the same. The facts vary greatly from case to case, and the cases cannot be "color-matched." The comparison of the facts in any death case with the facts in previous cases in which the death penalty has been imposed can at best be general in nature.

From our review of the record in this case, and the review of the records in all cases in which the death sentence was imposed for offenses committed on or after April 20, 1973, we have concluded that the penalty imposed in this case is neither excessive nor disproportionate to the penalty imposed in the earlier cases, considering both the crime and the defendant.

The judgment of the district court is affirmed.

AFFIRMED.

WHITE, J., concurring.

This court has struggled to apply the provisions of Neb. Rev. Stat. §§ 29-2521.01 et seq. (Reissue 1985) since their passage. The difficulties, both constitutional and semantic, have been extreme, as is well pointed out in the majority opinion. I agree that to compare a case in which there is a finding of guilt of first degree murder with a conviction of a lesser homicide is not only difficult, it is impossible. Any case where the requisites of either felony murder or intentional, premeditated murder have not been found is as different as night to day from a case where such requisites are judicially determined, if for no other reason than

the fact of judicial determination of the requisite facts in one case and not the other.

We must adhere to our role as an appellate court. The findings of fact by a jury or a judge in a jury waived case or on the acceptance of a plea are binding on us. We do not have the authority to determine that the crime was of a higher degree. We may not, in a matter so vital as the imposition or nonimposition of the death penalty, speculate as to decisions of the executive branch in not seeking conviction of a higher degree of homicide, nor by our decision question the factual determination of the fact finder.

I do not, however, agree that the only reasonable or possible application of § 29-2521.01 is to limit the comparison to cases in which the death penalty has been imposed. The penalty for first degree murder is either life imprisonment or death. That sentence decision is considered in all convictions for first degree murder. It seems to me that the rejection of a sentence of death by the judge or panel of judges is as important to proportionality as the imposition of such a penalty. The task of comparison, though difficult, is neither impossible nor constitutionally prohibited, and, therefore, we are commanded to make that comparison. I state further, however, that comparing all first degree murder cases with the subject case, the sentence is not disproportionate. I therefore concur in the result.

SHANAHAN, J., joins in this concurrence.

KRIVOSHA, C.J., concurring in part, and in part dissenting.

I concur in the opinion as adopted by the majority insofar as it concludes that no error was committed in finding Palmer guilty of first degree murder. I am unable to agree in all respects with the majority's analysis of the penalty and must therefore concur in part and in part dissent.

In reaching that decision I am quick to acknowledge that the law is an art and not an exact science, and therefore honest disagreements may exist even among members of a court.

I further wish to point out, before undertaking an analysis of our differences, that my conclusions are not in any manner affected by personal views but, rather, are controlled by honest

disagreements as to the meaning of the law as adopted by the Legislature of the State of Nebraska. What I may think about the law is totally irrelevant to the decision, and the decision may not reflect my personal views. All that matters is what I think the law thinks about the matter. In that respect the majority and I may honestly disagree without either injecting our personal views in the making of our respective decisions.

Obviously, I am not, nor could I as a matter of law be, opposed to the death penalty. See *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981), and *State v. Joubert, post* p. 411, 399 N.W.2d 237 (1986), cases in which I either wrote the majority opinion for the court or concurred in the opinion of the majority in upholding the imposition of the death penalty. Furthermore, even in those cases in which I have dissented on the basis that I do not believe the penalty was imposed in accordance with Nebraska statutes, I have voted with the majority in subsequent postconviction cases when the issues presented to us involved legal questions other than whether the death penalty had been imposed in accordance with the law as enacted by the Legislature. See, *State v. Holtan*, 216 Neb. 594, 344 N.W.2d 661 (1984); *State v. Harper*, 214 Neb. 911, 336 N.W.2d 597 (1983); *State v. Otey*, 212 Neb. 103, 321 N.W.2d 453 (1982); *State v. Peery*, 208 Neb. 639, 305 N.W.2d 354 (1981).

My disagreement with the majority in this case is a disagreement over the meaning of the law and does not involve questions of ethics or morality. As I have earlier stated in my dissent in *State v. Williams*, 205 Neb. 56, 79-80, 287 N.W.2d 18, 31 (1979):

> I totally reject the contention made by some that the imposition of the death penalty is either immoral or unethical when imposed by a society pursuant to its criminal code and subject to the further requirement that the defendant be afforded due process of law. We find the imposition of capital punishment in an appropriate case provided for as early as the Mosaic Code and perhaps even before. I have difficulty concluding that that which is embodied in the Mosaic Code can be either unethical or

immoral.

It is true that some societies, through the ages, have discriminated in the manner in which capital punishment has been administered or have imposed it in a barbaric manner. Neither of those actions can be condoned. But the mere fact that a society prescribes the imposition of the death penalty in an appropriate case does not cause it to be either immoral or unethical.

I therefore do not believe that the death penalty itself violates the eighth amendment to the U.S. Constitution. I do, however, believe that the majority in this case is in error in its interpretation of certain provisions of Neb. Rev. Stat. §§ 29-2523 and 29-2521.02 to 29-2521.04 (Reissue 1985). I shall now attempt to point out wherein I believe the majority is in error.

The majority has concluded that the provisions of § 29-2523(1)(d) contain two separate prongs which are disjunctive. The first prong, according to the majority, is that the murder was "especially heinous, atrocious, cruel," while the second prong is that the murder "manifested exceptional depravity by ordinary standards of morality and intelligence." This language is not language created by the court; rather, it is the language of the statute as adopted by the Legislature in § 29-2523(1)(d).

Then, in an effort to avoid an attack that the second prong is invalid because it is too vague, the majority has very properly attempted to refine the meaning of the second prong by setting out five factors, any one of which it says may be sufficient to establish the second prong of (1)(d). It is here where I have difficulty. It appears to me that the majority has defined the second prong of (1)(d) either in terms of the first prong or in terms which I believe are no more precise than the statutory words of the second prong itself.

As I have already indicated, I have no quarrel with the majority in attempting to redefine the second prong of (1)(d) in order to give it certainty. The Legislature, having failed to sufficiently define either the first prong or the second prong of (1)(d) with constitutional sufficiency, has left the court with no other choice.

As noted by the majority, the U.S. Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 188-89, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), held in part:

> Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. . . .
>
> *Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

The majority in this case then further observes that thereafter the U.S. Supreme Court held in *Godfrey v. Georgia*, 446 U.S. 420, 427-28, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980):

> A capital sentencing scheme must, in short, provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Id.*, at 188, quoting *Furman v. Georgia, supra*, at 313 (White, J., concurring).
>
> This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." [Citations omitted.] It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death." As was made clear in *Gregg*, a death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." 428 U.S., at 195, n. 46.

The sum and substance of all of this is that in order for a

statute such as § 29-2523(1)(d) to pass constitutional muster, it may not be so vague that it is meaningless or so broad that it may be used in an arbitrary fashion. If reasonable minds can honestly disagree as to its meaning, the statute fails to satisfy its constitutional requirement. That is to say, the standards may be in fact no standard simply because of their language.

I am of the opinion that the majority's effort in defining what it has described as the second prong of (1)(d), though made with the best of intentions, fails to define the act with the requisite clarity or do anything more than redefine the first prong of (1)(d). The second prong of (1)(d) cannot, therefore, standing alone, justify the imposition of the death penalty as prescribed by the Legislature. I shall now attempt to point out where I believe the effort of the majority in that regard fails.

The majority has said that the second prong of (1)(d) may be established if one or more of five factors, either alone or together, are established by the evidence beyond a reasonable doubt. The five factors are: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; and (5) helplessness of the victim.

According to both the U.S. Supreme Court and the majority, the purpose of defining the second prong in definite terms is to provide a " 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia, supra* at 188.

And as further noted by the majority: "The word 'exceptional' sets the defendant's act apart from the usual or norm of first degree murder cases and requires 'a consciousness materially more "depraved" than that of any person guilty of murder.' " In my view the five factors which the majority now says establish the second prong of (1)(d), which is separate and apart from the first prong of (1)(d), are either too broad to satisfy the requirement that they narrow the cases in which the death penalty may be imposed or are nothing more than a repeat of the definition of the first prong and therefore cannot stand alone.

I turn first to factor (4), the "senselessness of the crime," and factor (5), the "helplessness of the victim." As to factor (4), I am

unable to envision any murder which makes sense. It occurs to me that, at a minimum, nearly all, if not all, murders are senseless, as that term is commonly understood. At best, this factor creates an honest but substantial difference of opinion. Therefore, factor (4) must fail either because it is all-encompassing or because it is too vague. In any event it certainly is not evidence of an "exceptional" act. Even if one can conjure up a few cases in which the murder "makes sense," a fact with which I am unable to agree, the definition of factor (4) will be the norm rather than the exception. The majority, therefore, has read the word "exceptional" out of the act and made the second prong merely evidence of a "depraved mind" rather than an "exceptionally depraved mind." The word "exceptional" is not the court's word but, rather, the Legislature's word.

And, in any event, a factor defined in terms of the "senselessness of the crime" is no more precise than our earlier definition of the second prong of (1)(d) to the effect that the murder manifests "exceptional depravity" if it is "totally and senselessly bereft of any regard for human life." In either case, the words of the second prong, as defined by the majority, are not "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). Nor, in my view, do they provide the sentencer with " 'clear and objective standards' " for " 'specific and detailed guidance' " and " 'make rationally reviewable the process for imposing a sentence of death.' " *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980).

In my view factor (5), likewise, offers no better limiting standard than does factor (4). In few, if any, cases will the victim be other than helpless. It is usually this helplessness which, unfortunately, results in the murderer's being able to complete his or her act. What I have set out in some detail regarding factor (4) can be applied to factor (5). In view of the fact that the majority has declared that not only is the second prong of (1)(d) disjunctive from the first but that all five factors are themselves disjunctive, it would appear that the death penalty could be imposed if the evidence established beyond a

reasonable doubt that the "murder was senseless" or that the "victim was helpless." That cannot, in my view, establish an *"exceptionally* depraved mind." I am therefore of the opinion that, on this basis alone, the second prong, as now defined by the majority, is constitutionally invalid.

However, I believe that an examination of the history which led to the adoption of (1)(d), including the creation of a definition for the first prong, convincingly establishes that in fact (1)(d) consists of only one prong and that the phrase "or manifests exceptional depravity" is nothing more than a further explanation of the phrase "especially heinous, atrocious, cruel." In order to make my point on this issue, it is necessary to review some of the history regarding the "especially heinous" phrase.

The Model Penal Code, from which much of our act, and in particular § 29-2523(1)(d), was taken, was somewhat different from what was ultimately enacted by our Legislature. Model Penal Code § 210.6(3)(h) (1980) reads: "The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity." How or why the word "or" between "atrocious" and "cruel" was moved between "cruel" and the second prong is not anywhere explained. But when one considers how we have defined "especially heinous" and how we have defined "exceptionally depraved," it seems to me that factors (1), (2), and (3) define one and the same prong.

In a long line of cases, apparently having its inception in *State v. Dixon*, 283 So. 2d 1 (Fla. 1973), *cert. denied* 416 U.S. 943, 94 S. Ct. 1951, 40 L. Ed. 2d 295 (1974), most, if not all, courts which have been given statutes by their legislatures using "especially heinous" as an aggravating factor have held that before the murder may be considered to be "especially heinous" the evidence must establish that it was "conscienceless or pitiless" and "unnecessarily torturous to the victim." *Id.* at 9. That has become the accepted legal meaning of the phrase "especially heinous, atrocious, or cruel."

Furthermore, an examination of just some of the cases makes the definition as set out above even clearer.

In *State v. Goodman*, 298 N.C. 1, 24-25, 257 S.E.2d 569, 585 (1979), the North Carolina court said:

G.S. 15A-2000(e)(9) states that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that the "capital felony was especially heinous, atrocious, or cruel." While we recognize that every murder is, at least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. By using the word "especially" the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection. *State v. Stewart, supra; State v. Rust, supra; State v. Simants*, 197 Neb. 549, 250 N.W. 2d 881, *cert. denied*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed. 2d 158 (1977).

The Florida provision concerning this aggravating factor is identical to ours. Florida's Supreme Court has said that this provision is directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Dixon*, 283 So. 2d 1 (Fla. 1973), *cert. denied*, 416 U.S. 943, 94 S.Ct. 1950 [sic], 40 L.Ed. 2d 295 (1974); *see also, State v. Alford*, 307 So. 2d 433 (Fla. 1975), *cert. denied*, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed. 2d 1221 (1976). Nebraska has also adopted the Florida construction of this subsection. Both Florida and Nebraska have limited the application of this subsection to acts done to the victim during the commission of the capital felony itself. *State v. Rust, supra; Riley v. State*, 366 So. 2d 19 (Fla. 1979). We too believe that this is an appropriate construction of the language of this provision. Under this construction, subsection (e)(9) will not become a "catch all" provision which can always be employed in cases where there is no evidence of other aggravating circumstances.

And in *State v. Monroe*, 397 So. 2d 1258, 1274-75 (La. 1981), the Louisiana Supreme Court, in a murder case, said:

Although the jury found the instant offense to have been committed in an "especially heinous, atrocious or cruel manner," this finding cannot stand. It is true that the murder was brutal—the victim lost over two quarts of

blood, her lungs were punctured and one of her ribs was severed. Her death was not instantaneous, and she lived long enough to call out for her daughter and reach for the telephone.

Nonetheless, in order for a murder to be "especially heinous," there must exist *evidence* that there was "torture or the pitiless infliction of unnecessary pain on the victim." *State v. English*, 367 So.2d 815, 823 (La.1979). *State v. Clark*, 387 So.2d 1124 (La.1980), provides an example of what is meant by "especially heinous." In that case the defendant stabbed the victim thirty-five times before shooting him with a gun. In the instant case, the "wounds were inflicted to kill, not to maim or to inflict pain." *State v. Culberth*, supra, at 851. While there is some evidence in this case that the offense was heinous and cruel, it was not proved beyond a reasonable doubt that the instant offense was *especially* heinous.

(Emphasis supplied.)

In *Hopkinson v. State*, 632 P.2d 79 (Wyo. 1981), the defendant, tried under a statute nearly identical to the Nebraska statute, argued that a jury could find any murder to be especially heinous, atrocious, or cruel and therefore could conclude that this aggravating circumstance is present in all cases. He contended that it, therefore, gave the jury a free rein to decide to sentence a person to death in every case and, thus, in effect, abolished the requirements previously established by the U.S. Supreme Court for imposing the death penalty. In rejecting that argument the Wyoming court said at 153-54:

We disagree with appellant's conclusion. The statute does *not* fail to properly channel the jury's sentencing decision and does *not* grant it unfettered discretion to impose the death penalty for arbitrary and capricious reasons. First, the statute requires the jury to find the murder to have been "especially heinous, atrocious or cruel." Webster's Third New International Dictionary defines heinous as "hatefully or shockingly evil." Thus the term "especially heinous" is more than just hatefully or shockingly evil. The murder, to be so classified, must

demonstrate that the consciencelessness of the defendant is not only an outrage but also a dangerous and unrestrainable threat to society. Only when this is found can the murder properly be categorized as especially heinous. Since very few murders can be regarded in this manner, the term is *not* impermissible and vague.

The view of the Wyoming court is in accord with that of the U.S. Supreme Court. In *Proffitt v. Florida*, 428 U.S. 242, 255, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), *reh'g denied* 429 U.S. 875, 97 S. Ct. 198, 50 L. Ed. 2d 158, Justices Stewart, Powell, and Stevens, in the Court's plurality opinion, said:

> In particular, the petitioner attacks the eighth and third statutory aggravating circumstances, which authorize the death penalty to be imposed if the crime is "especially heinous, atrocious, or cruel," or if "[t]he defendant knowingly created a great risk of death to many persons." §§ 921.141(5)(h), (c) (Supp. 1976-1977). These provisions must be considered as they have been construed by the Supreme Court of Florida.
>
> That court has recognized that while it is arguable "that all killings are atrocious . . . [s]till, we believe that the Legislature intended something 'especially' heinous, atrocious or cruel when it authorized the death penalty for first degree murder." *Tedder v. State*, 322 So. 2d, at 910. As a consequence, the court has indicated that the eighth statutory provision is directed only at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim."

The necessary distinction to be made between what is simply heinous and what is especially heinous is pointed out by the Alabama court in *Berard v. State*, 402 So. 2d 1044 (Ala. Crim. App. 1981), in which the trial court found that the homicides were "brutal" and therefore ordered the imposition of the death penalty. In discussing that matter the Alabama court said at 1050: "That the homicides were 'brutal' fails to conform to § 13-11-6(8) which requires a finding that the crime was '*especially* heinous, atrocious or cruel.' (Emphasis supplied.) The crime was in fact brutal, but the statute requires more."

Later, in the case of *McCray v. State*, 416 So. 2d 804 (Fla.

1982), the Florida Supreme Court again reviewed its statute, nearly identical to Nebraska's, and reversed a sentence of death because it found that the crime was not especially heinous, atrocious, or cruel, as previously defined by the Florida court. The facts of *McCray* indicated that a murder in which the victim died from three bullets to the stomach did not meet the statutory definition.

Similarly, in *Clark v. State*, 443 So. 2d 973, 977 (Fla. 1983), the Florida court again said:

> Directing a pistol shot to the head of the victim does not establish a homicide as especially heinous, atrocious, or cruel. *Kampff v. State*, 371 So.2d 1007 (Fla.1979). Although Mr. Satey testified that he heard his wife moan after being shot, there was no evidence of whether she was conscious after being shot, not [sic] did the medical examiner indicate how long Mrs. Satey survived or what degree of pain, if any, she suffered. Although the helpless anticipation of impending death may serve as the basis for this aggravating factor, there is no evidence to prove that Mrs. Satey knew for more than an instant before she was shot what was about to happen to her. Similarly, as pitiable as were Mr. Satey's vain efforts to dissuade his attackers from harming his wife, it is the effect upon the victim herself that must be considered in determining the existence of this aggravating factor.

The following year, Mississippi, in the case of *Billiot v. State*, 454 So. 2d 445 (Miss. 1984), considered the "especially heinous, atrocious or cruel" provision of its statute, saying at 464:

> [W]hat is intended by the words "especially heinous, atrocious or cruel", "are those capital crimes where the actual commission of the felony was accompanied by such additional facts as to set the crime apart from the norm of capital felonies—*the consciencelessness* [sic] *or pitiless crime which is unnecessarily tortuous* [sic] *to the victim.*"

During that same year, Florida, in *Gorham v. State*, 454 So. 2d 556 (Fla. 1984), held that where one shot penetrated the victim's heart, causing death within 10 seconds, and where the evidence disproved any possibility of prolonged and torturous captivity and there was no evidence whatsoever that the victim

apprehended certain death more than moments before he died, the aggravating circumstance in support of the death penalty that the murder was especially heinous, atrocious, and cruel, being based as it was upon the victim's having been thereafter shot twice in the back, could not be sustained.

In doing so the Florida court said in *Gorham, supra* at 559: "While the murder was, of course, a cruel and unjustifiable deed, there is nothing about it to 'set the crime apart from the norm of capital felonies.' " The evidence indicated that the victim was already dead when the next two shots were fired. The Florida court's position was not based upon its notion that the murder was not terrible or even heinous but that, in order for the statute to be constitutional and not permit the imposition of the death penalty in every case, the aggravating circumstance "especially heinous" must be interpreted to be limited to those few cases in which the murder was committed in such a manner as to cause torture to the victim before death in a conscienceless and pitiless way. This distinction is made not because the courts are without sensitivity but, rather, because the death penalty may not be imposed unless clear, rigid standards are first met. See, *Thompson v. State*, 456 So. 2d 444 (Fla. 1984); *Rembert v. State*, 445 So. 2d 337 (Fla. 1984); *State v. Wilson*, 467 So. 2d 503 (La. 1985).

In arriving at its conclusion that the second prong of (1)(d) is disjunctive and consists of five separate factors, the majority has relied upon similar action taken by the Arizona Supreme Court, and, in particular, its decision in *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983), *cert. denied* 461 U.S. 971, 103 S. Ct. 2444, 77 L. Ed. 2d 1327, wherein the Arizona Supreme Court set out the five factors now adopted by this court as the definition of the second prong of (1)(d).

As I see it, the difficulty with that analysis is that Arizona appears to make no distinction between "especially heinous" and "especially depraved," as does the majority herein.

To begin with, the Arizona statute is not the same as Nebraska's. Ariz. Rev. Stat. Ann. § 13-703F.6. (Supp. 1986) reads: "The defendant committed the offense in an especially heinous, cruel or depraved manner."

Furthermore, the Arizona Supreme Court uses the five

factors not only to define "depraved" but to define "heinous" as well.

In *State v. Smith*, 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985), the Arizona Supreme Court said:

> "Heinous" and "depraved" are characteristics reflecting the mental state and attitude of the perpetrator of the crime. *State v. Gretzler*, 135 Ariz. at 51, 659 P.2d at 10. In *Gretzler*, we listed several factors which may lead to a finding of *heinousness or depravity*: (1) the apparent relishing of the murder by the killer; (2) the infliction of gratuitous violence on the victim beyond the murderous act itself; (3) the needless mutilation of the victim; (4) the senselessness of the crime; and (5) the helplessness of the victim. *Id*. at 52, 659 P.2d at 11.

(Emphasis supplied.) See, also, *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54 (1984); *State v. Lambright*, 138 Ariz. 63, 673 P.2d 1 (1983).

In my view the Arizona Supreme Court opinion supports my assertion that there is only one prong and not two, as suggested by the majority.

With that background in mind I now examine what the majority has created as factors (1), (2), and (3) of the second prong: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; and (3) needless mutilation of the victim. It seems to me that no matter what gloss is placed upon factors (1), (2), and (3), they constitute a murder which is conscienceless or pitiless, and was unnecessarily torturous to the victim. Therefore, if I disregard factors (4) and (5) because of vagueness, I appear to be left with nothing more than a definition of "especially heinous" for "especially depraved." It is for these reasons I am unable to join with the majority in concluding that there are two distinct prongs to § 29-2523(1)(d). I believe that there is only one, and I would so hold.

That leads me to the second area in which I am unable to agree with the majority. I do not believe that the majority is correct in limiting the proportionality review required by the provisions of §§ 29-2521.02 to 29-2521.04 to only that pool of Nebraska cases in which the death penalty has been imposed

since April 20, 1973. I believe that the majority opinion in that regard is incorrect for at least three reasons: (1) The plain language of the act does not permit such a review; (2) The clear intent of the Legislature is contrary to the majority view; and (3) Common sense, in light of the objective sought to be accomplished by the Legislature as expressed in the act itself, is contrary to the majority view. For reasons which I will detail more fully hereafter, I believe that we are required to compare the case on appeal with all other cases of homicide involving the same or similar circumstances without regard to the penalty imposed.

The current Nebraska statutes prescribing when the death penalty is to be imposed are a combination of two separate acts, one passed in 1973 and the other in 1978, the acts having been slightly modified in 1978 and 1982. See, 1973 Neb. Laws, L.B. 268; 1978 Neb. Laws, L.B. 711; 1978 Neb. Laws, L.B. 748; 1982 Neb. Laws, L.B. 722.

The principal reason for adopting this series of statutes is clear. In 1972, in the now famous case of *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), the U.S. Supreme Court held that absent standards which prevent a state from imposing the death penalty in an arbitrary and discriminatory manner, statutes authorizing the use of the death penalty violate the eighth amendment to the U.S. Constitution. In an apparent effort to solve that problem, the Nebraska Legislature, in 1973, adopted L.B. 268. Specifically, L.B. 268 (codified as Neb. Rev. Stat. § 29-2519 (Reissue 1975)) set out the intent of the Legislature and provided:

> The Legislature hereby finds that it is reasonable and necessary to establish mandatory standards for the imposition of the sentence of death; that the imposition of the death penalty in every instance of the commission of the crimes specified in section 28-[303] fails to allow for mitigating factors which may dictate against the penalty of death; and that the rational imposition of the death sentence requires the establishment of specific legislative guidelines to be applied in individual cases by the court. The Legislature therefore determines that the death penalty should be imposed *only* for the crimes set forth in

> section 28-[303] and, in addition, that it shall *only* be imposed in those instances when the aggravating circumstances existing in connection with the crime outweigh the mitigating circumstances, as set forth in sections 29-2520 to 29-2524.

(Emphasis supplied.) This may be contrary to the view held by some that anyone who kills should be put to death, but it is the will of the Legislature as expressed in its enactment of L.B. 268.

The Legislature then adopted a list of aggravating circumstances and mitigating circumstances to be considered first by the sentencing court and thereafter by the Supreme Court on appeal, the appeal to the Supreme Court being automatic. See Neb. Rev. Stat. § 29-2525 (Reissue 1985). The death penalty is not to be imposed unless the aggravating circumstances outweigh the mitigating circumstances. Neb. Rev. Stat. § 29-2522 (Reissue 1985).

A second step, however, was added to the Supreme Court's review procedure in 1978 when the Legislature adopted L.B. 711. See 1978 Neb. Laws, L.B. 711. In adopting L.B. 711 the Legislature made further specific legislative findings which became a part of the law. Neb. Rev. Stat. § 29-2521.01 (Reissue 1985) provides:

> The Legislature hereby finds that:

> (1) Life is the most valuable possession of a human being, and before taking it, the state should apply and follow the most scrupulous standards of fairness and uniformity;

> (2) The death penalty, because of its enormity and finality, should never be imposed arbitrarily nor as a result of local prejudice or public hysteria;

> (3) State law should be applied uniformly throughout the state and since the death penalty is a statewide law an offense which would not result in a death sentence in one portion of the state should not result in death in a different portion;

> (4) Charges resulting from the same or similar circumstances have, in the past, not been uniform and have produced radically differing results; and

> (5) *In order to compensate for the lack of uniformity in*

*charges* which are filed as a result of similar circumstances it is necessary for the Supreme Court to review and analyze *all* criminal homicides committed under the existing law in order to insure that each case produces a result similar to that arrived at in other cases with the same or similar circumstances.

(Emphasis supplied.)

To carry out that legislative mandate, the Legislature then imposed upon *only* the Supreme Court an obligation to, within a reasonable time after July 22, 1978, review and analyze *all* cases involving criminal homicide committed on or after April 20, 1973. Section 29-2521.02 provides: "Such review and analysis shall examine (1) the facts including mitigating and aggravating circumstances, (2) *the charges filed*, (3) the crime for which defendant was convicted, and (4) *the sentence imposed*. Such review shall be updated as new criminal homicide cases occur." (Emphasis supplied.)

Using this compilation of cases, the Supreme Court is required, upon appeal, to determine "the propriety of the sentence in each case involving a criminal homicide by comparing such case with previous cases involving the same or similar circumstances. No sentence imposed shall be greater than those imposed in other cases with the same or similar circumstances." § 29-2521.03.

The plain language of the act seems to make it clear that *all* criminal homicide cases are to be reported to the Supreme Court and that the Supreme Court, in conducting its review, is to look at *all* of these cases and to then compare the case on appeal with those other cases having same or similar *circumstances*, not penalties, to determine whether the imposition of the death penalty in the case on appeal is more severe than that imposed in other cases having same or similar circumstances. As pointed out in our opinion in *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), that is no easy task. We said in *Williams, supra* at 77, 287 N.W.2d at 29: "It would be virtually impossible to find two murder cases which are the same in all respects." Nevertheless, difficult as the task may be, unless we declare the act unconstitutional, we are duty-bound to follow it.

In that regard it should be noted that the U.S. Supreme Court does not require a proportionality review to be conducted before imposing the death penalty. As noted by the majority, in the case of *Pulley v. Harris*, 465 U.S. 37, 42-45, 104 S. Ct. 871, 79 L. Ed. 2d 29 (1984), the U.S. Supreme Court held:

At the outset, we should more clearly identify the issue before us. Traditionally, "proportionality" has been used with reference to an abstract evaluation of the appropriateness of a sentence for a particular crime. Looking to the gravity of the offense and the severity of the penalty, to sentences imposed for other crimes, and to sentencing practices in other jurisdictions, this Court has occasionally struck down punishments as inherently disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime. . . .

. . . .

. . . In *Furman*, the Court concluded that capital punishment, as then administered under statutes vesting unguided sentencing discretion in juries and trial judges, had become unconstitutionally cruel and unusual punishment. The death penalty was being imposed so discriminatorily, *id.*, at 240 (Douglas, J., concurring), so wantonly and freakishly, *id.*, at 306 (Stewart, J., concurring), and so infrequently, *id.*, at 310 (White, J., concurring), that any given death sentence was cruel and unusual. In response to that decision, roughly two-thirds of the States promptly redrafted their capital sentencing statutes in an effort to limit jury discretion and avoid arbitrary and inconsistent results. . . .

Four years after *Furman*, this Court examined several of the new state statutes. We upheld one of each of the three sorts mentioned above. See *Gregg v. Georgia, supra; Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976). Needless to say, that some schemes providing proportionality review are constitutional does not mean that such review is indispensable. We take statutes as we find them. To endorse the statute as a whole is not to say that anything different is unacceptable. . . .

Examination of our 1976 cases makes clear that they do not establish proportionality review as a constitutional requirement.

The U.S. Supreme Court went on to say at 50-51:

There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it. Indeed, to so hold would effectively overrule *Jurek* and would substantially depart from the sense of *Gregg* and *Proffitt*. We are not persuaded that the Eighth Amendment requires us to take that course.

Nevertheless, the Nebraska Legislature has not repealed that portion of its statutes which requires this court to conduct a proportionality review, and, therefore, this court must abide by the requirements of the statute or declare it unconstitutional.

The majority has chosen a middle ground. It has suggested that if we follow the language as it is written by the Legislature, the act will be rendered unconstitutional; therefore, we shall interpret it by changing the language in order to declare the act constitutional.

While the effort by the majority is commendable, I do not believe it judicially proper. Judicial activism, regardless of the result, is still judicial activism and should not be undertaken by a court. It is our function to interpret the law and, if ambiguous, give it meaning. It is not our function, however, to redraft an act which is clear and unambiguous. As we observed in *State v. Roth*, 222 Neb. 119, 124, 382 N.W.2d 348, 352 (1986): " 'Whether a court considers particular legislation as wise or unwise is irrelevant to the judicial task of construing or applying a statute.' " And in *State v. Carlson*, 223 Neb. 874, 394 N.W.2d 669 (1986), we said: "In the absence of anything indicating the contrary, statutory language should be given its plain and ordinary meaning. Where words of a statute are plain and unambiguous, no interpretation is necessary to ascertain the meaning of language in a statute." (Syllabus of the court.)

The language of § 29-2521.03 is clear and unambiguous and, thus, requires no interpretation by this court. To read meaning into the statute by limiting the review to be conducted by this

court to those cases in which the death penalty has been imposed is to rewrite the statute. One need only read the statement of intent set out in § 29-2519 and the legislative findings set out in § 29-2521.01 to recognize that this court is to compare the case on appeal not only with those in which the death penalty has been imposed but, more importantly, also with those in which the death penalty has not been imposed. The legislative findings clearly require that by providing in part:

> In order to compensate for the lack of uniformity in *charges* which are filed as a result of similar circumstances it is necessary for the Supreme Court to review and analyze all criminal homicides committed under the existing law in order to insure that each case produces a result similar to that arrived at in other cases with the same or similar circumstances.

(Emphasis supplied.) § 29-2521.01(5).

Moreover, an examination of § 29-2521.02 further makes it clear what it is we are to do. That section requires the Supreme Court, within a reasonable time, to review and analyze *all* cases involving criminal homicide. It would not have been difficult to limit the language of § 29-2521.02 if the review was to be limited to those few cases in which the death penalty had been imposed. There would be little reason to review and analyze, as required by § 29-2521.02, "(1) the *facts* including mitigating and aggravating circumstances, (2) the *charges* filed, (3) the crime for which defendant was convicted, and (4) the sentence imposed" (emphasis supplied), or to require that "all" homicide cases be forwarded to the Supreme Court, or to require the Supreme Court to review *all* homicide cases if the ultimate review is limited to those few cases where the death penalty is imposed. The language of the act simply will not, absent painful distortion, permit a finding that the review is to be limited to only cases in which the death penalty had been imposed.

In 1977, in the case of *State v. Simants*, 197 Neb. 549, 563-64, 250 N.W.2d 881, 890 (1977), we told the Legislature:

> The Supreme Court has indicated in its opinions that meaningful appellate review may be required to insure that the death penalty is not applied in an arbitrary or

capricious manner. . . . While we do not have the Georgia provision for proportional review, every capital case where there can be the slightest question will be considered in comparison with other capital cases. In other words, we will compare each capital case under review with those previous cases in which the death penalty *has or has not been imposed* under the new statute. By this means review by this court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case.

(Emphasis supplied.)

While *Simants* was decided even before the adoption of L.B. 711, the legislative history of L.B. 711, as will be shown, indicates that it was adopted in part to codify what this court had said it was already doing.

We then decided *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979), wherein the majority now claims we said that, in conducting the proportionality review required by § 29-2521.02, we would examine only cases in which the penalty of death has been imposed. However, we attached to our opinion in *Williams* an addendum indicating the cases that had been analyzed and reviewed as of November 1, 1979. There were 32 cases. The death penalty had only been imposed in six such cases, the balance receiving life sentences. To therefore suggest that *Williams* stands for the proposition that we were limiting our review to cases in which the death penalty had been imposed is simply not supported by the record.

We followed *Williams* with *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), and then with *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), which we have now overruled in this case. In *Moore* and *Reeves* we held that we were comparing *all first degree* murder convictions, whether the death penalty was imposed or not. While the rationale of *Moore* and *Reeves* makes somewhat more sense than the rationale of *Williams*, there is nothing in the statute which limits the comparisons to first degree murder cases, and such a limitation appears contrary to the words and the intent of the statutes.

In *Moore* this court held that the proportionality review, to be constitutional, must be limited to cases in which the

defendant had been convicted of first degree murder. The court reasoned that any additional review would violate the separation of powers between the judicial and executive branches because such a review would, of necessity, require the court to gather evidence and examine prosecutorial decisions in filing charges.

While I do not agree with the conclusion that if we were to follow the statutes, as directed by the Legislature, the act would be unconstitutional, if, in fact, one accepts that view, we have no choice but to declare the act unconstitutional and cannot remedy alleged unconstitutional defects by redrafting the statutes and deleting words. As we said in *Metropolitan Utilities District v. City of Omaha*, 112 Neb. 93, 101, 198 N.W. 858, 861 (1924), "when a legislative act clearly violates a specific constitutional declaration the court has no recourse, but to declare the act invalid."

It seems somewhat of an anomaly for us, on the one hand, to say that if we do what the Legislature has directed us to do, it will constitute a violation of the doctrine of separation of powers, and, on the other hand, to seek to remedy what we declare to be a constitutionally defective statute by invading the province of the Legislature and redrafting the act will not constitute such a violation. How following the act violates the doctrine regarding the separation of powers, but redrafting the act, clearly a legislative function, does not, escapes me. If the act is unconstitutional, let us say so and declare it to be invalid.

I do not, however, believe that such declaration is either necessary or proper. Rather, I believe that the act is constitutionally drafted. It may not be constitutionally required, but, having been adopted by the Legislature, it should not now be rewritten by us. In my view the position set out in the majority opinion in *Moore, supra*, is flawed. I now examine the underlying reasons given by the *Moore* decision, one by one.

I. *The Legislature cannot, by subsequent legislation, divest rights which vested by virtue of a judgment.* L.B. 711, as adopted by the Legislature, does not divest any rights which have been vested. We are not permitted to change the judgment in any case we are comparing. Our authority is limited solely to the case on appeal.

II. *The Legislature cannot enact legislation to retroactively open or vacate a judgment.* L.B. 711, as adopted by the Legislature, does not retroactively open or vacate a judgment. The cases which we compare are final and binding and cannot be affected by anything we do in the case on appeal. We do not change anything in those cases. We only compare the present case with the final results in those other cases. The function we perform is no different whether we use cases in which the death penalty has been imposed or whether we use cases in which the death penalty has not been imposed.

III. *The limits of the jurisdiction conferred upon the Supreme Court by the Constitution may not be increased or extended by legislative enactment.* L.B. 711, as adopted by the Legislature, does not increase or extend our jurisdiction. Our jurisdiction is to examine the case on appeal. What we compare that case with is not prescribed by constitution. If we can compare it to cases in which the death penalty has been imposed, we can constitutionally compare it to cases in which the death penalty has not been imposed.

IV. *The Legislature cannot change procedures established by the Constitution.* L.B. 711, as adopted by the Legislature, does not change procedures established by the Constitution. There is no constitutional procedure for reviewing a case in which the death penalty has been imposed.

V. *The Legislature cannot interfere with the judicial function of adjudicating the facts of an acquittal.* L.B. 711, as adopted by the Legislature, does not interfere with the judicial function of adjudicating the facts of an acquittal. The acquittal is not before us for adjudication, only for comparison with the case we are to review. Nothing done by virtue of L.B. 711 can affect an acquittal once rendered. It is not the comparison cases we rule upon, but only the case being examined on appeal.

VI. *The Legislature may not reverse a judgment.* L.B. 711, as adopted by the Legislature, does not permit the court to reverse any other decision except the case on appeal. Obviously, we have authority to reverse a case on appeal.

VII. *The Legislature may not direct the disposition of a case in which jurisdiction has attached.* L.B. 711, as adopted by the Legislature, does not *direct* a disposition. It merely prescribes

the standards we are to use in exercising our judgment. Notwithstanding anything contained in L.B. 711, we may still uphold the imposition of the death penalty in a proper case. Nothing about L.B. 711, as currently enacted, requires the court to reach any directed specific decision. All it requires of us is to use all homicides before imposing the death penalty. In my view the Legislature has clear authority to do that. Courts do not have inherent authority to impose the death penalty. Absent a statute enacted by the Legislature, neither a crime nor a punishment may exist. See, *State v. Douglas*, 222 Neb. 833, 388 N.W.2d 801 (1986); *Kinnan v. State*, 86 Neb. 234, 125 N.W. 594 (1910). If the Legislature, then, can, within its power, prescribe whether the death penalty may be imposed in the first place, it seems to me it can prescribe the conditions under which it may be imposed. Our function is merely to examine the evidence to determine that the prerequisites established by the Legislature have been met.

Contrary to the position taken by the majority, either in *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), or in this case, I do not believe we are asked to gather evidence or look behind prosecutorial discretion. The evidence is to be brought to us, just as all evidence is brought to us, and we are to accept on their face the decisions of the prosecutors. This is precisely what we do when we examine any sentence pursuant to Neb. Rev. Stat. § 29-2308 (Reissue 1985) to determine whether the sentence imposed is excessive.

An examination of the legislative history underlying the adoption of both L.B. 268 in 1973 and L.B. 711 in 1978 unequivocally establishes the fact that the Legislature did not intend to limit the examination to those cases in which the death penalty had in fact been imposed. In introducing L.B. 711 the sponsor, Senator Ernie Chambers, filed a statement which began as follows: "The following constitute my reasons for this bill and the purposes sought to be accomplished thereby:" Statement of Purpose, L.B. 711, Judiciary Committee, 85th Leg., 2d Sess. (Jan. 24, 1978). Senator Chambers then proceeded to explain the various reasons for his bill. He concluded by saying: "Now, for convenience and clarity, I shall set out crucial propositions in the form of numbered items."

Thereafter followed 12 numbered items. Number 10 reads as follows: "If review and comparison are limited to cases where death is *actually imposed*, the base is too narrow and fails to take any cognizance of the multitude of similar cases (like those mentioned above) where the perpetrator of the homicide never faces the *risk* of death because of the action by the prosecutor in not charging 1st degree." Number 11 reads as follows: "If review of all criminal homicides (regardless of the charge filed or the punishment imposed) reveals that the death case before the Court carries a sentence which is different from that in similar homicide cases, the penalty will not stand." *Id*.

In a statement at the public hearing before the Judiciary Committee, Senator Chambers said in part:

> The Nebraska Supreme Court already recognizes a limited version of this proposal and mentioned it in the Simants decision which it handed down February 2, 1977. "While we do not have the Georgia provision for proportional review, we will compare each capital or death case under review with those previous cases in which the death penalty has or has not been imposed under the new statute." You'll see from this provision that the only cases that the State Supreme Court in Nebraska will review, are those where death has actually been pronounced. In this situation, that means five cases: Holtan, Ruse [sic], Stewart, Simants, and Peery. Those are the only cases. It's a very small circle and it does not provide the basis for the type of review the court itself indicates it's interested in. Now I'll go back to the statement. The Supreme Court limits its review to capital cases but completely ignores homicides where the facts and circumstances may have justified filing of a capital or death penalty charge, but for some reason, none was filed. This means that the Supreme Court's stated purpose for reviewing and comparing cases is effectively defeated in the vast majority of instances. . . .
> If in past cases, prosecutors have shown by the charge they filed that they rejected the death penalty or judges who received pleas of guilt to first degree murder or convictions of first degree murder and they rejected the death penalty by not imposing it, those cases nevertheless

should be reviewed to determine whether the circumstances would have warranted the death penalty, if in the case before the court now, the circumstances were similar and death was pronounced as a sentence.

Judiciary Committee Hearing, L.B. 711, 85th Leg., 2d Sess. 33-34, 36 (Jan. 24, 1978). The statement makes it clear that the intent of the act was to expand the cases to be included in the review.

Furthermore, an examination of the floor debate discloses what the Legislature, or at least those who voted in favor of L.B. 711, had in mind. Senator Clark asked Senator Chambers:

SENATOR CLARK: Does not the Supreme Court, at the present time, review the case after the death penalty has been imposed by the district court?

SENATOR CHAMBERS: They review the individual case but they don't compare them with the cases where the death penalty *was not imposed*. They do not make a comparison of case against case. They review the case itself.

(Emphasis supplied.) Floor Debate, L.B. 711, Judiciary Committee, 85th Leg., 2d Sess. 7377 (Mar. 8, 1978).

Senator Chambers then further said in part:

The State Supreme Court under this bill will not merely review an individual case to see whether errors were committed in that case but it will compare the cases of criminal homicide throughout the state to see just what kind of cases ought to carry the death penalty and which kind ought not. And if a person who commits a crime in Scottsbluff [sic] County will escape the death penalty because he or she lives in that county, while for the same thing being sentenced to death in Douglas County, then the death penalty is not a state law. The death penalty is broken up into 93 different laws interpreted solely and only in the discretion of the individual prosecutor. I am saying that the Supreme Court should be authorized to compare all of these cases where criminal homicide has occurred and rectify some of the disparities, some of the differences, radical differences, which have occurred as a result of the difference in attitude among prosecutors.

This bill, remember, causes a comparison among cases. Currently an appeal merely reviews an individual case. So it might be like you have a hundred people in this room. You give each one a physical to see whether he or she is healthy. Then you compare all of them with each other to see which is the healthiest. One is an individual review. The other is a comparison. 711 adds the concept of the comparison and I think only through a procedure such as this can the arbitrariness be taken away, and Senator Clark, when I say arbitrariness, I am saying that similar circumstances do not result in a similar result in this state, and if you review the cases of people on death row, there are others in the penitentiary who have confessed to crimes far more atrocious than those committed by the ones who are currently awaiting death and those who are not on death row naturally will not die and I think that is not proper and the purpose of this law is to bring about uniformity.

*Id*. at 7378.

Reading the clear meaning of the statutes in light of the debate leads one to the conclusion that the comparison review must encompass *all* cases involving homicide, whether the death penalty was imposed or not.

Finally, in my view, common sense dictates that no other rational conclusion can be reached. The purpose of L.B. 711 was to ensure that persons were not being arbitrarily sentenced to death. To therefore suggest that we look only at those individuals who may have been discriminated against to determine whether or not they have been discriminated against is an exercise in futility. If one wants to determine whether individuals are being discriminated against in public transportation, one does not merely look at those who are required to sit in the back of the bus and conclude that since everyone in the back of the bus looks alike, there is no discrimination. One, of necessity, must look at who is riding in the front of the bus as well in order to determine whether the persons in the back are being discriminated against. So, too, there is no way that we can determine whether those who are sentenced to death are being discriminated against if we do not

examine those cases having the same or similar circumstances which, for whatever reason, did not result in the imposition of a death sentence.

I have attached to this concurrence and dissent a list of 185 cases in which individuals have been involved in the killing of another and have been convicted or have pleaded guilty to either first degree murder, second degree murder, or manslaughter or less. Of that number only 13 resulted in the imposition of the death penalty. The percentage of times the death penalty has been imposed in Nebraska since 1973 as compared to the total of such murders is 7 percent. While that may be justified, to limit the comparison we make pursuant to L.B. 711 to 7 percent of the cases is to totally ignore the obvious intent and purpose of the act. I believe we have no other choice but to review all homicide cases having the same or similar circumstances. One may argue that there may be other cases wherein homicides were committed but charges less than first degree murder, second degree murder, or manslaughter were filed. That may be true, but under the record currently before us, and in view of the few cases in which the death penalty has been imposed as compared to the total number of known homicide cases having the same or similar circumstances, the absence of those additional cases, whatever they may be, can only further exacerbate the result of the review in this case. There is nothing about those cases which will be helpful in determining whether there is discrimination in this case.

I would interpret L.B. 711 to require that the Supreme Court must review all homicide cases having the same or similar circumstances, the records of which are filed with the court pursuant to §§ 29-2521.02 and 29-2521.04, regardless of the penalty imposed, and would not limit the review to those cases in which the death penalty was imposed, as has been done by the majority. Using this broader standard of review, I believe a review of all of those cases, in light of the mandates imposed upon the states by the U.S. Supreme Court, leads to the conclusion that the imposition of the death penalty in this case is arbitrary and discriminatory and cannot stand. The decision has nothing to do with what is morally appropriate; only with what is legally permitted. A state's authority to execute must be

strictly interpreted and fully complied with before the sentence may be carried out.

Of the 185 cases set out in the attached list, it would appear that 57 of them involved robberies and murders. Those cases are identified in the list by placing an asterisk in front of the name of the case. Of that total number only six of the robbery/murders resulted in the imposition of the death penalty. In 51 of the cases a sentence of life imprisonment or less was imposed. This means that the death penalty was imposed in only 10.5 percent of the cases involving the same or similar circumstances, while in 89.5 percent of the cases the death penalty was not imposed. As we have already recognized, it is not easy to determine whether one murder is the same as or similar to another. At a minimum, all of the cases involved a situation in which the defendant attempted to or did in fact rob the victim as well as kill the victim.

A closer look at the facts of some of these cases reveals that many of these 51 cases involving a robbery and a murder where a sentence of life imprisonment or less was imposed have not only similar but nearly identical fact patterns to the instant case. For example, in *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978), the defendant robbed a gas station. He ordered the attendant to lie down. When the defendant suspected that the victim was moving behind the counter to get something, the defendant hit him with his gun. The gun went off, and the victim eventually died from a gunshot wound to the heart. Defendant was sentenced to life in prison for first degree murder.

In *State v. Domingus*, Lincoln County District Court, Docket 92, Page 31, the defendant pleaded no contest to first degree murder. The record discloses that the victim was viciously beaten by the defendant, sustaining a considerable amount of bruising in the area of the eyes and nose. In the opinion of the pathologist, the victim was alive when she sustained the facial injuries. She ultimately died of massive head injuries after she was beaten with a wooden board. The defendant was convicted of first degree murder and was sentenced to life imprisonment, plus up to 20 additional years for the beating death of the woman.

And in *State v. Suffredini, ante* p. 220, 397 N.W.2d 51 (1986), the defendant pleaded no contest to second degree murder. The facts disclose that the defendant murdered the victim immediately outside the door of a men's restroom at a rest stop along Interstate 80. The victim was shot five times, and between $180 and $240 was stolen from him. The defendant was sentenced to life imprisonment for the murder, plus not less than 15 nor more than 45 years on the robbery and not less than 5 nor more than 15 years on the use of a firearm, all of the sentences to be served consecutively.

In *State v. Marshall,* Lancaster County District Court, Docket 48, Page 262, the defendant robbed the owner of a Lincoln flower shop. In the course of the robbery, the defendant struck and killed the owner with a metal bar. The defendant was convicted of first degree murder and sentenced to life imprisonment.

In *State v. Ware,* 219 Neb. 594, 365 N.W.2d 418 (1985), the defendant robbed a music store and shot the victim when the victim attempted to phone the police. Again, the defendant, charged with first degree murder, was sentenced to life imprisonment.

These cases, though not an inclusive list of all Nebraska cases with the same or similar circumstances as the instant case, clearly exemplify that what Palmer did, while morally repugnant and deserving of the maximum punishment permitted by law, was really no different from what many others have done and for which they received a life sentence. In Palmer's case there are no significant factors different from those in the 56 other cases listed, and, therefore, a comparison with the 56 cases seems appropriate.

Even if we exclude from this number those cases in which the defendant was less than 18 years of age at the time the robbery/murder was committed (identified by placing the letter *m* following the asterisk on the attached list), we still find that there are a total of 47 cases involving a robbery and a murder. Of that number only six resulted in the imposition of the death penalty. That means that, disregarding those cases in which the defendant was less than 18 years of age, the death penalty for murdering an individual while attempting to or in fact robbing

the individual was imposed in only 12.8 percent of the cases, while life imprisonment or less was imposed in 87.2 percent of the cases. Therefore, it appears to me that, absent additional aggravating factors, a sentence of death in this case is disproportionate. The selection of six to be executed, including Palmer, is arbitrary and capricious and, therefore, in violation of the eighth amendment to the U.S. Constitution. As the U.S. Supreme Court said in *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980): "[I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."

One of the factors suggested as to why this case falls into the limited category is that this is an example of a case in which the victim was bound before being murdered. There is some brief testimony to that effect. The testimony comes solely from the defendant's wife, Cherie Palmer, who testified, in response to a single question, as follows:

Q. What did you observe?

A. Mr. Zimmerman was lying on his back on one of the beds . . . . His hands and his feet were tied.

There is, however, much evidence to contradict that statement. One of the police officers who was called to the scene testified as follows:

Q. . . . Was Mr. Zimmerman's hands or legs bound when you observed him?

A. No.

Q. . . . You weren't the first one up there to see him, isn't that right? You weren't the first person —

A. No, I was not.

Q. But you have determined that he was not bound at the time he was found, is that —

A. That's definitely correct.

This testimony is supported by the pathologist, who, likewise, testified as follows:

Q. Did you observe any abrasions or bruises around the hands or the wrists of the decedent?

A. No, sir.

Q. Did you examine them for those?

A. Yes, sir.

Q. Did you make an examination as to whether or not the decedent had been tied up in the hands area then?

A. There were no findings that would suggest to me that that had taken place, sir.

While that testimony is not intended to minimize the horror of the murder, for, indeed, it does not, it is intended to point out that the murder in this case was not significantly different from most other cases having the same or similar circumstances in which the death penalty has not been imposed.

In the original case of *Furman v. Georgia*, 408 U.S. 238, 309, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), Justice Stewart said: "[I]t is equally clear that these sentences are 'unusual' [in the eighth amendment sense] in the sense that the penalty of death is infrequently imposed for murder, and that its imposition for rape is extraordinarily rare." He went on at 309-10 to say:

For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . . I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

It was this very fact that prompted the Supreme Court of the United States to declare the death penalty in the *Furman* decision to be in violation of the federal Constitution, and that apparently prompted the Nebraska Legislature to adopt L.B. 711. This is not a case in which the court is passing upon the morality of the death penalty but, rather, a case wherein, as required by statute, we are to proportionately review the imposition of the death penalty in this case as compared to those criminal homicide cases having the same or similar circumstances. It occurs to me, therefore, that we have no alternative, so long as we are required to make a proportionality review, but to conclude that the imposition of the death penalty for the murdering of an individual in the commission of a robbery, under the facts of this case, is

arbitrary and capricious and cannot stand. This is not a pleasant choice to have to make. Nevertheless, doing what the law requires of a court is sometimes not pleasant, but always required. If the Legislature, indeed, wishes us not to follow the rule it has adopted for us, all it need do is repeal L.B. 711 which requires this court to engage in a proportionality review.

For these reasons I believe that the sentence of death in this case cannot stand and that Palmer, having been convicted of the murder, should be resentenced to a term of imprisonment for the balance of his natural life, never to be released from prison or permitted to be free again.

## ANALYSIS OF CRIMINAL HOMICIDE CASES FOR USE IN COMPARING DEATH PENALTY CASES UNDER L.B. 711

### I. FIRST DEGREE MURDER CONVICTIONS—DEATH PENALTY IMPOSED.

*State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977).

Date of Sentence: October 30, 1975.

On February 21, 1975, defendant and Ronald Ell robbed a Hinky Dinky Store in Omaha, Nebraska. The store manager and several employees pursued the robbers. The getaway car was intercepted by a policeman in a cruiser, who also chased the robbers. Shots were exchanged, and the robbers fled the getaway car. They were pursued by several officers and by a civilian, Michael Kellogg, who had armed himself and was attempting to capture Rust and Ell. Kellogg was shot four times and killed by Rust. Rust was later apprehended.

*State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977).

Date of Sentence: February 9, 1976.

Defendant robbed a bar in Omaha, Nebraska, after tying up certain persons then in the bar, including some customers. Holtan then put a gun to the head of one of the individuals. The individual's boyfriend yelled, "Oh, my God, no," at which point Holtan shot the boyfriend and the girlfriend. The boyfriend died as a result of the gunshot wounds.

*State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977).

Date of Sentence: June 24, 1976.

Defendant robbed a coin shop in Lincoln, Nebraska. He

tightly bound the owner's wrists behind her, and also bound her ankles. He then shot her three times at close range, once in the right temple, once between the eyes, and once through the roof of the mouth, directly into the brain, and robbed the store of rare coins and watches.

*State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979).

Date of Sentence: June 20, 1978.

Defendant was walking home after a night out drinking. Through a window, he saw the victim sleeping on a sofa on the first floor of her house. He entered through the back door, took her stereo, and carried it outside. He reentered, and the victim was awakened. He told the victim he was going to rob and rape her. She fought back, and defendant cut her across the forehead with his knife. He then raped the victim and inquired if she had any money. He forced her upstairs to get the money, leaving a trail of blood droplets behind her. Defendant stated that while he was starting to stab her, she pleaded for him to kill her. He then hit her four or five times over the head with a hammer and strangled her with a belt.

*State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979).

Date of Sentence: June 23, 1978.

On August 11, 1977, defendant came to the home of one of the victims, Patricia McGarry, a close personal friend. They argued over a gun which Williams had purchased, presumably to commit suicide. A friend of McGarry's, Catherine Brooks, arrived and became involved in the incident. During this time, Williams shot McGarry and Brooks three times each in or about the head. The autopsy of Brooks' body also evidenced sexual contact, although Williams denies this. After these murders defendant went to the apartment of an acquaintance and asked to use the telephone. She admitted him, and he then told her he needed to stay for a while. She suggested that he stay in the storage room area of the apartment complex, whereupon Williams drew a revolver and raped her as many as six times. He then left and traveled through Iowa, where he sexually assaulted and shot and killed a woman, and then made his way to Minnesota, where he shot and raped another woman.

*State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980).

Date of Sentence: August 24, 1978.

The defendant Anderson was an employee of Commercial Realty, owned by one Abboud. The other defendant, Hochstein, was a close friend of Anderson. Anderson was upset with some of Abboud's business practices and apparently felt that he was not getting the correct commission checks that he was owed. Anderson discussed with Hochstein several alternative ways of getting rid of Abboud, including hiring someone to kill Abboud, using a knife and explosives. About a week before the murder, Anderson and Hochstein, along with Lon Reams, began seriously discussing the murder of Abboud. Hochstein offered to execute Abboud for $1,500. Anderson agreed, and the three then planned the actual murder. Hochstein inveigled Abboud to meet him at 168th and Q Streets in Omaha. This location was chosen because it was property listed with Abboud's company and because it was out of the way. The murder was postponed, however, because Abboud had several other people in the car during this meeting. The second meeting was arranged for the next day, whereupon Hochstein shot Abboud three times, once in the head, once in the neck, and once in the back. Both Anderson and Hochstein were sentenced to death.

*State v. Harper*, 208 Neb. 568, 304 N.W.2d 663 (1981).

Date of Sentence: November 7, 1979.

Harper was involved in an emotional relationship with Sandra Johnson in 1973 and 1974. The relationship deteriorated, and Sandra told Harper that she intended to marry a Duane Johnson. The marriage did in fact take place, and Harper threatened to kill them both when Sandra refused to annul the marriage. In 1975 Harper fired a shotgun at a group gathering outside Sandra's mother's home and was arrested and sentenced to serve time in the penal complex for shooting with intent to kill, wound, or maim. Upon release, he was employed by the Eppley Research Institute in Omaha, from which he took some lethal carcinogenic drugs and put them in the milk and lemonade in the refrigerator at Sandra Johnson's home. Various family members drank the milk and lemonade. Five became ill and two of the five (Sandra's husband and her 11-month-old nephew) died.

*State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982).

Date of Sentence: June 20, 1980.

On August 22, 1979, Moore robbed and killed an elderly cabdriver. His motive was simply robbery, and he made several calls for cabs and waited until an older cabdriver arrived. Four days later he repeated this scheme, killing and robbing another cabdriver.

*State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984).

Date of Sentence: September 11, 1981.

Defendant entered victim's house by way of a back window and proceeded to the second floor bedroom. He ripped the telephone cord out in an effort to isolate the victim from the outside world. He stabbed her seven times in the chest in perpetration of or attempt to perpetrate a sexual assault. A second victim, a girlfriend and guest staying overnight with the first victim, was also found stabbed inside the doorway to the victim's bedroom. Both women were killed by stabbing.

*State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706 (1986).

Date of Sentence: September 6, 1984.

Defendant and his wife robbed a coin shop in Grand Island, Nebraska. The victim was struck on the head and tied up. He was then taken upstairs to a bedroom, where he was watched by defendant's wife while defendant robbed the shop. Defendant then came upstairs and sent his wife downstairs. While downstairs, she heard thumping noises and a low, throaty, chant-like sound. The victim was found dead upstairs, having been strangled with an electrical cord.

*State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986).

Date of Sentence: October 9, 1984.

Defendant kidnaped a young paperboy on September 18, 1983. He bound his hands and feet, taped his mouth, and put him in the trunk of defendant's car. He later removed all of his clothes except for his undershorts, though he did not sexually molest the child. The child was stabbed 11 times. On December 2, 1983, the defendant kidnaped another young boy, whom he forced to lie down in the front of the automobile. When the body was found, it too was clad only in undershorts, though the victim had not been sexually molested. He had been stabbed

seven times and roughly grabbed around the neck. Joubert confessed to the killings and pleaded guilty. He admitted that despite the pleas of the young boys, he drove to secluded places, told them to get out of the car, and coolly stabbed both of them to death because he was curious about how people died.

*State v. Bird Head*, appeal pending.

Sheridan County District Court, No. C1802.

Date of Sentence: March 18, 1986.

Defendant bound, beat, sexually assaulted, and murdered the victim in her home. When apprehended, he was intoxicated and was driving the victim's automobile.

## II. FIRST DEGREE MURDER CONVICTIONS—SENTENCED TO LIFE IMPRISONMENT.

*State v. Andersen*, no written opinion.

Dawson County District Court, No. 14391.

Date of Sentence: July 26, 1973.

Defendant and his wife resisted arrest by a patrolman, and in the struggle in the police car the patrolman was shot and killed.

*State v. Kennedy*, no written opinion.

Lancaster County District Court, Docket 37, Page 72.

Date of Sentence: September 26, 1973.

Defendant was in need of money and decided to rob someone. He first attempted to rob a home but, because of a barking dog, was unable to do so. He shot the dog with a 12-gauge shotgun and left. He then returned to Kramer Lake, where he had been earlier fishing, and approached a victim, who was also fishing. The defendant shot the fisherman in the back and proceeded to rob him. The victim was still alive, so the defendant shot him three more times.

*State v. Casper*, 192 Neb. 120, 219 N.W.2d 226 (1974).

Date of Sentence: December 13, 1973.

Defendant and several friends spent the evening at several Omaha bars. They were later joined by the victim, who promised them a night on the town. Defendant was aware that the victim had two $100 bills on his person. Defendant maintained that the victim pulled a knife on the others, fearing that he, the victim, was going to be robbed. A struggle ensued

between one of the parties and the victim. The other party got the knife away from the victim. He then ordered the victim to hand over the money. Defendant admitted that he joined in the robbery attempt. At some point the victim ended up in the river. It was not clear from the testimony whether he fell down the riverbank or was pushed. Both defendant and the other party maintain that the victim was unharmed and standing in shallow water when they left him. His body was found several days later, floating in the Missouri River.

*State v. Wilson*, 192 Neb. 435, 222 N.W.2d 128 (1974).

Date of Sentence: January 4, 1974.

Same facts as in *State v. Casper*, above.

*State v. Nokes*, 192 Neb. 844, 224 N.W.2d 776 (1975).

Date of Sentence: March 22, 1974.

Defendant and his wife had entered into an adulterous relationship with the daughter of the victims. The relationship became estranged, and the difficulty led to verbal and physical altercations between the defendant and the victims' daughter. The victims became aware of the situation and thought defendant was blackmailing their daughter. Defendant and his wife went to the victims' residence to settle the misunderstanding. Defendant took a gun with him. Later, the four went to defendant's home and down to the basement. While in the basement, defendant shot and killed the father of the daughter involved in the relationship. When the mother screamed and tried to run up the stairs, defendant shot her in the back. Defendant and his wife then dismembered the bodies, wrapped the pieces in butcher paper, and later disposed of the bodies in a nearby lake.

*State v. Brown*, no written opinion.

Douglas County District Court, Docket 88, Page 625.

Date of Sentence: March 25, 1974.

Defendant gave the victim, an acquaintance, a ride. They stopped near the Carter Lake area and got out of the car. After telling the victim that defendant did not get the job he had hoped to get, he struck the victim and robbed her of $82. She died from the beating, with massive contusions to the neck, and five cracked ribs.

*State v. Russell*, 194 Neb. 64, 230 N.W.2d 196 (1975).

Date of Sentence: May 31, 1974.

The victim, a young boy, was a friend of defendant's younger brother. Defendant, a teenager, and victim went shopping together. They then entered an abandoned apartment. Once inside, they talked, ate doughnuts, drank coffee, and engaged in homosexual activity for a brief period of about 5 minutes, apparently at the victim's request. Defendant claimed that victim started calling him names and also made derogatory statements about defendant's grandmother. Defendant got mad, cut the cord off the telephone, and strangled the victim. The victim's face turned red and his eyes bulged. Defendant left victim there, gasping for air. The victim was 8 years of age, and the defendant was 17 years of age.

*ᵐState v. Harris, 194 Neb. 74, 230 N.W.2d 203 (1975).

Date of Sentence: June 26, 1974.

The victim, an 81-year-old woman, was walking home from the bus stop after attending church. She was encountered by the defendant and a codefendant, who attempted to snatch her purse. A struggle ensued, and the woman was knocked down and kicked several times. She was taken to the Douglas County Hospital by a rescue squad. She sustained a number of serious injuries, including a broken hip. She died 2 months later as a result of complications secondary to the injury.

*ᵐState v. Lytle, 194 Neb. 353, 231 N.W.2d 681 (1975).

Date of Sentence: June 26, 1974.

Same as facts in State v. Harris, above. At the time of the assault Harris was 16 years of age and Lytle was 17 years of age.

*ᵐState v. McDonald, 195 Neb. 625, 240 N.W.2d 8 (1976).

Date of Sentence: June 16, 1975.

On the evening of July 3, 1974, the defendant and two other youths were driven by a mother of one of the youths to a liquor store so that they could buy beer. Defendant was, at that time, 16 years old. Later that evening, defendant was informed that a car belonging to defendant's older brother had been hit. Defendant and his friend went outside and viewed the car. The victim was standing nearby, and there was a discussion between defendant and the victim as to whether the victim had hit the car. Defendant and his friend then went to the friend's trailer and got a gun and disassembled it. There was conflicting

testimony, but either the defendant or his friend hit the victim over the head. The two then stuffed the victim into the trunk of his car, stole his wallet, and shut the lid. The car was later set on fire. The defendant's friend testified that defendant went back to the car and, later, returned, stating that he had set the car on fire. The victim was found dead in the trunk by firefighters, who were called to the scene by a policeman who saw the burning car.

*State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977).

Date of Sentence: August 20, 1975. Initially sentenced to death, but sentence reduced by Supreme Court.

The defendant was 16 years old at the time of the commission of the murder. He had developed a relationship with two drug dealers, who were supplying him with marijuana. He fell behind in his payments and was threatened by the dealers if he did not pay. Defendant advised the dealers that he needed 2 pounds of marijuana so that he could sell it and make a sufficient profit to pay the drug dealers. It was during this attempted transaction that the murder occurred. The dealers picked up Stewart in a van. The plan was to take Stewart to the house of the buyer so that the transaction could take place. Stewart actually had no buyer, and planned to steal the marijuana from the dealers. He had on his person his father's pistol and a can of gasoline. He told the dealers the gas was for a friend. While in the van, the defendant shot both dealers in the back of the head. One died immediately, but the other survived and witnessed the defendant pour gas all over the inside of the van and ignite it. After the defendant left, the injured dealer escaped from the burning van, and later testified.

*State v. Sims*, 197 Neb. 1, 246 N.W.2d 645 (1976).

Date of Sentence: September 19, 1975.

Defendant and the victim were involved in a near accident, which resulted in defendant's having words with the victim. After a brief conversation the defendant returned to his automobile. A short time later, the defendant returned to the area where the victim's car was parked. The passenger in the defendant's automobile stepped out of the car and fired a pistol in the air. The defendant removed a shotgun from the car and walked rapidly in the direction of the deceased, who was

standing against his car. The defendant stopped when he was about 10 feet away from the deceased and fired one shell, which struck the deceased in the abdomen, causing his death.

*State v. Ell, 196 Neb. 800, 246 N.W.2d 594 (1976).

Date of Sentence: November 10, 1975.

This is a companion case to State v. Rust, 197 Neb. 528, 250 N.W.2d 867 (1977). Because the evidence indicated that Rust did the actual shooting, Ell was sentenced to life imprisonment, being convicted of felony murder.

*State v. Record, 198 Neb. 530, 253 N.W.2d 847 (1977).

Date of Sentence: July 2, 1976.

Defendant, 18 years of age, and another were driving in an automobile when they decided to rob anyone who next came along. They drove to approximately 180th and Dodge Streets in Omaha and parked on a side road, waiting for someone to drive by so that the defendant could shoot and rob someone. At approximately 3 a.m. a car driven by the victim passed their parked car, proceeding east on Dodge Street. With the other party driving, the victim's car was pursued. As their car drove alongside the victim's as if to pass, the defendant fired a shot, breaking the glass and killing the driver.

State v. Beans, 199 Neb. 807, 261 N.W.2d 749 (1978).

Date of Sentence: January 20, 1977.

Defendant and his wife (the victim) had concluded a bitter divorce and child custody proceedings. Defendant went to the victim's home to talk with her, taking his gun along with him. The victim had a gun in her purse. They argued, and defendant fired a shot into the wall. After the victim pulled the gun from her purse, the defendant attempted to knock it out of her hand; in the process the defendant's gun went off and the victim was killed with one shot to the abdomen.

*State v. Scott, 200 Neb. 265, 263 N.W.2d 659 (1978).

Date of Sentence: May 6, 1977.

The defendant entered the home of William and Bertha McCormic in Omaha, Nebraska, and demanded money at gunpoint. A scuffle ensued, and Mr. McCormic, who was 92 years of age, was shot twice and died. Mrs. McCormic, who was 83 years old, was shot twice and wounded. The defendant was 18 years of age.

*State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978).

Date of Sentence: July 8, 1977.

Defendant robbed a gas station. He ordered the attendant to lie down. When defendant thought the victim was going behind the counter to get something, defendant hit him with his gun, and it went off. Defendant took the money and fled. The victim died from a gunshot wound to the heart. The defendant was 24 years of age.

*State v. Simpson*, 200 Neb. 823, 265 N.W.2d 681 (1978).

Date of Sentence: September 16, 1977.

The defendant, his sister, and his sister's child were hitchhiking and were picked up by the victim. They had formed a plan whereby they would get the driver to stop the car and defendant's sister would pull a gun and rob him. They stopped the car, but nothing happened. As they got back on the road, defendant's sister pulled the gun and told the driver to keep his hands on the wheel and stop the car. The driver turned to disarm her, and she shot him in the back. The victim was paralyzed, so they dragged him from the car into a borrow pit off the Interstate and took his billfold. The defendant fired two more shots to the head of the victim. The defendant was 20 years of age.

*ᵐState v. Schaeffer*, no written opinion.

Hall County District Court, Docket 28, Page 279.

Date of Sentence: September 30, 1977.

The defendant, a 16-year-old, together with a friend, forced the manager of the Ace Hardware Store in Grand Island into their car at gunpoint, where, after robbing him, they shot him 17 times.

*State v. Roewert*, no written opinion.

Platte County District Court, No. 2805.

Date of Sentence: December 8, 1977.

The defendant and some friends were drinking at a bar in Norfolk, Nebraska, and planned to rob and kill the victim. They determined they would kill the victim so as not to be identified. The defendant went and got some knives and lured the victim out of the bar by inviting him to a party. They drove him out to a country road, where they took his billfold. While the victim was passed out from being intoxicated, the defendant

cut his throat and then decapitated him. The defendant then disemboweled the victim, rolled the body over, and cut it about the back. The defendant was 23 years of age.

*State v. Beers*, 201 Neb. 714, 271 N.W.2d 842 (1978).

Date of Sentence: December 16, 1977.

Defendant and his wife were separated. After drinking he went home and put a double-barreled shotgun in his car. He then found his wife with another man and threatened to kill her. She fled to the home of one Steve Gruber. The defendant continued to drive about Nebraska City looking for his wife. Meanwhile, Gruber reported to the police that the defendant had made threats. Two officers proceeded to look for the defendant. Upon spotting one of the officers the defendant did a U-turn in the alley where he was and came back to the rear of the police station. The defendant stepped out of his pickup truck with his shotgun in hand. When he was ordered to put the gun down, he began firing, and a gun battle ensued. The defendant shot both officers, killing one of them. He then fled and was caught at a rest stop near York, Nebraska.

*State v. Marshall*, no written opinion.

Lancaster County District Court, Docket 48, Page 262.

Date of Sentence: March 13, 1978.

The defendant, a 20-year-old, working in a flower shop in Lincoln, Nebraska, robbed the owner, and in the course of the robbery struck the owner in the head several times with a metal bar, from which blows the victim died.

*State v. Hatcher*, no written opinion.

Douglas County District Court, Docket 101, Page 321.

Date of Sentence: April 14, 1978.

The defendant, being pursued by a police officer, engaged in a struggle with the police officer, and as the officer struggled with the defendant the officer's gun went off twice, the second time hitting the officer in the head.

*State v. Floyd*, no written opinion.

Hamilton County District Court, Docket 24, Page 196.

Date of Sentence: May 16, 1978.

Defendant, 37 years old, attempted to rob a filling station. The attendant advised the defendant that he knew kung fu, did a kung fu scream, and jumped into a kung fu stance. Defendant

shot the attendant three times in the head.

*State v. Nielsen*, 203 Neb. 847, 280 N.W.2d 904 (1979).

Date of Sentence: May 26, 1978.

Defendant returned from a hunting trip, during which time he consumed a great deal of alcohol. Upon returning home he engaged in an argument with his wife. He left for a while, and when he returned, found that his wife was gone. He then went to her parents' home to look for her and got into an argument with them. The defendant called his father-in-law an obscene name and shot once at the wall to show them that his gun worked. Defendant and his father-in-law stepped outside, where defendant then shot the father-in-law. The mother-in-law screamed, and was also shot when she went outside. The father-in-law died of a gunshot wound to the head, and the mother-in-law died of a gunshot wound to the neck and left upper posterior thorax.

*State v. Bennett*, 204 Neb. 28, 281 N.W.2d 216 (1979).

Date of Sentence: July 27, 1978.

While there was some dispute in the evidence, it appears that the defendant sought to rob the victim while on a public street. He struck the victim with a large rock, and then apparently became scared and called the rescue squad. He later went to the hospital to check on the victim's status. The victim died as a result of the head wounds inflicted by the rock.

*ᵐState v. Anderson*, no written opinion.

Douglas County District Court, Docket 102, Page 85.

Date of Sentence: September 25, 1978.

The defendant, a 15-year-old, together with his brother and a friend, decided to rob someone. The three were in one car and followed a man in another car until he stopped at a stop sign. Defendant got out of the car and pulled a gun on the victim, telling him to move over. The friend drove the victim's car, and the victim was placed in the passenger seat. Defendant got into the back seat. They drove around for several minutes and parked off the highway. They took the victim's billfold at gunpoint. When the victim started to struggle, the defendant shot him in the head.

*State v. Robbins*, 205 Neb. 226, 287 N.W.2d 55 (1980).

Date of Sentence: February 16, 1979.

The victim and his wife were separated. The victim was under the impression that his wife was having an affair with the defendant. Actually, the defendant was living with the wife's 16-year-old daughter. Defendant and a friend went to the victim's house, apparently to straighten out the misunderstanding. A fight ensued, and the defendant shot the victim six times. Defendant and his friend later returned and took money from the victim's wallet.

*State v. Ditter*, 209 Neb. 452, 308 N.W.2d 350 (1981).

Date of Sentence: November 15, 1979.

Defendant and his wife, the victim, were separated. Defendant went to his wife's apartment, where he broke in. He ordered a girlfriend of the victim to remove the parties' two minor children, and then ordered his wife to disrobe. While requiring his wife to beg for her life, he fired four shots into her body. Shots were fired at different intervals. When the police broke in, the victim was still alive, but died before the rescue squad arrived.

**State v. Thornton*, no written opinion.

Douglas County District Court, Docket 105, Page 263.

Date of Sentence: January 3, 1980.

The defendant entered the victim's apartment through a boarded-up doorway in the basement. His intent was to break and enter for the purpose of burglarizing the home. He took money, drugs, and a radio while the victim was asleep on the sofa. She was awakened by the noise of the defendant. She screamed, and the two struggled. Defendant strangled her with a gag.

**State v. Bussard*, no written opinion.

Red Willow County District Court, No. 11,542.

Date of Sentence: February 22, 1980.

The defendant, defendant's brother, and two friends were shooting pool at a bar. They met the victim at the bar, and the group decided to go for a ride and shoot rabbits. They rode in the victim's car and stopped first at defendant's home to get a gun. They then drove out of town and stopped to shoot at some lights. The defendant told one of his friends that he was going to shoot and rob the victim because the victim was an undercover drug agent. They turned off the road and decided to

shoot at a beer can. Defendant then shot the victim in the nose. When the victim hollered, the defendant fired several more shots into the victim's head from close range. They then took off the victim's clothes and stole his billfold. They dumped the body over a fence and returned to town. They then returned to the scene, where they buried the body and set the car on fire. The defendant was 24 years of age.

*State v. McGee,* no written opinion.

Sarpy County District Court, Docket 38, Page 170.

Date of Sentence: April 14, 1980.

This defendant, together with several others, was part of a social "family." The defendant was told that if he wanted to get in good with the family he would have to kill the victim, another member of the family, or else he himself would be killed. On the night of the murder a party was held at the home of one of the family members. Most were drinking and took drugs. The victim was given a drink which was drugged. Later, while defendant and two others went upstairs to load a gun, the victim was downstairs with another. The others came down, handed the defendant the gun, and told him to kill the victim, which he did, shooting him 15 or 16 times. The body was thrown in a creekbed in Iowa, where it was found a week later.

*State v. Boyer,* 211 Neb. 139, 318 N.W.2d 60 (1982).

Date of Sentence: April 14, 1981.

Defendant had an argument with his parents the evening prior to the murder and spent the night sleeping in his car. A neighbor saw him return home in the morning and called defendant's mother, the victim, at work, as the neighbor had been instructed to do by the victim. The defendant was locked out of his home but broke a window to gain entrance. He went upstairs to his bedroom, locked the door, and loaded his shotgun. The victim came home from work and demanded entrance to defendant's bedroom. The defendant opened the door, and the two quarreled. The victim told the defendant to pack his suitcase and leave the house. At that time the defendant retrieved the gun from under his bed and shot her. He then called 911 and told them that his mother had fallen.

*State v. Pope,* 211 Neb. 425, 318 N.W.2d 883 (1982).

Date of Sentence: June 23, 1981.

The victim and the defendant had been together at a bar. The victim wanted to hire someone to kill his wife, so the two were discussing the transaction. A third party may have been present. They stopped the automobile they were in so they could relieve themselves along a country road. The victim pulled out a large roll of bills, and defendant shot him in the back of the head. The defendant then took the money and dragged the body away to where it was found several days later.

*ᵐ*State v. Hubbard*, 211 Neb. 531, 319 N.W.2d 116 (1982).

Date of Sentence: July 16, 1981.

The defendant, 17 years of age, desired to rob someone in order to get money to buy marijuana. The defendant tried unsuccessfully to gain entry into one house. After this failure he obtained a gun from the codefendant, Juan Bradley, and went up to the victim's house. When the victim opened the door, the defendant shot the victim and fled.

*ᵐ*State v. Bradley*, 210 Neb. 882, 317 N.W.2d 99 (1982).

Date of Sentence: July 17, 1981.

This is a companion case to *State v. Hubbard*, above. The defendant was 17 years of age.

*State v. Scott*, 212 Neb. 625, 324 N.W.2d 670 (1982).

Date of Sentence: October 14, 1981.

The defendant and the victim had been living together for approximately 4 years. The victim had two children with the defendant and one more with a previous boyfriend. On the evening of the murder the defendant had gone out with a friend and the victim had gone out with a girlfriend and left the children with a neighbor. When the victim returned at about 10:30 p.m., she found the defendant at the door of her apartment. He was furious with her for leaving the children out past 10 p.m. The victim's girlfriend felt that it was her fault that he was angry and attempted to calm him down. After 20 minutes with him she felt that he had calmed down. At 3 a.m. the next morning the police received a 911 call for a rescue squad. The call was made by the defendant. When the rescue squad arrived, the defendant stated that it was his fault and that he had pushed the victim down the stairs. The apartment was in disarray. There was a coffee table overturned with two legs missing. It was later determined that the body had been beaten

with a leg from the table and with a leather belt, and kicked with steel-toed shoes.

*State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983).

Date of Sentence: October 29, 1981.

The defendant shot and killed his wife, who apparently was suffering from many physical ailments.

*\*State v. Tucker*, 215 Neb. 636, 340 N.W.2d 376 (1983).

Date of Sentence: July 19, 1982.

Defendant and his brother entered the International House of Pancakes restaurant for the purpose of committing a robbery. The brother asked the waitress/cashier (victim) for change for a dollar. Defendant then pulled his gun and said it was a stickup. The defendant shot the victim once in the upper right chest. The victim was 18 years of age, and the defendant was 21.

*\*ᵐState v. Tucker*, no written opinion.

Douglas County District Court, Docket 111, Page 465.

Date of Sentence: July 28, 1982.

This is a companion case to *State v. Tucker*, 215 Neb. 636, 340 N.W.2d 376 (1983). The only difference is that, here, the defendant did not actually pull the trigger.

*\*State v. Blackbonette*, no written opinion.

Lancaster County District Court, Docket 59, Page 108.

Date of Sentence: August 23, 1982.

The defendant knocked on the door of the victim's home. The victim was an elderly woman. The defendant showed her a picture ID and told her he was a police officer. When she then let him in, he tried to make his story believable by checking out the windows, as if observing someone. He told her to go up to her room in case the men broke down the door. He then located a knife and went upstairs. He asked the victim for money. When she said she had none, he stabbed her twice in the stomach. He then strangled her with a cord, which he had apparently cut from some drapery. He then stole her radio, which he later sold for $5. The defendant was 35 years of age.

*State v. Searles*, 214 Neb. 849, 336 N.W.2d 571 (1983).

Date of Sentence: November 26, 1982.

The defendant was a resident of a state-licensed residential care facility. In this custodial foster home 90 percent of the

residents require medication for psychiatric disorders. The defendant shared an apartment with five others, including the victim. The defendant and the victim had often argued over the use of the TV. On the day of the killing the defendant was told by the proprietor that he was going to have to be moved. The defendant took a knife out of the kitchen, went out to the balcony where the victim was, and stabbed her several times. The defendant admitted the killing, stating, "I stabbed her good; I hope I killed her."

*State v. Lynch*, 215 Neb. 528, 340 N.W.2d 128 (1983).

Date of Sentence: December 16, 1982.

The victim, a 57-year-old man, was out driving and "looking for some action." He picked up the defendant, age 20, who was a hitchhiker. The defendant explained that he was down on his luck and needed some money. The victim responded to this by saying, "I could get you some money if you will be my friend for a while." The defendant agreed, and the two proceeded back to the victim's apartment. The victim offered the defendant a drink, and the two went into the bedroom. There, the victim disrobed and made homosexual advances toward the defendant. The defendant refused, and the victim persisted. The victim came close to the defendant, and at this point the defendant pulled a pocketknife out and stabbed the victim several times. A struggle ensued, in which the victim was stabbed several more times in the throat area. The cause of death was hemorrhaging from the stab wounds.

*State v. Lee*, 216 Neb. 63, 341 N.W.2d 600 (1983).

Date of Sentence: January 24, 1983.

The defendant had, on the day on which the murder occurred, driven in from Kansas City with his girlfriend, Bonnie Welker, and Sue Welch. The three were drinking beer and smoking marijuana. That evening the defendant and Welker were using Welker's gun to do some target practice. They later bought additional shells at K-Mart. Just by chance, the defendant and Welker met the victim, Wilbert Swick, and one Gregory Powell at the intersection of 84th and L Streets at approximately 1:20 a.m. Powell was driving Swick's Corvette, and Welker was driving a white Continental, with defendant in the passenger seat. Swick yelled to Welker something like,

"How is it going, baby?" When defendant learned of this he became angry. He made Welker stop the car, got out with the gun, and approached Swick in the Corvette. He told Swick, "Don't be flirting with my girl." He then shot Swick at close range.

*ᵐState v. Nollen, no written opinion.

Washington County District Court, No. 8982.

Date of Sentence: January 24, 1983.

The defendant, 17 years of age, and a companion broke into a doughnut shop in Blair, Nebraska, for the purpose of robbing it. They encountered the young manager, who was in the process of closing the store. They stole $200 and abducted the victim against her will. They had a knife, and drove around in the victim's car. The defendant sexually assaulted her while they were in the back seat. They tied her hands behind her back. While she was alive in the car, they ran the car off the dock into the river, causing her to drown.

State v. Krimmel, 216 Neb. 825, 346 N.W.2d 396 (1984).

Date of Sentence: April 21, 1983.

The defendant, 20 years of age, did odd jobs for the deceased, who was an elderly (84-year-old) man. On the morning of November 4, 1982, the defendant went to the victim's residence to collect some money for jobs he had done. The victim only had $5 to give him. The defendant became enraged because he felt he was being cheated out of money owed to him. He jumped the victim as the victim was on his way to the bathroom. The defendant put a choke hold on the victim and began stabbing him in the neck and back. The coroner's report indicated 25 stab wounds on the victim.

State v. Meis, 217 Neb. 770, 351 N.W.2d 79 (1984).

Date of Sentence: May 2, 1983.

While inside a local tavern, the defendant made vulgar comments towards the victim's friend. The defendant and the victim stepped outside, where they were involved in a fight. The victim pinned the defendant on a car and then returned to the bar. The defendant subsequently reentered the bar, aiming his revolver at victim's section of the bar. The defendant also harassed others. While the bar owner was telephoning the police, defendant left. The bar was closing, so the victim left

also. The victim died from a single gunshot wound to the front part of his lower chest.

*State v. Jones*, 217 Neb. 435, 350 N.W.2d 11 (1984).

Date of Sentence: June 13, 1983.

The victim and the defendant had had an ongoing dispute, the defendant maintaining that the victim had fired shots into the defendant's house, nearly hitting a child. Several days later, the defendant entered a north Omaha after-hours club. He saw the victim and asked for an apology. The victim responded by saying it was the defendant that owed him, the victim, the apology. The victim was seated at a table playing cards and the defendant was standing. The victim leaned over the table to gather his money. When the victim went for his pocket to put the money into it, the defendant, fearing that the victim had a gun, shot the victim twice. The victim fell to the floor, but was not yet dead. The defendant went around the table, got on top of the victim, and shot him three more times. The defendant's gun clicked several times after this.

*State v. Rehbein*, no written opinion.

Douglas County District Court, Docket 113, Page 475.

Date of Sentence: June 13, 1983.

The defendant used a penknife to cut the screen and enter victim's apartment in an attempt to perpetrate a robbery. The victim woke up, and the defendant feared being identified. The defendant beat up the victim with his fists and a hatchet. The victim died from multiple stab or cutting wounds to the head, neck, and upper body, as well as multiple lacerations of the scalp and forehead, inflicted by a blunt object.

*State v. Massey*, 218 Neb. 492, 357 N.W.2d 181 (1984).

Date of Sentence: July 8, 1983.

The defendant and an accomplice lured the victim up to a hotel room at the Ramada Inn and robbed him, after hitting him over the head with a vodka bottle. A scuffle ensued, and the victim and Massey ended up in the elevator. After reaching the lobby, Massey shot the victim at close range in the side, and then ran off.

*State v. Lopez*, no written opinion.

Douglas County District Court, Docket 114, Page 521.

Date of Sentence: August 25, 1983.

One Maxine Wells and the defendant had been drinking at Mitchell's Game Room early on the morning of March 19, 1983. Wells advised the defendant she was going to solicit someone to get some money. The defendant told her that there was a possible customer across the street. She went across the street to a restaurant, where she began talking to the victim as he entered his car. The defendant then came up from behind the victim and beat him on the head with a club.

*State v. Bradford*, 223 Neb. 908, 395 N.W.2d 495 (1986).

Date of Sentence: December 12, 1983.

The defendant and several other individuals robbed the landlord of a house where defendant's sister lived. The robbery was in progress when defendant arrived on the scene. The landlord was stabbed a number of times and then thrown into a trunk of a car and taken out to the country, where he was then thrown into a ditch. He was stabbed again and his throat cut so severely that he was nearly decapitated.

*State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985).

Date of Sentence: January 4, 1984.

The defendant, a prostitute in Omaha, Nebraska, together with three other prostitutes, kidnaped a fifth prostitute who had solicited many "dates" that night. The four decided to rob her instead of trying to rob someone else. The victim was verbally and physically assaulted, including being forced to perform an act of oral sex on one of the prostitutes. The victim was then robbed of $25. Later, she was taken out of the car and beat to death with a stick and a bat.

*State v. Perkins*, 219 Neb. 491, 364 N.W.2d 20 (1985).

Date of Sentence: April 3, 1984.

This is a companion case to *State v. Bradford*, above. This defendant actually instituted the robbery and stabbed the victim a number of times.

*State v. Jones*, 218 Neb. 713, 358 N.W.2d 765 (1984).

Date of Sentence: April 13, 1984.

The defendant murdered the victim, Ann Speese, and her 12-year-old daughter, Tina. Ann's body was dismembered by a saw or other mechanical means. Ann's death was due to multiple head wounds inflicted by a blunt instrument, and Tina died of asphyxiation. Autopsy reports indicated that Tina may

have been sexually assaulted, but that was not clearly established.

*State v. Crisp*, 219 Neb. 265, 361 N.W.2d 544 (1985).

Date of Sentence: June 6, 1984.

The defendant had escaped while participating in the Douglas County work release program and stole the victim's car so he could leave town. Defendant stated to investigators that he struck her, knocked her out, tore her clothes off, grabbed her by the breast, stuck his hand in her vagina, and tried to "pull her insides out." He admitted stabbing her. He threw her out of the car, and her partially decomposed body was found 1 month later in a field behind an Omaha manufacturing plant. Following the killing, he stole her purse and her car. The defendant was 23 years of age.

*State v. Smith*, 219 Neb. 176, 361 N.W.2d 532 (1985).

Date of Sentence: June 12, 1984.

Loray Smith was one of the participants in the beating death of Laura LaPointe, a prostitute. For fuller details see *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985), and *State v. Joy*, 220 Neb. 535, 371 N.W.2d 113 (1985).

*State v. Ware*, 219 Neb. 594, 365 N.W.2d 418 (1985).

Date of Sentence: June 20, 1984.

The defendant robbed a music store and shot the victim when the victim attempted to phone the police.

*State v. Benzel*, 220 Neb. 466, 370 N.W.2d 501 (1985).

Date of Sentence: October 29, 1984.

The defendant and another went to the home of the victim to purchase some drugs. Once inside the house, the defendant began to beat up on the party who had accompanied him (a female). The victim told them to leave. The defendant apparently disputed whether or not payment had been made for the drugs and grabbed the victim's girlfriend and put a gun to her head. The victim went to his bedroom for a gun, and when he returned, the defendant shot the victim once in the mouth. He then attempted to shoot the girlfriend by pointing the gun at her from a distance of about 5 feet. He attempted three or four shots, but the gun misfired.

*State v. Joy*, 220 Neb. 535, 371 N.W.2d 113 (1985).

Date of Sentence: November 29, 1984.

This individual was another involved in the beating death of a prostitute. For full details, see *State v. Robertson*, 219 Neb. 782, 366 N.W.2d 429 (1985).

*State v. Haselhuhn*, no written opinion.

Lancaster County District Court, Docket 65, Page 96.

Date of Sentence: December 11, 1984.

Clement Rolenc and his former wife, the victim, were involved in a dispute about the provisions in the decree of dissolution of their marriage. Rolenc hired Robin Burchett to kill her. Rolenc and Burchett had met at a truckstop in Lincoln to arrange the murder. The day of the killing, Rolenc took his former wife to breakfast at the truckstop. There, the couple met Burchett and a third party, who was unknown to the couple. This was the defendant. Rolenc and the victim drove to the country in a car followed by Burchett and the defendant, who were in Burchett's car. The two cars stopped, and the defendant, who in turn had been hired by Burchett to actually perform the killing, transferred cars. Sitting in the back seat behind the victim while the victim's husband drove the car, the defendant slipped a belt around the victim's neck and choked her to death. Burchett and the defendant then carried the victim's body into the trunk of Burchett's car. Rolenc removed the victim's ring and took her purse. Rolenc paid Burchett for doing the job, and drove off. Burchett and defendant drove to a creek, where they tied the hands and feet of the body, attached three large pieces of concrete to it, and allowed it to sink into the water.

*State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986).

Date of Sentence: December 19, 1984.

The defendant went to his aunt's home, where he obtained a butcher knife. After removing his clothing he went to his aunt's bedroom and stabbed her three or four times. He then placed his arm around her neck and squeezed until she died. After that he attempted to have intercourse with her dead body.

*State v. Burchett*, 224 Neb. 444, 399 N.W.2d 258 (1986).

Date of Sentence: January 2, 1985.

This is a companion case to *State v. Haselhuhn*, above. Burchett was hired by Clement Rolenc to kill Rolenc's former wife. Burchett in turn hired Wayne Haselhuhn to actually do

the killing. After the woman was strangled by Haselhuhn, Burchett and Haselhuhn removed her body from the car and drove to a creek, where they then weighed the body down and threw it into the creek.

*State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986).

Date of Sentence: June 17, 1985.

The defendant forcibly entered the victim's home. The victim, an elderly lady, was apparently lying on the kitchen floor, trying to use the phone to call for help. The defendant grabbed the phone and ripped it from the wall. The defendant then ransacked the house, going through closets and drawers. The victim was discovered the next day, lying dead on the floor. It was extremely cold in the house, and death was apparently due to exposure to cold caused by the breaking of a window to gain access.

*State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985).

Date of Sentence: October 11, 1985.

The defendant knocked on the victim's door and, when the victim opened the door, forced his way in at gunpoint. He then told her to lie on the floor, and she complied. He tied her arms and legs and stuffed panties in her mouth. He took a nylon stocking and strangled her to death, then untied her, removed her clothing, and masturbated over her body. Believing that she still had a pulse, although, in fact, she was dead, he carried the body to a bathtub, where he placed the body in the water. The phone rang, and he then fled the premises, later having his wife call the police and report the murder.

*State v. Domingus*, appeal pending.

Lincoln County District Court, Docket 92, Page 31.

Date of Sentence: November 10, 1986.

The defendant was convicted of killing a 35-year-old female, who died of massive head injuries after she was beaten with a board. The medical testimony indicated that the victim was alive when much of the beating was inflicted. Much of her head and skull were damaged.

III. SECOND DEGREE MURDER CONVICTIONS—LIFE SENTENCE IMPOSED.

*State v. Deckard*, no written opinion.

Douglas County District Court, Docket 87, Page 382.

Date of Sentence: April 25, 1974.

Defendant maintains that he was with a friend who took him over to the victim's house. The friend and the victim were having an argument over money and drugs, and defendant pulled out his gun and ordered the victim to stop fighting. The victim bumped into the gun, and it discharged accidentally. Death was caused by a bullet wound to the temple.

*State v. Goldsberry*, no written opinion.

Lancaster County District Court, Docket 39, Page 219.

Date of Sentence: October 7, 1974.

The defendant was 18 years old at the time of the crime. On the morning of November 11, 1973, he observed the victim walking by his home on her way to school. He misrepresented to her that he had mail in his home belonging to her. Once she entered the house, she realized he was attempting to hold her there, and sought to leave. He did not let her go, and she began to scream. Defendant pushed her back as the victim resisted. He then used both hands to choke her. She fell to the ground and was rendered unconscious shortly thereafter. He described her face as being blue and her mouth as foamy. Defendant wrapped the body in a blanket and put a green trash bag over the body. He then placed the body in a station wagon and took it to a pasture near Table Rock, Nebraska. There, the body was undressed and the clothes put in the trash bag. He returned home and threw away the clothes, along with her purse and book. The body apparently was ravaged by coyotes, and the skull was found several months later. The bones of the body were scattered throughout a pasture, apparently by the coyotes.

*State v. Laravie*, 192 Neb. 625, 223 N.W.2d 435 (1974).

Date of Sentence: December 20, 1974.

The defendant, though only 15 years of age, was married with a child. He had been drinking all day with friends and decided to use a public phone to call his wife. He changed his mind and decided to use a phone in a home. After walking several blocks he went into a home and began looking around to see if there was anything he could steal. He grabbed a knife from the kitchen for protection in case someone was home. The victim, a 2½-year-old boy, woke up and made a noise.

Defendant tried to cover the victim's mouth with his hand and finally stabbed him twice in the chest to prevent him from getting out of bed.

*State v. Taylor*, no written opinion.

Douglas County District Court, Docket 91, Page 592.

Date of Sentence: June 16, 1975.

Defendant picked up a hitchhiker at 31st and Dodge Streets in Omaha, Nebraska. After arriving at the victim's home, defendant removed a sawed-off rifle from his waistband in his coat, took the safety off, and placed it against the victim's left temple area and pulled the trigger just as the victim was about to leave the car. Defendant drove around for a while with the body in the car. He then stopped, pushed the body out of the car, searched all the pockets, to make it look like a robbery, and shot the victim one more time in the back of the head.

*State v. Braasch*, no written opinion.

Adams County District Court, Docket 61, Page 285.

Date of Sentence: August 15, 1975.

The victim in this case was the defendant's supervisor in Hastings, Nebraska. Defendant had worked for the company for the past 6½ years and received much of his early education and training from the victim. The defendant had hard feelings towards the victim for several years because the defendant felt he was not getting credit for the work he did.

*State v. Walker*, 197 Neb. 314, 248 N.W.2d 759 (1976).

Date of Sentence: March 24, 1976.

Defendant and his wife, the victim, were separated. Defendant intercepted her as she was leaving her place of employment in an automobile operated by her brother. Apparently, a fight developed between defendant and his brother-in-law, during which time a gun of the defendant's discharged, striking and killing the victim. Defendant maintained that he was not aware that the victim had been shot until the next morning, when he turned himself in to authorities.

*State v. Hoppes*, 202 Neb. 383, 275 N.W.2d 608 (1979).

Date of Sentence: June 3, 1976.

Defendant's wife had recently moved out after an extended period of quarreling with defendant. On the evening of the

murder the defendant consumed a bottle of wine and then purchased a second bottle, which he took to his wife. She accepted the bottle and let him into her residence. The two began to argue about getting back together, and a verbal argument turned into a physical battle. Defendant claims that he swung at his wife, aiming for her face, but missed and hit her in the neck. He states that she flew backwards and hit the wall, fell, and eventually died. Defendant maintains that he attempted to call for an ambulance, but when he discovered the phone was not working, he placed his wife's body in his van and went home. The next day, after driving for some time, he decided to dispose of the body. He cut a hole in some ice, tied a wheel to the body with a log chain, and dumped the body into the lake. The autopsy disclosed that the wife died of strangulation and not by reason of a blow to the neck.

*State v. Cole*, no written opinion.

Otoe County District Court, Docket 27, Page 68.

Date of Sentence: August 3, 1976.

The defendant entered the home of the victim and fatally stabbed her with a hunting knife. He also stabbed the victim's 11-year-old daughter. There was evidence that after stabbing the victim the defendant sexually assaulted her. She was stabbed once in the throat and twice in the chest. It was the wounds to the chest which caused her death. The defendant then carried the victim's body over his shoulder to the rear door, where he dropped it and left.

*State v. Robinson*, 198 Neb. 785, 255 N.W.2d 835 (1977).

Date of Sentence: August 27, 1976.

The defendant and the victim were close friends. On the day of the murder the defendant took the victim, his girlfriend, and her children from Omaha to Lincoln in his automobile. The defendant had a $50-per-day heroin habit, which he supported by stealing checks out of mailboxes. Later in the evening, the victim requested the defendant to return him, his girlfriend, and her children to Omaha. The defendant refused to do so, though, on several occasions, he promised he would. The two ultimately got into a fight, and the victim approached the defendant. Defendant warned the victim to get back, then pulled the gun out and shot the victim in the head.

*State v. Scott*, no written opinion.

Cass County District Court, No. C-7 52.

Date of Sentence: September 7, 1976.

Defendant was living with his girlfriend. The victim was also a friend of theirs, who was romantically inclined toward the defendant's girlfriend. On the night of the incident the defendant had a gun and had consumed much alcohol. The girlfriend and her children were staying in the victim's trailer. Defendant suspected she was there, and he wanted to get her and bring her home. He went to the door, and the victim answered. The victim shoved the defendant away and said the girlfriend would come home when the victim brought her home. The victim returned to bed and told the girlfriend that he was not going to let the defendant in at that time of the night. The girlfriend got up and was going out to talk to the defendant, when she heard a shot. She walked out of the bedroom into the hallway to find the defendant, who had sneaked into the trailer without anyone's knowledge and who then shot the victim.

*State v. Thompson*, 199 Neb. 67, 255 N.W.2d 880 (1977).

Date of Sentence: December 10, 1976.

Defendant went to a party at his sister's home. During the evening, an argument developed and a fight broke out. One of the guests threatened the defendant, saying he would kill the defendant the next time he saw him. The next day, the defendant, after drinking alcohol and smoking marijuana, purchased a rifle and ammunition. He then went over to his sister's house to talk to her about what had happened the night before. He walked in with a loaded gun and pointed it at her and several other persons. The victim, a longtime friend of the defendant, was in the house. The victim pushed or knocked defendant against the wall in an effort to disarm him. There was a brief conversation between the two, and, as the victim began to walk away, defendant shot him. The bullet entered in the chest near the right shoulder.

*State v. Bogan*, no written opinion.

Lancaster County District Court, Docket 47, Page 7.

Date of Sentence: March 11, 1977.

The defendant was in the lounge of a hotel, drinking with

friends. The victim, a friend of the bartender, was advised that the defendant owed the bar some money. The victim confronted the defendant about it, and the defendant became angry, pulled out his gun, and shot the victim in the head. A witness to the shooting stated that the victim did not strike the defendant and was unarmed.

*State v. Womack*, no written opinion.

Keith County District Court, No. 6860.

Date of Sentence: December 16, 1977.

The defendant and two codefendants were on their way to Montana to live in the mountains. They had stolen guns in Texas and were involved in a series of robberies along the way. They pulled off at a truckstop, with plans to rob a trucker. One of the codefendants knocked on the driver's door, and the victim, who was sleeping inside the truck, raised up from the sleeper. The defendant shot once through the windshield and once through the driver's window. The defendant was approximately 10 feet away. They then took the victim's billfold and a CB radio.

*State v. Fort*, no written opinion.

Douglas County District Court, Docket 100, Page 423.

Date of Sentence: January 12, 1978.

The account of the murder comes from the defendant. He maintains that he met the victim approximately 10 days before the homicide. On the night in question they drove to Carter Lake, Iowa, for the purpose of smoking marijuana. While at the lake, defendant maintains, the victim suggested that they engage in homosexual activity. The defendant refused, but the victim continued to make advances. At that point the defendant removed a pistol he carried in a shoulder holster and shot the victim three times in the head. He then disposed of the body by burying it in a shallow grave near Glenwood, Missouri, and stole the victim's credit cards, which he then proceeded to use.

*State v. Price*, 202 Neb. 308, 275 N.W.2d 82 (1979).

Date of Sentence: March 20, 1978.

The victim, an infant, was pronounced dead on arrival at a hospital. She had sustained numerous injuries about her body, and the only fresh wound was a large bump on the back of her head, along with some blood coming from her left ear. The

defendant, who was living with the child's mother, was the only one with the baby at the time she allegedly fell down the stairs.

*State v. Sell*, 202 Neb. 840, 277 N.W.2d 256 (1979).

Date of Sentence: May 26, 1978.

Defendant admitted that he first hit the victim and then took her out to the country, where he killed her. He inflicted two deep puncture wounds, one in the neck and one in the right side of the chest. There were also 15 to 20 small cuts around the neck and many bruises in the vaginal area.

*State v. Barnett*, 204 Neb. 655, 284 N.W.2d 573 (1979).

Date of Sentence: February 13, 1979.

The defendant had been married to the victim for about $2^1/2$ years. During the course of this marriage, the defendant discovered that his wife had worked as a prostitute. On the evening before the murder the defendant and his wife had consumed large amounts of beer. In the late evening and early morning, they began to argue about various things, ranging from the defendant's past involvement in the military to the fact that he did not have a job. The defendant attempted to vent his anger by throwing a flowerpot. The next thing the defendant could recall was standing by a window with a gun in his hand. He had shot his wife 15 times with his .22-caliber rifle, which held 15 rounds. He attempted to revive her, but he could not because she was obviously dead. He called 911 and informed them that he had shot his wife.

*State v. Myers*, 205 Neb. 867, 290 N.W.2d 660 (1980).

Date of Sentence: June 5, 1979.

The defendant killed his father by shooting him in the head while in their home. Defendant maintained that he shot his father because his father was an alcoholic.

*State v. Thornton*, no written opinion.

Douglas County District Court, Docket 105, Page 265.

Date of Sentence: February 1, 1980.

This is apparently a companion case to *State v. Thornton*, Douglas County District Court, Docket 105, Page 263. The first case involved a life sentence for felony murder, while this one was a life sentence for second degree murder.

*State v. Wredt*, 208 Neb. 184, 302 N.W.2d 701 (1981).

Date of Sentence: May 28, 1980.

The defendant, along with his stepmother, planned to kill his father. The defendant had discussed with his stepmother who would get the insurance money and the personal property of the deceased. The plan was to make the shooting look like an accident. The defendant took his father's .45-caliber revolver and waited for him to come home. When the victim arrived, the defendant shot him once, causing the victim's death.

*State v. Branch,* 209 Neb. 279, 307 N.W.2d 512 (1981).

Date of Sentence: June 27, 1980.

The defendant and the victim had lived together for 3 years. They were arguing about credit cards and had a fight. The victim was going to hit the defendant with her shoe while the defendant was lying on the bed. Defendant reached up and grabbed her by the neck with his hand to hold her off. He held her against the wall and she choked to death.

*ᵐState v. Moore,* 209 Neb. 88, 306 N.W.2d 183 (1981).

Date of Sentence: August 15, 1980.

Defendant was a codefendant in the case of *State v. Moore,* 210 Neb. 457, 316 N.W.2d 33 (1982), and participated in the robbery and murder of an Omaha cabdriver. Defendant was 14 years old at the time.

*State v. Hardin,* 212 Neb. 774, 326 N.W.2d 38 (1982).

Date of Sentence: June 5, 1981.

Defendant and victim were husband and wife and had been separated for several months. On the evening in question defendant went to his wife's home, ostensibly to obtain some clothing which was stored there. The parties had an argument. The defendant walked back to where his car was parked, got in, and drove the car through the house, aiming at what would be the victim's bedroom. The defendant then emerged from the car, uninjured, withdrew his weapon, and fired five times. His wife later died from four bullet wounds received from the shooting.

*State v. Randall,* no written opinion.

Saunders County District Court, No. 1845.

Date of Sentence: December 10, 1981.

The defendant and two friends were hitchhiking. They obtained a ride from the victim. They later went into a bar with the victim, where they drank. They next went to the home of a

friend of the victim. At the end of the night the victim was giving the three a ride home when one of them asked him to pull over so he could relieve himself. This was part of a scheme to rob the victim. The victim stopped the car and literally fell out of the car because he was so intoxicated. One of the three punched him and kicked him until the victim was unconscious. His unconscious body was then put in the trunk of the car. Defendant drove and dropped one of the others off. The defendant and the remaining friend then proceeded to a place west of the Elkhorn River. They got out and heard the victim pounding on the trunk. The defendant hit him with his fists and then struck him over the head with a metal bar. They then robbed him, took his clothes, and threw him over the edge into a ditch creek. The victim was found dead either of asphyxia from drowning or of massive head injuries.

*State v. Davis*, no written opinion.

Saunders County District Court, No. 1846.

Date of Sentence: December 10, 1981.

This is a companion case to *State v. Randall*, and the facts are identical. John Davis was the other party involved in the murder.

*State v. Isherwood*, 213 Neb. 592, 330 N.W.2d 495 (1983).

Date of Sentence: April 23, 1982.

The defendant, then age 18, was living with a man and his 4-year-old son. Defendant was in charge of caring for the 4-year-old while the father was away at work. On the day in question she had given the child a shower and dressed him in pajamas for an afternoon nap. When the defendant later checked on the boy, he was playing with the window air-conditioner instead of sleeping. Defendant spanked the boy five or six times, whereupon the boy told her he hated her and his father. Defendant proceeded to beat the boy brutally, and then strangled him with either her hands or a television cord, or both.

*State v. Hunt*, 214 Neb. 214, 333 N.W.2d 405 (1983).

Date of Sentence: August 16, 1982.

On March 23, 1982, the defendant flew to Kansas City, Missouri, where he planned to steal an automobile and drive it to a "chop shop" in Waukegan, Illinois, where he intended to

sell it for $10,000. Upon arriving in Kansas City the defendant, over the next several days, staked out cars. On the 25th of March he abducted a cabdriver at knife-point from the Kansas City airport. The defendant ordered the cabdriver to pick up a hitchhiker, and the three of them proceeded on I-29, eventually ending up near Nebraska City, Nebraska. Defendant then stabbed the cabdriver in the back. The cabdriver fell down an embankment and began running across a creekbed. The defendant chased him, and they engaged in a struggle for the knife. The defendant then proceeded to stab the cabdriver 14 more times and slashed his throat 5 times. During all of this time, the cabdriver pleaded for his life.

*State v. Clark*, no written opinion.

Douglas County District Court, Docket 114, Page 465.

Date of Sentence: September 16, 1983.

The defendant and his brother, a codefendant, were entering a local bar. The brother noticed keys in the ignition of a truck. The brother got into the truck and began backing the truck out, when he hit another vehicle. The brother then left the scene. The victim, a part owner of the truck, learned that defendant's brother was responsible for the damage. The owner of the truck then went to the Clark home to discuss the matter. As the owner was about to leave, he attempted to shake hands with the brother, who responded by beating and kicking the owner of the vehicle. The defendant then joined in. The victim was apparently beaten into unconsciousness and his body placed in a trash dumpster, where he died of injuries sustained from the beating.

*State v. Clark*, no written opinion.

Douglas County District Court, Docket 114, Page 464.

Date of Sentence: September 16, 1983.

The facts of this companion case are identical to the facts in the preceding case of *State v. Clark*.

*State v. Crawford*, no written opinion.

Douglas County District Court, Docket 114, Page 837.

Date of Sentence: January 6, 1984.

The defendant and the victim had had a number of altercations because the victim had sexually assaulted the defendant's 17-year-old sister. On the day of the murder both

the defendant and the victim were at a large, annual gathering at Carter Lake, Iowa. There were between 4,000 and 7,000 at the park. The occasion was the Fourth of July. The defendant and the victim had a chance encounter. The two had some words, and the defendant pulled his gun out and shot the victim once in the chest and once in the leg. The victim died of the wounds.

*State v. Honeycutt*, no written opinion.
Otoe County District Court, Docket 31, Page 153.
Date of Sentence: April 24, 1984.

Although the defendant pleaded guilty to second degree murder, he refused to give any statement concerning how the murder occurred. Further investigation disclosed, however, that the defendant and the victim were friends. Apparently, the defendant needed money and beat the victim to death by hitting him a number of times in the face with a brick. When apprehended, the defendant was in possession of the victim's car and television. The body of the victim was beaten beyond recognition.

*State v. Harrington*, no written opinion.
Lancaster County District Court, Docket 65, Page 170.
Date of Sentence: August 10, 1984.

The defendant and the victim were in a car driven by a friend of the defendant. The car was pulled over to the side of the road, and the defendant and the victim got out of the car. The driver observed the defendant hit the victim with a baseball bat and saw blood splatter on the windows of the car. Defendant returned to the car with bloodstains on his person. He then pushed the body down the hill toward a creek.

*State v. Rolenc*, no written opinion.
Lancaster County District Court, Docket 64, Page 263.
Date of Sentence: January 9, 1985.

The defendant and his former wife, the victim, were involved in a dispute about the provisions in the decree of dissolution of their marriage. The defendant met with Robin Burchett and arranged to have him kill his former wife. The day of the murder, the defendant took his former wife to breakfast at a truckstop. There, the couple met Burchett and Wayne Haselhuhn, who was unknown to either defendant or the

victim. Defendant and the victim drove to the country in a car followed by the killers, who were in a second car. At a particular point the car stopped and one of the killers transferred into the back seat of the defendant's car behind the victim. He slipped a belt around her neck and choked her to death. The defendant then removed the victim's ring and took her purse. The two killers put her body in the trunk of their car, drove to a creek, and, after attaching three large pieces of concrete to the body, allowed it to sink into the water.

*State v. Moss,* no written opinion.

Hall County District Court, Docket 32, Page 37.

Date of Sentence: March 13, 1985.

The defendant, a 67-year-old man, shot and killed his grown son. He and his son had been having a disagreement for some time over a number of matters, including a matter involving defendant's wife, not the victim's mother. The defendant fired four shots into his son's head as his son lay sleeping in a trailer.

*State v. Eggers,* 220 Neb. 862, 374 N.W.2d 36 (1985).

Date of Sentence: December 21, 1985.

Defendant severely beat a minor child of his girlfriend, causing her death. He attempted to revive her and could not. When he realized she was dead, he panicked and attempted to make the death look like an accident by placing the body in a bathtub and then calling 911.

*\*State v. Suffredini,* 224 Neb. 220, 397 N.W.2d 51 (1986).

Date of Sentence: June 30, 1986.

The defendant robbed and murdered a man outside the door of the men's restroom at the rest area along Interstate 80 in Lincoln County, Nebraska. The victim was shot five times with a .22-caliber pistol. Between $180 and $240 was taken from him by the defendant.

## IV. SECOND DEGREE MURDER CONVICTIONS—TERM OF YEARS.

*State v. Taylor,* no written opinion.

Lincoln County District Court, Docket 68, Page 23.

Date of Sentence: March 21, 1974.

Sentence: 20 years.

The defendant, who had been drinking most of the day, sold his bike to buy gun shells with the intention of committing suicide. He returned home and engaged in an argument with his wife, the victim. She had hidden his gun at a neighbor's house. They both went over and retrieved the gun. Upon returning home and discussing the fact that the victim had filed for divorce, defendant shot her and then shot himself in the mouth. The bullet passed through his upper lip and only wounded him.

*State v. Hampton,* no written opinion.

Douglas County District Court, Docket 88, Page 179.

Date of Sentence: April 1, 1974.

Sentence: 10 to 20 years.

The only evidence in the case comes from the defendant himself. According to the story he tells, he was invited into the victim's home when he asked to use the phone. Once in the house, he maintains that the victim, a female, for no apparent reason shot once at him. He charged her with a knife and stabbed her three times. After she fell he ransacked the house.

*State v. Bautista,* 193 Neb. 476, 227 N.W.2d 835 (1975).

Date of Sentence: July 23, 1974.

Sentence: 20 years.

Defendant and the victim's son engaged in a fight outside a bar. After the minor disturbance the defendant left the bar to take his nephew home. He then returned to the bar some 10 to 25 minutes later, carrying a rifle. He went over to the table of the victim and asked where the victim's son was, saying, "Look what he did to me," and pointing to his face. He then said to the victim, "How would you like it if I got you here and now?" or words to that effect. The victim began to get up from his chair, and defendant shot him in the heart.

*State v. Barajas,* 195 Neb. 502, 238 N.W.2d 913 (1976).

Date of Sentence: August 13, 1975.

Sentence: 25 years.

The defendant and his girlfriend were at a bar when they met the victim. The victim was interested in the defendant's .22-caliber pistol, and the three went to try it out at a target practice site. At the victim's request they left the bar in defendant's car. On the way the victim made several advances toward defendant's girlfriend, putting his arms around her and

brushing her leg with his hand. She told defendant, who became angry, stopped the car, and ordered the victim to get out. Outside the car, an argument ensued that developed into a fight. Defendant shot and wounded the victim, and then killed him with two shots to the left cheek. Defendant then fled to Mexico, where he was later arrested and returned for trial.

*State v. Shonka*, no written opinion.

Butler County District Court, Docket 26, Page 36.

Date of Sentence: February 5, 1976.

Sentence: 10 years.

The defendant, a 33-year-old female, was married to the victim, age 63. On October 31, 1975, the defendant took her husband to Columbus, Nebraska, to work, and then went to a bar to drink. Later that evening, she went to Surprise, Nebraska, to continue drinking. Upon leaving the bar she pulled out a gun and waved it around. She felt she was being pushed around. She then apparently went back to her trailer home in Rising City, Nebraska, and shot her husband. While she does not recall the episode, she was found in the trailer with a gun. The body of her husband was found outside the trailer. Several witnesses stated that she said she should have shot the victim between the eyes.

*State v. Pigue*, no written opinion.

Douglas County District Court, Docket 94, Page 378.

Date of Sentence: July 28, 1976.

Sentence: 10 years.

The defendant returned home from work on February 13, 1976, and found that her husband (the victim) had left with her car. The victim did not return until February 18. He apparently also lived with another woman. There had been difficulties between them for several years. Prior to the 18th, the defendant had purchased a gun, and when the victim attempted to enter the house on that date, the defendant told him she would kill him if he came in, fearing that he would beat her up. When the victim entered the house, the defendant shot him three times.

*State v. Yarbrough*, 199 Neb. 41, 255 N.W.2d 874 (1977).

Date of Sentence: September 28, 1976.

Sentence: 50 years.

The defendant went to Fairbury, Nebraska, with several

friends. Once in Fairbury, they stopped at the victim's residence and had her join them. The entire group then went to a beer party at a local tavern in Fairbury. At around midnight the defendant had an argument with one of the members of the group and was taken back to the victim's residence. The victim then took the defendant to a local hotel. The two of them lay down on a bed, and the defendant strangled the victim. After killing her he then had sexual intercourse with her body. The defendant fell asleep and then, when he awoke in the morning, had intercourse again with the victim's body. When he saw blood around her face, he became scared and hitchhiked back to Lincoln, Nebraska. The victim was later discovered by the hotel employees.

*State v. Victor*, no written opinion.

Douglas County District Court, Docket 95, Page 308.

Date of Sentence: November 15, 1976.

Sentence: 20 years.

The defendant and the victim were friends and next-door neighbors. Defendant maintains that he was invited into the victim's home and asked to engage in sexual intercourse with her. When he refused, she asked whether he knew where she could get some marijuana. He again replied in the negative. At this point the defendant maintains the victim grabbed his arm and he stabbed her as he was attempting to get away.

*State v. Denney*, no written opinion.

Knox County District Court, Docket 33, Page 58.

Date of Sentence: April 7, 1977.

Sentence: 15 years.

The defendant and some friends had been drinking all day. The defendant and the victim got into a fight about Indian culture. The victim had a gun and threatened defendant. The defendant then went upstairs and got a gun, came back down, and, as the victim stood up and began to move toward the defendant, the defendant shot him once in the abdomen.

*State v. Johnson*, 200 Neb. 760, 266 N.W.2d 193 (1978).

Date of Sentence: June 30, 1977.

Sentence: 20 years.

The defendant and a friend spent several hours drinking beer and driving around York, Nebraska. They encountered

defendant's younger sister and her friends and offered them a ride home. In the car on the way home, the defendant offered alcohol to one of the minor girls. Once home, the defendant's mother reprimanded him for offering alcohol to a juvenile. An argument followed, in which both parties slapped each other in the face. Defendant's mother reported the matter to his brother, who notified the police after hearing shots while on the phone talking to his mother. Defendant had grabbed a gun, ran outside toward a local church, and fired five shots through the living room window. Defendant's mother phoned the police after defendant was seen by her to be in the area of the church. The victim, a police officer, went to the church parking lot across the street. Shortly after he stepped out of his car, the defendant shot him once in the chest, causing his death.

*State v. Brick*, no written opinion.
Cheyenne County District Court, No. 9179.
Date of Sentence: September 20, 1977.
Sentence: 40 years.

This is a companion case to *State v. Simpson,* 200 Neb. 823, 265 N.W.2d 681 (1978), in which a life sentence for first degree murder was imposed. The defendant, her child, and her brother decided to hitchhike to California because they had no money. They got a ride with a trucker, who gave them $20. In addition, they stole a gun belonging to the trucker. The three then got another ride, this time with the victim, who offered to take them all the way to California. Along the way, the defendant and her brother determined to rob the victim and take his car. On a signal from her brother, the defendant pulled out the gun they had stolen and placed it against the victim's head. She ordered him to stop, but he resisted. She shot him in the back of the head twice, which caused the victim to be paralyzed but not dead. The defendant and her brother then pulled the body into a borrow pit off of Interstate 80 near Kimball, Nebraska. The defendant's brother shot the victim two more times, and then the two left for California.

*State v. Hander*, no written opinion.
Cedar County District Court, No. 6528.
Date of Sentence: November 17, 1977.
Sentence: 15 years.

Defendant and his wife separated, and a mutual friend of the parties moved in with the wife. Defendant became angry and ordered him out. The two scuffled, and defendant said to the victim that if the victim did not move out he, the defendant, would kill him. Later, the defendant saw his wife with the victim and became angry. He obtained a .22-caliber rifle and followed the victim. When the victim parked his automobile and got out of the car, the defendant shot and killed him. Defendant maintained he thought the victim was going for a weapon.

*State v. Forster*, no written opinion.

Platte County District Court, No. 2820.

Date of Sentence: December 8, 1977.

Sentence: 35 years.

This is a companion case to *State v. Roewert,* Platte County District Court, No. 2805, in which a life sentence for first degree murder was imposed. The defendant and some friends were drinking at a bar in Norfolk, Nebraska, and planned to rob and kill the victim. They determined they would kill the victim so as not to be identified. The victim was lured out of the bar by inviting him to a party. They drove him out to a country road, where they took his billfold. While the victim was passed out from being intoxicated, Roewert cut his throat and then decapitated him. He then disemboweled the body, rolled it over, and cut it about the back. The defendant willingly participated in the robbery and later disposed of the wallet in a trash receptacle.

*State v. Brown*, 201 Neb. 536, 270 N.W.2d 318 (1978).

Platte County District Court, No. 3839.

Date of Sentence: December 9, 1977.

Sentence: 35 years.

The individual here was involved in the same case as *State v. Roewert* and *State v. Forster*.

*State v. Denman*, no written opinion.

Keith County District Court, No. 6886.

Date of Sentence: February 10, 1978.

Sentence: 25 years.

This is the same fact situation as is involved in *State v. Womack*, Keith County District Court, No. 6860, in which a life sentence for second degree murder was imposed.

*State v. Stofer*, no written opinion.
Saline County District Court, No. 1058.
Date of Sentence: March 6, 1978.
Sentence: 40 years.

The defendant, who had been drinking, returned home, picked up a gun, and shot and killed his mother while she was in bed sleeping.

*State v. Epp*, no written opinion.
Gage County District Court, No. J-70.
Date of Sentence: June 8, 1978.
Sentence: 50 years.

The victim, who owned a liquor store and lived close to it, one night heard his security alarm go off. He took a shotgun and went to investigate. Defendant was there and had gone up to the door of the liquor store to rob it, but the door was locked. Defendant shot the victim once, after the victim inquired what the defendant was doing there and told defendant to leave. After the shooting the defendant drove away in his car.

*State v. Coleman*, no written opinion.
Douglas County District Court, Docket 102, Page 250.
Date of Sentence: July 25, 1978.
Sentence: 20 years.

The defendant and the victim argued over some money that the defendant owed the victim. The victim then went to a phone in the tavern where the argument took place and, when he returned, told the defendant that he had called for help. Defendant had had trouble with the individuals the victim had called, so he left. He later went over to the victim's home to talk it over. He took his nephew with him. They had a 12-gauge shotgun and a .38-caliber revolver. When the defendant confronted the victim, a second argument ensued, and, subsequently, the shotgun went off, killing the victim.

*State v. Marteney*, 210 Neb. 172, 313 N.W.2d 449 (1981).
Date of Sentence: March 23, 1979.
Sentence: 12 years.

The victim entered a local bar in DuBois, Nebraska, and went behind the bar to get a glass of water. Shortly after the victim entered the bar, the defendant entered, carrying a rifle. The defendant walked near to where the victim was standing

and mentioned something about leaving his daughter-in-law alone. Apparently, the defendant believed that the victim was having an affair with his daughter-in-law. He then raised the rifle and shot the victim in the chest.

*State v. Samuels*, 205 Neb. 585, 289 N.W.2d 183 (1980).

Date of Sentence: April 5, 1979.

Sentence: 13 years.

According to the statement given by the defendant, the victim had taken money from the defendant's friend. The defendant went to see the victim, and the victim pulled a gun on the defendant. Defendant was alongside the victim's car when he shot the victim three times, and then ran from the scene because he was scared.

*State v. Morris*, no written opinion.

Douglas County District Court, Docket 106, Page 203.

Date of Sentence: January 9, 1980.

Sentence: 20 years.

The defendant, who had been drinking heavily and who had just lost his job of 22 years as a baker, shot and killed his second wife, who had filed for divorce.

*State v. Paulson*, 211 Neb. 711, 320 N.W.2d 115 (1982).

Date of Sentence: June 3, 1980.

Sentence: 15 years.

The defendant and several others were members of a social "family." A codefendant was told that if he wanted to get in good with the family he would have to kill the victim, another member of the family, or he would be killed. Defendant was apparently one of the organizers of the plan. On the night of the murder a party was held at the home of one of the family members. Upon signal the codefendant shot the victim. The body was thrown into a creekbed in Iowa, where it was found a week later.

*State v. Stranghoener*, 208 Neb. 598, 304 N.W.2d 679 (1981).

Date of Sentence: June 3, 1980.

Sentence: 20 years.

This is a companion case to *State v. Paulson*, 211 Neb. 711, 320 N.W.2d 115 (1982). Defendant here was a member of the "family" and one of the organizers of the murder.

*State v. Green*, no written opinion.

Buffalo County District Court, No. 6177.

Date of Sentence: July 25, 1980.

Sentence: 25 years.

The defendant and his wife, the victim, were separated. After the wife filed for a divorce, the couple attempted several counseling sessions, which failed. On the day of the crime the defendant visited his wife at their home to discuss the payment of certain bills. Defendant asked to use the bathroom. He came out of the bathroom, went to the kitchen, got a drink of water at the sink, and shot his wife three times.

*State v. Herren*, no written opinion.

Scotts Bluff County District Court, No. 28207.

Date of Sentence: September 26, 1980.

Sentence: 35 years.

The defendant, after drinking heavily and using cocaine, LSD, and barbiturates, attacked his girlfriend and stabbed her a number of times. She lived only by feigning death. Upon leaving the girlfriend's apartment defendant went to the home of an alcohol and drug detoxification program leader who had been involved in aiding the defendant. The leader was killed by reason of multiple stab wounds inflicted by the defendant, including several after death.

*State v. Jackson*, no written opinion.

Douglas County District Court, Docket 107, Page 500.

Date of Sentence: November 21, 1980.

Sentence: 25 years.

Defendant and the victim were involved in an altercation on a public street, each being in his respective automobile. The victim refused to yield the right-of-way to the defendant, and also delivered racial remarks. At a stop light the victim got out of his car and walked over to the defendant's car. The defendant got his gun from under his seat and shot the victim three times.

*State v. Payne*, no written opinion.

Dodge County District Court, Docket 71, Page 169.

Date of Sentence: November 24, 1980.

Sentence: 17 years.

The defendant and the victim lived in the same trailer park. The victim was a drug dealer. There were apparent ill feelings between the two. The defendant took a record book of drug

sales and some money from the victim's trailer and may have been returning them when the murder occurred.

*State v. Stocker*, no written opinion.

Douglas County District Court, Docket 109, Page 62.

Date of Sentence: February 27, 1981.

Sentence: 12 years.

The victim in this case was a neighbor of the defendant. He was an auto mechanic and towed junk cars to the street in front of both homes. The victim then worked on the cars, often into the late hours of the evening. Friction arose between the defendant and the victim over the cars that were left on the street. Defendant made repeated calls to the Omaha Police Department, but the situation went on unresolved. On the day in question the defendant, who had been drinking at a bar, came home to find the victim outside working on a car. It was late, so the defendant asked the victim to shut off the lights and cease working. The victim responded with vulgar language and continued working. Defendant retrieved his gun from his house and pulled the trigger twice, but there was no discharge. He injected another shell and shot the victim once from a distance of 15 to 20 feet.

*State v. Kemp*, no written opinion.

Douglas County District Court, Docket 109, Page 441.

Date of Sentence: September 29, 1981.

Sentence: 25 years.

On February 22, 1981, the Omaha Police Department received a call from defendant, at which time defendant advised the police that he had shot his girlfriend. The police were directed to the scene and found the victim shot three times in the head with a .22-caliber pistol. She died the following day.

*State v. Brown*, 213 Neb. 68, 327 N.W.2d 107 (1982).

Date of Sentence: December 14, 1981.

Sentence: 25 years.

Defendant maintained that he and the victim had an argument and that the victim pulled out a knife. Defendant claims that he retreated out of the building where the argument began but that the victim pressed on. Finally, the defendant said he pulled a revolver from his pocket, fired a warning shot into the ground, and when that did no good, he fired approximately

five more shots into the victim. When the victim was found, the knife was beside the victim, but was closed. There was contrary evidence indicating that the victim never opened the knife.

*State v. Harton*, no written opinion.
Lancaster County District Court, Docket 59, Page 5.
Date of Sentence: March 31, 1982.
Sentence: 35 years.

The defendant and the victim were both residents of a city mission in Lincoln, Nebraska. Defendant, after a day of drinking, returned to the mission. He remembered that he had loaned a radio to the victim and went to the victim's room to retrieve the radio. The victim maintained that he did not have the radio. The two got into a quarrel and began fighting, pulling out knives. The defendant eventually stabbed and killed the victim.

*State v. Rowe*, 214 Neb. 685, 335 N.W.2d 309 (1983).
Date of Sentence: July 29, 1982.
Sentence: 25 years.

The defendant murdered his wife. The body was discovered by firefighters who were called to the scene by neighbors who reported a fire at the defendant's residence. The body was found partially burned and wrapped in blankets in one of the second floor bedrooms. The autopsy report revealed that one of the victim's breasts had been removed and that there was an incision in the trunk of the victim extending from below the breastbone to the pubic area and into the vagina and the rectum. The victim also had suffered a depressed skull fracture and broken ribs.

*State v. Rife*, 215 Neb. 132, 337 N.W.2d 724 (1983).
Date of Sentence: August 19, 1982.
Sentence: 30 years.

The defendant and victim were coworkers at a motel. Defendant entered the victim's apartment and asked if she wanted to "mess around." The victim started playing with the buttons on defendant's shirt, and when defendant started to unbutton victim's blouse, she said, "No, I don't want to." Defendant took a pottery vase and hit her about the head and face three or four times. He then struck her once with a mug. He went to the kitchen for a butcher knife and cut her throat.

*State v. Rush*, no written opinion.

Douglas County District Court, Docket 114, Page 115.

Date of Sentence: February 16, 1983.

Sentence: 15 years.

Defendant shot and killed his wife during a fight over an alarm clock.

*State v. Klinginsmith*, no written opinion.

Hall County District Court, Docket 31, Page 201.

Date of Sentence: May 12, 1983.

Sentence: 50 years.

The defendant killed his former wife. On the night of the murder he was sitting with his children. When his former wife returned home, a struggle ensued over a gun which the defendant had in his possession. Following the struggle, his ex-wife succeeded in getting the gun away from him and informed him that she was leaving. The defendant then obtained a knife from the house and tried to get the gun back. A second struggle ensued, which culminated in the defendant's shooting his ex-wife with the handgun.

*State v. Jones*, no written opinion.

Douglas County District Court, Docket 115, Page 509.

Date of Sentence: June 8, 1984.

Sentence: 12 years.

The defendant killed the victim, who was dating his former girlfriend. The killing was accomplished with a knife.

*State v. Voskamp*, no written opinion.

Saunders County District Court, Docket 7, Page 231.

Date of Sentence: July 30, 1984.

Sentence: 15 years.

The victim had moved in with the defendant's wife while the defendant was away driving an over-the-road truck. Upon return from his trip the defendant found the defendant's belongings in his car with a note from his wife. It told him not to return because she was seeking a divorce. The defendant took a gun and went to his wife's house. He kicked in the back door, and when the victim came running at him, the defendant shot twice, killing the victim.

*State v. Valerio*, no written opinion.

Banner County District Court, No. 1164.

Date of Sentence: October 18, 1984.

Sentence: 35 years.

The victim was engaged in a fight with the defendant. During the fight, the defendant cut the victim's face with his knife and apparently held him hostage. Later, the victim was taken out into the country, where he was tied up with baling twine and a gunnysack placed over his head. He was then placed in the back of a pickup truck with the defendant. At this point the defendant and possibly some of the others stabbed the victim to death. There were 18 stab wounds in all.

## V. CASES INVOLVING CHARGES OF MANSLAUGHTER OR LESS.

*State v. Jackson*, Dakota County District Court, No. 8803. Date of Sentence: October 12, 1973. Sentence: 10 years for manslaughter.

*State v. Andersen*, Dawson County District Court, Docket 45, Page 296. Date of Sentence: October 26, 1973. Sentence: 3 to 9 years for manslaughter.

*State v. Ralls*, Lancaster County District Court, Docket 37, Page 125. Date of Sentence: February 5, 1974. Sentence: 3 to 8 years for manslaughter.

*State v. Long*, Dakota County District Court, No. 8934. Date of Sentence: March 25, 1974. Sentence: 2 to 7 years for manslaughter.

*State v. Kinghorn*, Douglas County District Court, Docket 90, Page 318. Date of Sentence: February 10, 1975. Sentence: 3 years' probation for manslaughter.

*State v. Johnson*, Douglas County District Court, Docket 89, Page 664. Date of Sentence: July 21, 1975. Sentence: Youth Development Center during minority.

*State v. Sherman*, Fillmore County District Court, No. 7726. Date of Sentence: November 4, 1975. Sentence: 10 years for manslaughter.

*State v. Abbott*, Richardson County District Court, Docket 6, Page 75. Date of Sentence: May 6, 1976. Sentence: 2 to 10 years for manslaughter.

*State v. Rice*, Lancaster County District Court, Docket 45, Page 121. Date of Sentence: September 23, 1976. Sentence: 2

years for manslaughter.

*State v. Honorable*, Douglas County District Court, Docket 95, Page 317. Date of Sentence: October 19, 1976. Sentence: 10 years for manslaughter.

*State v. Ralls*, Lancaster County District Court, Docket 47, Page 1. Date of Sentence: May 23, 1977. Sentence: 10 years for manslaughter.

*State v. McGaughey*, Keith County District Court, No. 6850. Date of Sentence: October 28, 1977. Sentence: 5 years for manslaughter.

*State v. Lashley*, Douglas County District Court, Docket 100, Page 276. Date of Sentence: February 2, 1978. Sentence: 1 year for manslaughter.

*State v. Wright*, Sarpy County District Court, Docket 30, Page 293. Date of Sentence: March 6, 1978. Sentence: 5 years' probation for manslaughter.

*State v. Welsh*, Lancaster County District Court, Docket 48, Page 86. Date of Sentence: March 20, 1978. Sentence: 10 years for manslaughter.

*State v. Williams*, Douglas County District Court, Docket 101, Page 246. Date of Sentence: May 12, 1978. Sentence: 2 to 4 years for manslaughter.

*State v. Coleman*, Douglas County District Court, Docket 102, Page 251. Date of Sentence: July 25, 1978. Sentence: 10 years for manslaughter.

*State v. Denbo*, Chase County District Court, No. 4121. Date of Sentence: August 2, 1978. Sentence: 18 months to 4 years for manslaughter.

*State v. Ellis,* Lancaster County District Court, Docket 52, Page 6. Date of Sentence: August 24, 1979. Sentence: 10 years for manslaughter.

*State v. Meegan*, Sarpy County District Court, Docket 38, Page 148. Date of Sentence: June 2, 1980. Sentence: 18 months to 5 years for accessory to a felony.

*State v. Thomas*, Sarpy County District Court, Docket 38, Page 147. Date of Sentence: June 2, 1980. Sentence: 15 months to 4 years for accessory to a felony.

*State v. Leander*, Sarpy County District Court, Docket 38, Page 151. Date of Sentence: June 3, 1980. Sentence: 5 to 15

years for conspiracy to commit first degree murder.

*State v. Schommer,* Fillmore County District Court, No. 8001. Date of Sentence: October 7, 1980. Sentence: 20 years for manslaughter.

*State v. Warford,* Gage County District Court, No. J-171. Date of Sentence: March 5, 1981. Sentence: 6 to 12 years for manslaughter.

*State v. Ihm,* Lancaster County District Court, Docket 56, Page 160. Date of Sentence: May 1, 1981. Sentence: 5 years' probation for manslaughter.

*State v. Gilbert,* Hamilton County District Court, No. 7812. Date of Sentence: May 29, 1981. Sentence: 10 years for manslaughter.

*State v. Rath,* Douglas County District Court, Docket 110, Page 213. Date of Sentence: January 25, 1982. Sentence: 6 $^2$/$_3$ to 20 years for manslaughter.

*State v. Beverly,* Douglas County District Court, Docket 112, Page 64. Date of Sentence: May 4, 1982. Sentence: 6 to 20 years for manslaughter.

*State v. Alexander,* Lancaster County District Court, Docket 58, Page 128. Date of Sentence: November 17, 1982. Sentence: 6 years 8 months to 20 years for manslaughter.

*State v. Armour,* Douglas County District Court, Docket 115, Page 677. Date of Sentence: June 19, 1984. Sentence: 4 to 7 years for manslaughter.

*State v. Carr,* Douglas County District Court, Docket 114, Page 787. Date of Sentence: June 29, 1984. Sentence: 1 year for accessory to a felony.

*State v. Denby,* Lancaster County District Court, Docket 66, Page 284. Date of Sentence: December 17, 1985. Sentence: 6 years 8 months to 20 years for manslaughter.